Brian S. King, #4610
**BRIAN S. KING, PC**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| TODD R., SUZANNE R., and LILLIAN R.<br><br>    Plaintiffs,<br><br>vs.<br><br>PREMERA BLUE CROSS BLUE SHIELD OF ALASKA,<br><br>    Defendant. | COMPLAINT<br><br> Civil No. 1:17-cv-00058 BCW |

        Plaintiffs Todd R. ("Todd"), Suzanne R. ("Suzanne") and Lillian R. ("Lillian"), through their

undersigned counsel, complain and allege against Defendant Premera Blue Cross Blue Shield of Alaska

("PBC") as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Todd, Suzanne, and Lillian[1] are natural persons residing in the Matanuska-Susitna

        Borough, Alaska.  Todd and Suzanne are Lillian's parents.

---

[1] Lillian was formerly known as Jonathan R. and is referred to as "Jon" or "Jonathan" throughout the medical records associated with the claim at issue in this case.   In order to consistently and accurately discuss the time frame at issue in this case, Plaintiffs will refer to "Jon" in their pleadings.

2.      Todd is the owner of a company that provides a number of benefits for its employees including, but not limited to, a group health benefits plan ("the Plan").  Todd is a participant in the Plan and Suzanne and Lillian are beneficiaries of the Plan.

3.      PBC is an insurance company and is the insurer for the Plan.

4.      PBC does business in Utah through Regence BlueCross BlueShield of Utah ("Regence"), the local Blue Cross Blue Shield affiliate.  PBC utilized a preferred provider contract between the health care provider and Regence when paying benefits for the medical care at issue in this case.

5.      The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 et. seq., of the Employee Retirement Income Security Act of 1974 ("ERISA").

6.      Jon received medical care and treatment at Island View Residential Treatment Center ("IVRTC"), a residential treatment facility in Davis County, State of Utah.  IVRTC (now known as Elevations) is a licensed and accredited health care provider in the State of Utah and provides residential treatment for adolescents with mental health conditions.

7.      This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8.      Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the medical treatment at issue in this case was provided in the State of Utah, the Defendants do business in the State of Utah, and Todd and Suzanne's financial obligations to Jon's healthcare providers were incurred in the State of Utah.  In addition, in light of the sensitive nature of the treatment provided to Jon, it is the Plaintiffs' wish to bring the case in Utah to protect Jon/Lillian's identity.  Based on ERISA's nationwide service of process provision and 28 U.S.C. §1391, venue is appropriate in the State of Utah.

9.    The remedies the Plaintiffs seek under the terms of ERISA, the terms of the Plan, and

pursuant to 29 U.S.C. §1132(a)(1)(B), are for the benefits due her for Jon's medical

care, for an award of prejudgment interest pursuant to U.C.A. §15-1-1, and for an

award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

**Background Facts**

10.    Jon was a full term baby and developed normally.  He was in the gifted program at

his school and was happy and well-liked.  He was a gifted artist.

11.    When he was eleven years old, Jon went to summer camp and returned exhausted and

experiencing constant headaches.  He was ultimately diagnosed with mononucleosis

and his symptoms resolved.

12.    A couple of months later, Jon had the flue and an infection.  His chronic daily

headaches returned.

13.    Jon was seen and evaluated by numerous doctors without successful resolution of his

symptoms.  Todd and Suzanne took Jon to Seattle for evaluation at the Children's

Hospital where he had a number of biofeedback sessions.

14.    Jon became anxious and depressed and withdrew from his friends.  Over the next

months, there were several trips to Seattle but no diagnosis or treatment were found.

Jon's condition deteriorated and he became frustrated and angry.

15.    A nerve block was tried for Jon and he had a very bad reaction to the anesthetic.  In

spite of the fact that he was uncontrollably vomiting, hospital staff insisted on

completing the procedure.   Jon was so upset and traumatized by this experience that

he began experiencing auditory and visual hallucinations.  He was terrified.

16.     Jon was diagnosed with post-traumatic stress disorder and began taking Sertraline, a psychiatric medication.  His symptoms gradually abated but the headaches, while less intense, continued.

17.     In 2012, when Jon was 14, he was evaluated at the Cleveland Clinic's Pediatric Pain Clinic.  He was inpatient for two weeks and outpatient for one week.  A doctor there said that he believed the headaches were related to tension.

18.     Sometime soon thereafter, Jon and a friend bumped their heads together accidentally, resulting in much more severe headaches for Jon.  He went to the emergency room for treatment.

19.     Jon's anxiety and depression continued to worsen.  His great aunt died in an aircraft accident and just a few months later, Jon's younger sister was diagnosed with Wilm's Tumor, a cancer condition requiring radiation and chemotherapy.  Jon was completely overwhelmed and became more and more isolated.

20.     The one exception to Jon's isolation was his girlfriend.  If he could not be with her or talk to her constantly, he would cry inconsolably.

21.     Jonathan ran away from home and it took two days for the police and his family to find him.

22.     Jon was becoming more actively hostile and defiant and injured Suzanne's arm when he threw a phone at her.

23.     Jon ran away again.  After he was located at his girlfriend's home and brought home, he continued to be hostile and defiant.  He told his girlfriend that he was going to hurt himself and Todd and Suzanne took him to the hospital.

24.     Suzanne was closely watching Jon day and night to ensure that he didn't do anything
        to himself.  She discovered that he was cutting himself on his arms.

25.     Jon began dressing in girls' clothing and insisted that he was transgender.

26.     After Jon refused to go on a family vacation, Suzanne and her daughters went on the
        trip and Todd stayed home with Jon.  Todd took Jon to the hospital for an evaluation.
        The hospital recommended admission to Providence's Crisis Recovery Center.  When
        asked why he needed to go, Jon said it was because his parents would not accept him.

27.     Jon continued to refuse treatment and medication.  At one point, he jumped out of the
        car in traffic.

28.     Jon was transported by an escort company to Utah and was admitted at IVRTC on
        December 31, 2013.

29.     Jon's initial diagnoses were:

        AXIS I: Post Traumatic Stress Disorder; Major Depressive Disorder, Recurrent,
        Moderate (in the past, severe with possible psychotic features), Parent Child
        Relational Problem; Academic Problem; Rule out Eating Disorder, NOS
        (restrictive type); Rule out Anxiety Disorder (possible OCD symptoms prior to
        medical illness onset)

        AXIS II: No diagnosis

        AXIS III: New Daily Persistent Headache (previously diagnosed as tension
        headaches) with unreliable pain control history; intermittent pattern of appetite
        restriction with a goal to lose weight (currently noted to be of slim build already)

        AXIS IV: Significant family stressors, including interplay of sibling illness
        (cancer) with Jonathon's recurrent headaches, which are improved but not
        resolved, decline in academic standing, enmeshment with girlfriend and
        associated gender identity diffusion

        AXIS V: Current GAF: 36[2] Previous Year GAF: 40

---

[2] G.A.F., or global assessment of functioning, was developed as a tool for mental healthcare providers to assess the
overall level of function and ability to carry out activities of daily living for their patients.  There is a separate scale
utilized when the patient is a child or an adolescent as opposed to an adult.  A GAF of 36 on the child's global

30.     Jon was extremely resistant to treatment and it took quite some time for his therapists to find interventions that were helpful for him.  However, ultimately he progressed at IVRTC and was discharged to a therapeutic boarding school for additional treatment on June 21, 2015.

31.     Claims were submitted to PBC for coverage of Jon's medical expenses but PBC denial the claims for treatment after April 30, 2014 on the basis that Jon's conditions did not meet Milliman Care Guidelines("MCG")  for residential treatment after that date.  The date of PBC's denial is November 18, 2014.

32.     Todd and Suzanne appealed the denial on May 13, 2015, and argued that the MCG were not available to them, but based on PBC's citations to the MCG, those guidelines were not reflective of generally accepted standards of care, a requirement of the Plan.

33.     They provided a detailed chronology of Jon's deterioration and argued that, based on standards of care, his residential treatment was necessary.

34.     PBC upheld its denial on June 16, 2015, asserting that appeals for treatment provided between May 1, 2014 and August 31, 2014 were untimely because they were not submitted within 180 days of the denial of coverage.  PBC's letter stated that the claims had been processed on December 5, 2014.

35.     There are 159 days between December 5, 2014, the date the claims were processed and denied, and May 13, 2015, when Todd and Suzanne appealed the denial.

---

assessment scale indicates: "Major impairment in functioning in several areas and unable to function in one of these areas, i.e. disturbed at home, at school, with peers, or in the society at large, e.g., persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent.  Such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category." in Psychiatric Measures, APA, Washington DC, 2000

36.  As for treatment provided after August 31, 2014, PBC again asserted that Jon's conditions did not meet the MCG for residential treatment.

37.  Jon and Suzanne appealed again on August 10, 2015 and PBC maintained its denial on September 10, 2015.  PBC asserted that the claim had been reviewed by a medical director board certified in internal medicine, a "member contracts operations manager," and a "new group and product implementation manager."

38.  Todd and Suzanne requested an external review on December 18, 2015 and the external reviewer, "mcmc," upheld PBC's denial, asserting that there were other, less intensive levels of care that would have been appropriate for Jon.

39.  Todd and Suzanne exhausted their appeal obligations under the terms of the Plan and ERISA.

40.  PBC's denial has harmed the Plaintiffs in that they have been required to pay out-of-pocket for Jon's treatment in an amount exceeding $160,000.

**CAUSE OF ACTION CAUSE OF ACTION**
**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

1.  ERISA imposes higher-than-marketplace quality standards on insurers.  It sets forth a special standard of care upon a plan fiduciaries such as PBC, acting as agent and insurer of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan.  29 U.S.C. §1104(a)(1).

2.  ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1133(2).

3.  PBC breached its fiduciary duties to the Plaintiffs when it failed to comply with its obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the Plaintiffs'

interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of the Plaintiffs' claims.

4. The actions of PBC in failing to provide coverage for Jon's medically necessary treatment at IVRTC are a violation of the terms of the Plan and generally accepted standards of care.

5. The actions of PBC, in failing to identify the first reviewer(s) and in failing to have qualified clinical practitioners review the final claim, are violations of ERISA and its claims processing regulations.

6. The actions of PBC, as outlined above, have caused damage to the Plaintiffs in the form of denial of payment for medical services rendered to Jon in an amount exceeding $160,000.

7. PBC is responsible to pay Jon's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the amount of $161,381, the total amount that is owed for Jon's medically necessary treatment at IVRTC under the terms of the Plan and the preferred provider contract between Regence and IVRTC, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this ___ day of April, 2017.

/s/ Brian S. King
Brian S. King

Attorney for Plaintiffs

Plaintiffs' Address:
Borough of Anchorage, Alaska