THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

TODD R., SUZANNE R., and LILLIAN R.,

    Plaintiffs,

v.

PREMERA BLUE CROSS BLUE SHIELD
OF ALASKA,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 2:17-cv-01041-JLR

**PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

**NOTING DATE: October 12, 2018
ORAL ARGUMENT REQUESTED**

Plaintiffs Todd R. ("Todd"), Suzanne R. ("Suzanne"), and Lillian R. ("Lillian")

(collectively, "Plaintiffs"), through their undersigned counsel and pursuant to Fed. R. Civ. P. 56,

and LCR 7, submit the following Motion for Summary Judgment against Premera Blue Cross

Blue Shield of Alaska ("Premera").

In this ERISA case, a copy of the pre-litigation record ("Record") has been filed under

seal with the Court clerk. The Record consists of documents Bates stamped JR_000001 through

JR_011756, and will be referred to as Rec 00001 through Rec 11756.

**INTRODUCTION**

Todd and Suzanne struggled for years to treat effectively their child's emotional and

mental disorders. When they had exhausted all other alternatives for dealing with their child's

problems, they felt they had no other options but to seek treatment in Utah at a residential

treatment center. Their physicians and other medical professionals agreed that this was the best,

most necessary and appropriate course of action. But when they presented their claims for

payment, their health insurer refused to pay the bills.

1    Premera, the family's health insurer, failed to properly identify the medical necessity

2  criteria against which their child's treatment should be evaluated to determine if coverage existed

3  under the terms of the ERISA plan that provided coverage for Todd and Suzanne and their

4  family. Premera also failed to take into account all the information in the medical records, the

5  voluminous information and arguments presented to them by Todd and Suzanne as to why the

6  residential treatment should be covered, and the recommendations and opinions of the

7  professionals who knew the needs of their child the best: the treatment team members providing

8  the care both before and during the residential treatment period. Because Premera wrongly

9  denied coverage for medically necessary treatment, its denial of payment should be reversed and

10  Todd and Suzanne should be reimbursed what they have paid for their child's care.

11                **PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

12  1.    Todd, Suzanne, and Lillian are natural persons residing in the Matanuska-Susitna

13        Borough, Alaska. Todd and Suzanne are Lillian's parents. Complaint, ¶ 1 [docket #2];

14        Answer ¶ 1 [docket #27]. Lillian was formerly known as Jonathan R. and is referred to as

15        "Jon" or "Jonathan" in her medical records relating to this claim. Considering the time

16        frame at issue, Plaintiffs will refer to "Jon" in this motion.

17  2.    Todd owns a company that provides welfare benefits for its employees including a fully

18        insured group health benefit plan ("the Plan"). Todd is the participant, and Suzanne and

19        Lillian are beneficiaries, in the Plan. Complaint, ¶ 2 and 3; Answer ¶ 2 and 3.

20  3.    Jon was treated for his mental health conditions at Elevations Residential Treatment

21        Center ("Elevations"), previously known as Island View Residential Treatment Center.

22        Rec 00023.

23                              **The Terms of the Plan**

24  4.    The Record includes Premera's Benefit Booklet ("SPD") describing benefits under the

25        Plan. Rec 02371-02386.

26  5.    The Plan covers medically necessary services and defines those services as:

27              Services and supplies that a doctor, exercising prudent clinical judgment, would

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

use with a patient to prevent, evaluate, diagnose or treat an illness, injury, disease or its symptoms. These services must:

- Agree with generally accepted standards of medical practice
- Be clinically appropriate in type, frequency, extent, site and duration. They must also be considered    effective for the patient's illness, injury or disease.
- Not be mostly for the convenience of the patient, doctor, or other health care provider. They do not cost more    than another service or series of services that are at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of that patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature. This published evidence is recognized by the relevant medical community, physician specialty society recommendations and the views of doctors practicing in relevant clinical areas and any other relevant factors.

Rec 2382.

6.     The Plan provides mental health benefits and covers treatment at a residential treatment facility. Rec 02374.

7.     In case of an adverse benefit determination, the Plan offers two levels of internal appeals. Rec 02384.

8.     After the internal appeals are exhausted and a member is not satisfied with the final internal adverse benefit determination, the Plan offers an external review option. Rec 02385-86.

9.     The Plan's criteria for discharge from residential treatment state the following:

"Continued residential care is generally needed until 1 or more of the following . . . :

➢ Residential care no longer necessary due to adequate patient stabilization or

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -     3
Case No. 2:17-cv-01041-JLR

The Wood Law Firm, PLLC
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

improvement as indicated by **ALL** of the following . . . :

- Risk status acceptable as indicated by **ALL** of the following:

  - Patient has not recently made a Suicide attempt or act of serious self Harm , [sic] or has had Sufficient relief of precipitants of any such action.

  - Absence of Current plan for suicide or serious self Harm for at least 24 hours.

  - Thoughts of suicide , [sic] homicide, or serious Harm to self or to another are absent or manageable at available lower level of care.

  - Patient and supports understand followup treatment and crisis plan.

  - Provider and supports are sufficiently available at lower level of care.

  - Patient can participate (eg, verify absence of plan for harm) in needed monitoring.

- Functional status acceptable as indicated by 1 or **more** of the following:

  - No essential function . . . is significantly impaired.

  - An essential function is impaired, but impairment is manageable at available lower level of care.

- Medical needs manageable as indicated by **ALL** of the following:

  - Adverse medication effects absent or manageable at available lower level of care.

  - Medical comorbidity absent or manageable at available lower level of care.

  - Substance withdrawal absent or manageable at available lower level of care.

♦ Residential care no longer appropriate due to patient progress record or consent as indicated by 1 or **more** of the following:

  - Patient deterioration requires higher level of care.

  - Patient or guardian no longer consents to treatment.

1      Rec 00195-196 (emphasis in original).

2                           **Jon's Background and Treatment History**

3   10.     Jon was a healthy and active child, academically and artistically gifted. Rec 02461.

4   11.     Jon's health troubles began in the summer of 2009, when he returned from a summer

5            camp complaining of constant headaches. *Id*.

6   12.     After Jon was diagnosed with and treated for mononucleosis, his headaches subsided

7            only to return in October of the same year when Jon contracted a flu followed by a

8            secondary infection. *Id*.

9   13.     The family physician suggested to Todd and Suzanne to take Jon to Seattle Children's

10           Hospital for treatment of his persistent headaches, as any of the treatments he has been

11           receiving were not effective. Rec 02462.

12   14.     At Seattle Children's Hospital, Dr. Heidi Blume diagnosed Jon with chronic daily

13           headaches and referred him for further assessment, as the medications she prescribed

14           were not effective either in alleviating Jon's pain.  Rec 00380, Rec 00312.

15   15.     Jon's persistent headaches greatly impacted his daily functioning; he became withdrawn

16           and irritable, developed extreme sensitivity to noise and light, had difficulty

17           concentrating, falling asleep, and even struggled with simple activities such as brushing

18           his teeth or bathing. Rec 02462, Rec 00312-313.

19   16.     Dr. Blume recommended that Jon continue treatment with Dr. Kathleen McGin Larken, a

20           pain specialist, who prescribed nerve injection procedure. Rec 02462, Rec 00310.

21   17.     The nerve block procedure provided no relief for Jon, and he came out of it

22           psychologically traumatized after experiencing an adverse reaction to nitrous oxide that

23           was administered for sedation. Rec 02462, Rec 09778.

24   18.     Jon reported vomiting during the procedure and "that he was really scared [] when he

25           began to have dry heaves and [the medical team] stopped for a minute" but continued

26           soon putting back the mask on his face. Jon stated that he felt like he was dying, "as he

27           was restrained and held against his will for the procedure." *Id*., Rec 00387.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

19.  Jon began reliving the emotions experienced during the nerve block procedure, and his symptoms became worse within the next couple of weeks. Jon could not fall asleep until he collapsed from exhaustion; he had a constant ringing in his ears, and began having auditory and visual hallucinations. Rec 02462.

20.  On February 8, 2011, almost three months after the nerve block procedure and in light of the continuing symptoms Jon was experiencing, Todd and Suzanne took him to Dr. Shubu Ghosh, a psychiatrist. Rec 02462, Rec 00403.

21.  Dr. Ghosh diagnosed Jon with Post Traumatic Stress Disorder ("PTSD"), as well as depression and anxiety. Rec 00403.

22.  Dr. Ghosh prescribed Sertraline, which helped alleviate Jon's flashbacks, ringing in the ears, hyper vigilance and hallucinations. Jon still struggled with anxiety and depression, and his headache symptoms somewhat improved but continued. Rec 02462, Rec 00403.

23.  In April of 2012, Jon received two weeks inpatient and one week outpatient treatment at the Cleveland Clinic's Pediatric Pain Clinic in Cleveland, Ohio. Rec 02462, Rec 00403-44

24.  A couple of traumatic events in Jon's life made it more difficult to cope with his mental health conditions:

In July 2012, his great aunt (who was a big part of life) was killed in an aircraft accident. Several months later in October his younger sister was diagnosed with Wilm's Tumor. By the middle of the year, [Jon] was refusing to take his medicine, his depression and anxiety had greatly increased and he was becoming aggressive. On two separate occasions, [Dr. Ghosh] recommended that [Jon] get residential care.

Rec 00404.

25.  In March of 2013, Jon began treating with Ted Sumner, a licensed clinical social worker, as Jon became increasingly defiant in following rules, was depressed, struggled with relationships with all family members, and was doing poorly in school. Rec 00407.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

26.    In addition to Mr. Sumner, Todd and Suzanne have also sought help of a parent coach and psychologist, Dr. Charles Lester. Rec 00404.

27.    By July of 2013, Jon was still refusing to take his medications, and "his behaviors became increasingly worse" by being "increasingly oppositional about rules/structure/limits from parents, . . . not socializing with anyone besides girlfriend, [sic]" and still doing very poorly in school. Rec 00404, 00407.

28.    Jon's academic performance was so poor that he was put on academic performance, and in December of 2013, "was finally de-selected from school." Rec 00404.

29.    Jon became increasingly aggressive toward his parents, throwing a phone and at his mother and bruising her arm. Rec 00404, Rec 02463.

30.    After the incident Jon locked himself inside the bathroom for several hours, talking on the phone with his girlfriend saying, "they are coming to get me." Rec 02463.

31.    Jon's only relationship was with his girlfriend, on whom he was overly dependent. Rec 00404.

32.    On one occasion, Suzanne had to "hide in the car with [Jon's] cancer stricken sister secondary to his verbal outburst." Rec 00387.

33.    In May of 2013, Jon left the house after midnight, walked for eight miles, and was found "after two days of looking and having the police go to his girlfriend's home." Rec 02463.

34.    In September 2013, Jon's girlfriend's mother called Suzanne voicing the concern that Jon could hurt himself based on his statements. Rec 00387.

35.    Tad Sumner advised Suzanne to take Jon to the emergency room for psychiatrist evaluation as a precaution:

> The therapist on staff at Providence [Hospital Emergency Room] called me and reported [Jon] was being very elusive and "gamey" and would not be honest about his thoughts and behaviors. They did not have enough information to keep [Jon] at the hospital at the time.

Rec 00030.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

36.  In October 2013, Jon run away for the second time and was gone for 24 hours. Rec 00404.

37.  Todd and Suzanne discovered that Jon was cutting his arms, and Suzanne began sleeping on the couch outside Jon's room to "make certain he would not hurt himself or that he was not going to run away." Rec 02463.

38.  In November of 2013, Jon "sabotaged" the family trip to Hawaii by locking himself in the bathroom and refusing to come out. *Id*.

39.  Suzanne departed with Jon's two sisters, and Todd stayed home with Jon taking him again to Providence Hospital Emergency Room for evaluation "due to his oppositional behavior and [Todd and Suzanne's] inability to have any influence over their son." Rec 02463, Rec 00031.

40.  The treating staff at the emergency room recommended that Jon go to the Providence Crisis Recovery Center, but Jon "was unwilling to be honest on the paper work at the hospital," stating that he was brought to the emergency room because his parents refused to accept him. Rec 02463.

41.  At that time Jon "began dressing in girl's clothing and explained that he was transgender and felt like a girl." *Id*.

42.  In November of 2013, Jon began treating with Dr. David Kim, a psychiatrist at Providence Behavioral Medical Health, but still refused to take his medications. Rec 02463, Rec 00399.

43.  Jon's therapist Tad Sumner provided the following observation:

> At the beginning of December the parents, myself and Chuck Lester PhD all met to discuss [Jon's] ongoing struggles. Chuck Lester had been meeting with the parents for co-parenting support for many months. Chuck Lester and I recommended that the parents placed [Jon] in residential treatment. We expressed concern that despite Chuck working with the parents, seeing me twice a week, his refusal to see a psychiatrist for medications, parents making efforts to change, the school putting effort to support him with improving grades, that [Jon] continued to decline in his behaviors and depression. We did not believe there was any more that could be done in an out patient basis. Parents agreed to begin looking into residential treatment options and we agreed to support

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

them through the process.

At the end of the semester in December, [Jon's] high school would not allow him to return to school the following semester because of his low grades and they saw no efforts by him to improve. After he left his last individual session from my office on December 27, his mother was enforcing a rule with [Jon], he got out of the car at a stop light, refused to go home and went to covenant house for 4 days. His parents placed him in residential treatment at that point.

These are the primary diagnoses I was working with [Jon] on:

Oppositional Defiant Disorder 313.81
Depressive Disorder NOS 300.00
Anxiety Disorder NOS 311.00

Rec 00408.

44.   Todd and Suzanne placed Jon at Elevations on January 1, 2014. Rec 00405

45.   The initial psychiatric evaluation at Elevations revealed diagnoses of PTSD, Major Depressive Disorder, and Parent/Child Relational Problem. Rec. 11558.

46.   In addition, Jon was diagnosed with New Daily Persistent Headache "with unreliable pain control." *Id*.

47.   Jon's psychiatric evaluation noted the presence of "[s]ignificant family stressors, including interplay of sibling illness (cancer) with [Jon's] recurrent headaches, which are improved but not resolved, decline in academic standing, enmeshment with girlfriend and associated gender identity diffusion." *Id*.

48.   Jon's Master Treatment Plan ("MTP") created on January 10, 2014, identified additional diagnoses of Anxiety Disorder, Eating Disorder, Identity Problem, Problems with Primary Support Group, Problems Related to the Social Environment, and Educational Problem. Rec 11481.

49.   Jon was treated at Elevations until June 17, 2015, when he was discharged. Rec 09258.

**Claims and Appeal Process**

50.   On November 18, 2014, Premera declined to cover Jon's continued residential treatment at Elevations after April 30, 2014. Rec 00049.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

51.     Premera provided the following rationale in its denial letter:

Continued residential care to treat a mental health condition is not medically necessary after 4/30/14. Information from your provider does not show evidence of continued high-risk behavior, immediate threat of high-risk behavior, life-threatening inability to provide self-care or to receive adequate care from caretakers, severe mental health symptoms, or need for a structured setting and continued around-the-clock care to treat a severe mental health condition that partly stabilized during inpatient care. The information from your provider also does not indicate that the most intensive non-residential level of care will still be unable to control your mental health difficulties, or that you need continued treatment for a severe Substance Use Disorder in order to [*sic*] your mental health disorder. The information from your provider indicates that you can be treated at a lower level of care. The difficulties that you are still experiencing are usually safely treated at a lower level of care, such as partial hospitalization or outpatient treatment. Your health plan covers only medically necessary services.

Rec 00050.

52.     On May 13, 2015, Todd and Suzanne appealed Premera's denial of coverage for Jon's residential treatment. Rec 00018-00046.

53.     Todd and Suzanne argued that Milliman Care Guidelines that Premera utilized in determining the medical necessity of Jon's treatment are not supported by and in accordance with the generally accepted standards of medical care, which in case of mental health treatment for adolescents, are found in the principles expressed by the American Academy of Child and Adolescent Psychiatry ("AACAP"). Rec 00019-00022.

54.     Todd and Suzanne asseted that the industry standard for residential treatment adopted by the AACAP considers that the treatment at a residential treatment facility is indicated when less restrictive levels of care are either unavailable or ineffective in treating an adolescent. Rec 00021.

55.     Premera's Milliman Care Guidelines require showing an acute deterioration in the patient's condition such as "lift-threatening inability to care for themselves or mental health symptoms that interfere with daily activities." Rec 00020, Rec 00022-23.

56.     Todd and Suzanne argued that Premera's denial rationale was more akin to a denial of acute inpatient treatment in a hospital setting than to a denial of sub-acute residential treatment. *Id.*

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

57.  Todd and Suzanne pointed out that all of Jon's treating providers prior to his admission to Elevations recommended that he receive residential treatment. Rec 00027.

58.  In their level one appeal, Todd and Suzanne included the opinion letter from Dr. Shubu Ghosh, a psychiatrist who treated Jon from February 2011 through July 2013. Rec 00027-29, Rec 00403.

59.  Todd and Suzanne also included the opinion of Tad Sumner, Jon's therapist, who treated Jon from March 2013 until his admission to Elevation in December of 2013. Rec 000407, Rec 00029-31.

60.  The level one appeal also included the February 2014, psychological evaluation done by Laura Brockbank, Ph.D., as part Jon treatment at Elevations. Rec 00031-32.

61.  Todd and Suzanne included Jon's detailed behavioral and treatment history, as well as his medical records from Elevations. Rec 00023-27, Rec 00032-00045.

62.  On June 16, 2015, Premera upheld the denial citing the following rationale:

> [Jon] was admitted to a residential treatment center due to chronic difficulties related to diagnoses of post-traumatic stress disorder and major depression, along with severe interpersonal conflict. By May l, 2014, his symptoms were not of a severity that would warrant the continued use of a residential treatment center level of care, though he continued to display chronic problems related to his mood and feelings of being 'overwhelmed.' However, these symptoms could have been treated in a less restrictive level of care. Therefore, your appeal is being upheld in accordance to the terms of the health plan, as the mental health residential treatment center stay from May 1, 2014, through April 30, 2015 was not medically necessary.

Rec 02410.

63.  Premera argued that that claims from May 1, 2014, through August 31, 2014, were untimely, as they were processed on December 5, 2014, and as such excluded from review. Premera argued that appeal requests must be received within 180 days of the claim process date. Rec 02410.

64.  Premera interpreted Todd and Suzanne's argument that Milliman Care Guidelines were not in accordance with the generally accepted standards espoused by the AACAP, to mean that those guidelines should not have been applied. *Id.*

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

65.   On August 10, 2015, Todd and Suzanne requested a level two appeal clarifying that their level one appeal was filed timely. Rec 07179-80.

66.   Todd and Suzanne noted that Premera failed to acknowledge and respond to the opinions of Jon's treating providers that his residential treatment was medically necessary. Rec 07180.

67.   Premera also failed to provide specific references to Jon's medical records on which Premera based its decision to uphold the initial denial. *Id*.

68.   Todd and Suzanne corrected Premera's misunderstanding of their argument about Premera's use of the wrong criteria. They made clear that Premera had failed to utilize medical necessity criteria that aligned with "generally accepted standards of medical practice" as required by the terms of the Premera policy itself. *Id*.

69.   Todd and Suzanne submitted the remainder of Jon's medical records from Elevations for the next reviewer, arguing that those records "continue to document our assertion that [Jon] continued to meet Premera's definition of medical necessity." Rec 07181. *Id*.

70.   Todd and Suzanne requested Premera to provide them with a full, fair, and thorough review complying with ERISA's procedural requirements. Rec 07183

71.   On September 10, 2015, Premera upheld the denial concluding that, although the records did not include a comprehensive evaluation, the "information indicated the absence of a plan for self harm, or to harm others, and no evidence of severe symptoms which could not have been treated in an intensive outpatient management program." Rec 07173

72.   Premera argued that the purpose of residential treatment "is stabilization in the context of a short term stay, followed by a transfer to a less restrictive level of care." *Id*.

73.   Premera also informed Todd and Suzanne that it had erroneously considered claims for services provided from May 1, 2014, through August 31, 2014, untimely, and that those claims were reviewed as part of the level two appeal. *Id*.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

74. Premera asserted that the Milliman Care Guidelines "are generally accepted standards of medical practice and thus the medical necessity determination is in compliance with plan language." *Id.*

75. Premera informed Todd and Suzanne that they have the right to request an external review of Premera's denial of benefits. Rec 07174

76. On December 18, 2015, Todd and Suzanne filed a request for external review of Premera's denial of Jon's residential treatment from May 1, 2014, through June 21, 2015. Rec 07170

77. Todd and Suzanne enclosed copies of the level one and level two correspondences in their request, as well as Jon's medical records from Elevations. *Id.*

78. On January 14, 2016, MCMC, an external review organization, concluded that "there are less intensive alternative approaches that would have as much of a chance to improving [Jon's] condition as the treatment that he was receiving at Elevations, [and] withholding treatment would not have reasonably been expected to affect the patient's health adversely." Rec 11751

79. Premera's denial of benefits to for Jon's treatment has cost Todd and Suzanne unreimbursed out-of-pocket expenses in an amount exceeding $160,000. Complaint, ¶ 40

## **ARGUMENT**

## I.   *DE NOVO* **IS THE PROPER STANDARD OF REVIEW.**

ERISA plan administrators, fiduciaries, and insurers acting in those capacities are not automatically entitled to deferential review based on an abuse of discretion standard of review. The Supreme Court,[1] holds that the default standard of review is *de novo* unless the terms of the ERISA plan give notice to participants and beneficiaries that the plan administrator intends to retain discretionary authority to interpret the terms of the plan and determine eligibility for benefits. There is no language in the Record demonstrating that Premera retained discretionary authority to interpret the terms of the Plan and determine eligibility for benefits. Moreover, even if Premera could show that it has discretionary

---

[1] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1   authority, Alaska law invalidates any such clause in the Plan.

2       The default standard of review in ERISA claims is therefore *de novo* and "the

3   administrator has to show that the plan gives it discretionary authority in order to get any judicial

4   deference to its decision."[2] "If a court reviews the administrator's decision, whether de novo . . . ,

5   or for abuse of discretion, the record that was before the administrator furnishes the primary

6   basis for review."[3] Premera has not demonstrated any grounds to utilize an abuse of discretion

7   standard of review. There is no master plan document in the Record, nor does the partial benefit

8   booklet included in Record contain any discretionary language.[4]

9       What is more, even if Premera could show that the Record contains discretionary

10  language, the State of Alaska imposes a ban on discretionary authority clauses for group health

11  policies. Alaska Stat. § 21.42.130 prohibits insurance policies containing "an inconsistent,

12  ambiguous, or misleading clause…that deceptively affects the risk purported to be assumed in

13  the general coverage of the contract."[5] Alaska's Department of Commerce, Community and

14  Economic Development, Division of Insurance provides a "checklist" for insurers specifically

15  stating that a group health "contract may not assert exclusive or discretionary authority to

16  interpret contractual provisions."[6]

17      The Ninth Circuit has held that ERISA does not preempt state laws banning discretionary

18  clauses.[7] In *Morrison,* the Court concluded that Montana Insurance Commissioner's "practice of

19  disapproving discretionary clauses is not preempted by ERISA's exclusive remedial scheme."[8] Rather,

20  such practice is "directed at the elimination of insurer advantage, a goal which the Supreme Court has

21  identified as central to any reasonable understanding of the savings clause."[9] Consequently, Premera's

22  decision to deny benefits to Jon should be reviewed *de novo.*

23

[2] *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999).
[3] *Id.* at 1090.
[4] Rec 02371-02386.
[5] See also Alaska Stat. §21.36.020 (prohibiting unfair methods and deceptive acts).
[6] https://www.commerce.alaska.gov/web/portals/11/pub/RatesAndForms/Credit_Checklist.pdf, p. 2 (last viewed on September 12, 2018).
[7] *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 849 (9th Cir. 2009).
[8] *Id*. at 845.
[9] *Id*. at 849.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

## II.   PREMERA VIOLATED THE TERMS OF THE PLAN AND ITS DENIAL OF BENEFITS FOR JON'S TREATMENT SHOULD BE REVERSED.

The Plan's definition of "medically necessary" and "medical necessity" requires that mental health treatment be within the scope of "generally accepted standards of medical practice" in order to be covered.[10] Premera's criteria for determining medical necessity of residential treatment impose requirements that are out of alignment with generally accepted standards of medical practice for treatment of mental health conditions in a residential treatment setting. As such, the medical necessity criteria relied on by Premera violates the Plan's explicit definition of medically necessary services. Because Premera's denial rests on improper medical necessity criteria, its denial must be reversed. In addition, Premera only applied its medical necessity criteria to Jon's PTSD diagnosis. It ignored Jon's diagnoses of Major Depressive Disorder, Anxiety Disorder, Eating Disorder, Identity Problem, and other conditions.[11]

Premera's disregard for the terms of the Plan, demonstrated by use of medical necessity criteria that are inconsistent with generally accepted standards of medical practice, and its failure to take into account undisputed information in the Record about Jon's medical conditions call for this Court to reverse Premera's denial of benefits for Jon's treatment and be ordered to reimburse Todd and Suzanne.

### A.   Premera's Analysis and Application of the Medical Necessity Criteria to Jon's Residential Treatment was inconsistent with Generally Accepted Standards of Medical Practice.

Residential treatment is a sub-acute, inpatient treatment setting for individuals with mental illness or substance abuse conditions.[12] The Plan unequivocally defines medically necessary services to treat an illness or injury as those that "[a]gree with generally accepted standards of medical practice," and that are "clinically appropriate in type, frequency, extent, site and duration," for an effective

---

[10] Rec 2382.
[11] Rec 00195-96, Rec 11558, Rec 11481.
[12] *Harlick v. Blue Shield of California*, 686 F.3d 699, 709 (9th Cir. 2012).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -   15
Case No. 2:17-cv-01041-JLR

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1    treatment.[13] In a factually similar case, the Northern District of California ruled that the failure to adopt

2    and correctly apply medical necessity criteria that are aligned with generally accepted standards of

3    medical practice requires reversal of a denial of benefits.[14]

4          The Plan defines "generally accepted standards of medical practice" as "evidence published in

5    peer reviewed medical literature" and "recognized by the relevant medical community."[15] To the extent

6    Premera relies on criteria that do no reflect these principles, it violates the terms of the Plan. In other

7    words, to be in congruence with the Plan's definition of medically necessary services, the Plan's medical

8    necessity criteria must be identify and rely on requirements for admission and continued stay at

9    residential treatment as defined by AACAP and generally found in other medical benefit plans.

10         Even if the medical necessity criteria in the Record that Premera claimed it was applying was

11   proper, Premera's reviewers failed to properly apply and analyze those criteria as applied to Jon's

12   medical records. The reviewers' analysis violates both the criteria in this Record and the generally

13   accepted standards for residential treatment. The criteria show that if a patient has recently attempted

14   suicide, or tried to harm self or others, or has a current plan for suicide or thoughts of suicide or

15   homicide, it is a contra-indicator for discontinuing residential treatment, not a reason to deny coverage

16   for residential treatment.[16] Premera's reviewers' interpretations of the criteria is squarely at odds with

17   the criteria and suggest that those physicians were confusing residential treatment with acute, inpatient

18   hospitalization. Alternatively, Premera appears to have been treating Todd and Suzanne as adversaries

19   and was "bent on denying" their claim.[17] In fact, Premera's interpretation of the requirements for

20   continued residential treatment are almost identical to other policies' requirements for acute, inpatient

21   treatment.

---

[13] Rec 2382.
[14] *Wit v. United Behavioral Health*, 2017 U.S. Dist. LEXIS 129076, at *58 (N.D. Cal. Aug. 14, 2017)
[15] *Id*.
[16] Rec 00195-196.
[17] *Friedrich v. Intel Corp.* 181 F.3d 1105, 1109 (9th Cir. 1999).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -   16
Case No. 2:17-cv-01041-JLR

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1        Todd and Suzanne outlined in detail in their May 13, 2015, appeal letter[18] how and why

2    Premera's interpretation of its medical necessity criteria was out of line with generally accepted

3    standards of medical practice. Specifically, they identified the criteria utilized by AACAP, the

4    professional society of child and adolescent psychiatrists, as the standard against which the Plan criteria

5    should be measured. They then outlined in detail how the Plan's criteria differed from the AACAP

6    criteria and went on to identify how Jon's condition satisfied the AACAP criteria.[19] But the facts in the

7    medical records show that Jon's condition also satisfied the criteria the Plan itself had in place.

8        Both the Premera November 18, 2014, review[20] and the June 8, 2015, external review from

9    Medical Review Institute of America, Inc. ("MRIA")[21] claim that medical necessity criteria for

10   residential treatment requires illness of greater severity than generally accepted standards of medical

11   practice require. For example, Premera's November 18, 2014, letter claims that the Plan's medical

12   necessity criteria for residential treatment require "immediate threat of high-risk behavior" or "life

13   threatening inability to provide self-care" or "continued severe mental health symptoms, such as severe

14   inability to carry out usual daily activities, severe problems with brain functioning, poor impulse control,

15   severe hallucinations, or other severe symptoms."[22] But this does not align with the requirements of

16   either the medical necessity the Plan claimed to rely on in the Record or the AACAP criteria that Todd

17   and Suzanne provided to Premera.[23] Nor do the references in the MRIA letter to the need for Jon to be at

18   "imminent risk of harm to self or others" or "episodes of self-harming behavior"[24] demonstrate that the

19   MRIA reviewer was utilizing medical necessity criteria that was in line with either the Plan's criteria or

20   with generally accepted standards of medical practice.

---

[18] Rec 18-47.
[19] Rec 19-47. The AACAP criteria are found at Rec 64-74.
[20] Rec 49-50.
[21] Rec 9-14.
[22] Rec 49.
[23] Rec 64-74.
[24] Rec 10.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -    17
Case No. 2:17-cv-01041-JLR

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1        Premera's wrongful application of the continued residential treatment criteria stand in

2    stark contrast to medical necessity requirements for residential treatment found in various other

3    group health policies. *See, e.g.*, Optum Level of Care Guidelines: Mental Health Conditions,[25]

4    pp. 9-10; Beacon Health Options[26], NMNC 2.202.04 – Residential Treatment Services (RTS)

5    (Adult/Adolescent/Child), pp. 1-2; Cigna Standards and Guidelines/Medical Necessity Criteria,[27]

6    pp. 35-36; New Directions Medical Necessity Criteria, [28] pp. 10-11; Anthem's Behavioral Health

7    Medical Necessity Criteria,[29] pp. 22-23.  These medical necessity criteria identify the conditions

8    Premera was relying on to assert residential treatment was not medically necessary as indications

9    that *acute* inpatient psychiatric treatment is necessary, and as contraindications of *sub-acute*

10    residential treatment being appropriate. See Exhibit A; Exhibit C at pp.29-30; Exhibit D at pp. 7-

11    8; and Exhibit E at p.21, for specific admission criteria for acute inpatient treatment.

12        In short, Premera and the external reviewers list attempts of suicide or other serious act of

13    self-harm, thoughts of suicide or homicide as *requirements* for continued stay in residential

14    treatment and asserts that these requirements conform to generally accepted standards of medical

15    practice for treatment of mental health disorders. But each of the reasons outlined above that

16    Premera's reviewers identified as reasons to deny coverage for Jon's treatment reveal themselves

17    as out of step with generally accepted standards of medical practice.

---

[25] https://www.providerexpress.com/content/dam/ope-provexpr/us/pdfs/clinResourcesMain/guidelines/optumLOCG/locg/retiredLOCG/locgMHConditions.pdf. A copy of the relevant pages of the Optum medical necessity criteria is attached as Exhibit A.
[26] https://s21151.pcdn.co/wp-content/uploads/NMNC2.202.04ResidentialTreatmentServicescleanforCMMCreview.pdf. A copy of the relevant pages of the Beacon Health Options medical necessity criteria is attached as Exhibit B.
[27] https://apps.cignabehavioral.com/cignabehavioral/media/consumer/educationAndResourceCenter/medicalNecessityCriteria.pdf. A copy of the relevant pages of the Cigna Behavioral Health medical necessity criteria is attached as Exhibit C.
[28] https://www.bcbsm.com/content/dam/public/Common/Documents/nd-bh-medical-necessity-criteria.pdf. A copy of the relevant pages of the Blue Cross Blue Shield of Michigan medical necessity criteria is attached as Exhibit D.
[29] https://www11.anthem.com/provider/ct/f3/s9/t1/pw_e175456.pdf?refe. A copy of the relevant pages of the Anthem Blue Cross Blue Shield medical necessity criteria is attached as Exhibit E.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1    To the extent there is any conflict between the terms of the Plan document on which

2    Todd and Suzanne were relying and the terms of the criteria that are not included as part of terms

3    of the Plan provided to insureds, it is the criteria that must yield to the express terms of the Plan.

4    The benefit booklet, including the definition of what is "medically necessary," "tells you about

5    this plan's benefits and how to make the most of them. Please read this benefit booklet to find

6    out how your healthcare plan works."[30] The benefit booklet functions as the "summary plan

7    description" required by ERISA as the primary vehicle by which Plan participants and

8    beneficiaries are informed of their rights and obligations under the Plan.[31]

9    **B.    Premera Failed to Identify and Fairly Evaluate the Undisputed Information**
10       **in Jon's Medical Records and the Recommendations of His Treating**
11       **Clinicians.**

12    For several years, Todd and Suzanne tried to get help for Jon through outpatient treatment. As

13    early as February 2011, only a few weeks after Jon's nerve block procedure and his first PTSD

14    symptoms, Todd and Suzanne took to Jon to Dr. Shubu Ghosh, a psychiatrist.[32] As Jon's mental health

15    deteriorated, following the traumatic experiences of losing his great aunt in a plane crash and his sister's

16    cancer diagnoses,[33] Jon began treating with Tad Sumner, a LCSW.[34] Despite his outpatient treatment,

17    Jon's behavior "became increasingly worse."[35] Jon's oppositional behavior turned into aggressiveness,

18    as he threw things at Suzanne, bruising her hand on one occasion.[36] By December of 2013, Jon's

19    behavior became out of control; he run away several times, refused to take his medications, his school

20    refused to let him return following semester because of his poor academic performance. Jon's final act

21    of defiance before his admission to Elevations was running from Suzanne's car at the intersection and

22    spending four days at a covenant house.[37]

---

[30]  Rec 2373
[31]  29 U.S.C. §1021(a)(1), 1022(a) and (b), and 1024(b)(1); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (referencing ERISA's requirement that ERISA plan fiduciaries be told "essential information about the [ERISA] plan" the summary plan description).
[32]  Rec 02462, Rec 00403.
[33]  Rec 00404, Rec 02463.
[34]  Rec 00407.
[35]  *Id.*
[36]  *Id.*
[37]  Rec 00408

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -    19
Case No. 2:17-cv-01041-JLR

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1        At the beginning of December 2013, Jon's therapist, Tad Sumner, and Chuck Lester, a parent

2  coach and psychologist, recommended residential treatment for Jon. Mr. Sumner concluded that despite

3  Jon's treatment with him "[Jon's] refusal to see a psychiatrist for medications, parents making efforts to

4  change, the school putting effort to support him with improving grades," Jon's behavior and depression

5  continued to decline.[38] Mr. Sumner and Mr. Lester were of the opinion that there was nothing that could

6  be done in an outpatient treatment setting to help Jon's mental health conditions and that he required a

7  higher level of mental health care.[39] Likewise, Dr. Shubu Ghosh, Jon's treating psychiatrist, concluded

8  that, "inpatient residential care was the only option for [Jon]."[40] Dr. Ghosh made that conclusion after

9  observing that Jon's worsening behaviors of "cutting, . . . aggression towards parents, withdrawal and

10  isolation from family and peers, failure at school, threats of self-harm and three incidents of running

11  away," were clear indications that the outpatient treatment was not providing the benefit Jon needed.[41]

12        "[I]f an administrator terminates [] benefits as a result of arbitrary and capricious conduct, the

13  claimant should continue receiving benefits until the administrator properly applies the plan's

14  provisions."[42] Although Premera's denial of benefits is reviewed under a *de novo* standard of review, its

15  conduct does not even pass the muster of an arbitrary and capricious standard.

16        Not only did Premera's denial rationale reflects an erroneous application of the continued stay

17  criteria, Premera failed to identify and consider the full scope of Jon's mental health diagnoses and the

18  corresponding criteria in its medical necessity analysis and evaluation. Specifically, Premera failed to

19  take into consideration Jon's multiple diagnoses beyond his PTSD. These included Major Depressive

20  Disorder, Anxiety Disorder, Eating Disorder, Identity Problem, Parent/Child Relational Problem,

21  Problems with Primary Support Group, Problems Related to the Social Environment, and Educational

22  Problem.[43] Considering only Jon's PTSD symptoms in evaluating the medical necessity of his

23  residential treatment shows that Premera got it wrong when they concluded Jon's care was not medically

24  necessary.

---

[38] *Id.*
[39] *Id.*
[40] Rec 000404.
[41] *Id.*
[42] *Pannebecker v. Liberty Life Assurance Co.*, 542 F.3d 1213, 1221 (9th Cir. 2008).
[43] Rec 11558, Rec 11481.

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

1    Premera's errors in evaluating Todd and Suzanne's claim for Jon's treatment also improperly

2    ignored the opinions of his treating providers who had the benefit of treating and observing him. Those

3    professionals knew him best, knew the information in his medical records, and understood his mental

4    health history. It is true the Supreme Court has ruled that treating physicians are not entitled to any

5    deference in ERISA benefit denial cases.[44] But it is also true that Premera, "may not arbitrarily refuse to

6    credit a claimant's reliable evidence, including the opinions of a treating physician."[45] Likewise, treating

7    physicians have a "greater opportunity to know and observe the patient as an individual compared to

8    individuals who have not examined the patient and are simply reviewing medical records."[46]

9

10    Similarly, "[f]iduciaries cannot shut their eyes to readily available information,"[47]

11    "Testimony as to a simple fact capable of contradiction, not incredible, and standing

12    uncontradicted, un- impeached . . . must be taken as true.... Un-impeached credible evidence

13    many not be disregarded by the trier of fact" as Premera did in this matter.[48]  It is especially

14    improper to ignore the findings and conclusions of a patient's treating physicians when dealing

15    with the care of individuals who have mental, behavioral, or emotional conditions. When the

16    information from a medical record arises out of an examination of a mental health patient, the

17    treating physician is in a better position to evaluate and come to valid conclusions about the

18    symptoms and diagnoses of a patient than a record reviewer.[49] Premera cannot "cherry-pick[] the

19    information contained in the administrative record…helpful to its decision to deny" coverage for

20    Jon's treatments.[50]

21    Other federal courts have ruled that an insurer's failure to consider opinions of treating

---

[44] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).
[45] *Id.*
[46] *Id.* at 832 (internal citations omitted).
[47] *Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004).
[48]  *Id.*
[49] *Rasenack v. AIG Life Ins. Co*, 585 F.3d 1311, 1325 (10th Cir. 2009).
[50] *Id.* at 1326.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -   21
Case No. 2:17-cv-01041-JLR

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

providers indicates "the lack of a diligent and reasoned" benefits determination process.[51] Jon's treating providers were in a position to accurately evaluate medical necessity of his treatments because they "knew him best."[52] Courts discount "for obvious reasons" the opinions of medical file reviewers who have not seen the patient.[53] Premera's reliance on a "record review" only was simply inadequate to show that a preponderance of the evidence supports its denial.[54] "[I]n the context of a psychiatric evaluation, an opinion based on personal examination is inherently more reliable than an opinion based on a cold record because observation of the patient is critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis."[55]

## III.    JON'S RESIDENTIAL TREATMENT WAS MEDICALLY NECESSARY ACCORDING TO GENERALLY ACCEPED STANDARDS OF MEDICAL PRACTICE AND THE TERMS OF THE PLAN'S CRITERIA.

The Plan unambiguously states that it covers medically necessary services, which are services utilized, among other things, to treat an illness or its symptoms.[56] The Plan defines those services as agreeing with generally accepted standards of medical practice.[57] The relevant generally accepted standards of medical practice for mental health treatment of adolescents are espoused by AACAP's Practice Parameters:

> ACAP Parameters, Principles, and Guidelines are clinical practice guidelines developed by the AACAP Committee on Quality Issues to encourage best practices in child mental health. They are designed to provide clinicians with assessment and treatment recommendations for child and adolescent psychiatric disorders and with principles guiding the general and special assessment of children, adolescents, and their families, and the management of children and adolescents with special mental health needs.[58]

---

[51] *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 612 (6th Cir. 2016)
[52] *Javery v. Lucent Technologies, Inc. LTD Plan*, 741 F.3d 686, 702 (6th Cir. 2014)
[53] *Smith v. Bayer Corp. LTD Plan*, 257 Fed. Appx. 495, 508 (6th Cir. 2008) (citing *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228, 254-255 (S.D.N.Y. 2005))
[54] *Id.*
[55] *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 U.S. Dist. LEXIS 41494, at *14-15 (W.D.N.Y. June 21, 2006) (unpublished).
[56] Rec 2382.
[57] *Id.*
[58]
https://www.aacap.org/AACAP/Resources_for_Primary_Care/Practice_Parameters_and_Resource_Centers/Home.a

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

The AACAP recommends residential level of treatment in situations:

> When the treating clinician has considered less restrictive resources and determined that they are either unavailable or not appropriate for the patient's needs, it might be necessary for a child or adolescent to receive treatment in a psychiatric residential treatment center (RTC). In other cases the patient may have already received services in a less restrictive setting and they have not been successful.[59]

The wisdom and applicability of the AACAP's recommendation could clearly be seen in Jon's circumstances. Years of various outpatient treatments have not brought any relief in his symptoms, or even slowed down the deterioration of his mental health conditions. Yet, Premera's overly restrictive application and evaluation of residential treatment criteria suggest that anyone who is not suicidal, homicidal, or an immediate threat to self or others fails to qualify to get coverage for residential treatment.

The depth and severity of Jon's mental health conditions is demonstrated by the fact that it took several months of residential treatment for Jon to start opening up. Even after several months of Jon's treatment at Elevations, he still struggled with suicidal thoughts and the desire to hurt himself.[60] The treating staff had to occasionally put him on a "Self-Harm Precautions."[61] Also, Jon continued to experience high levels of anxiety and depression while in treatment. This shows that his mental health problems were too complex and advanced to be effectively treated at any lower levels of care.[62] Jon's psychological assessment performed in February of 2014 showed that he was "struggling with significant symptoms of anxiety and depression," had a fragile sense-of-self and "[w]hen his is anxious or feels overwhelmed, he decompensates, isolates himself, thinks of suicide, and lashes out at himself and others."[63] Jon exhibited each of those behaviors prior to his admission at Elevations. Laura Brockbank, a licensed psychologist who performed the evaluation, highly recommended that Jon complete residential treatment based on her findings.[64] Dr. Ghosh who treated Jon a weekly basis from February 2011 until July 2013, observed deterioration of Jon's mental health conditions first hand and

---

spx.
[59] Rec 00064.
[60] Rec 10937
[61] Rec 10937, Rec 10923
[62] Rec 000035
[63] Rec 0426-27
[64] Rec 00427-430

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

ineffectiveness of lower levels of care.[65] Dr. Chosh noted that Todd and Suzanne" had exhausted all outpatient avenues and [Jon] required intensive treatment to cope with his debilitating depression, anxiety and behavioral problems. I recommended that [Jon] be put in inpatient residential treatment because I was concerned for his safety."[66]

When all the pieces of Jon's multiple, complex conditions are put together, the complete picture of a troubled young man strongly suggests that his clinicians who recommended residential treatment got it right: the care at Elevations was medically necessary and Premera was required under the terms of the Plan and its medical necessity criteria to cover that care. Todd and Suzanne were fortunate enough to scrap together the resources to pay for that care themselves and ensure Jon got the treatment he so badly needed. But the time has come for Premera to reimburse Todd and Suzanne for those expenses.

## IV.    TODD AND SUZANNE ARE ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS

In the event that the Court grants Todd and Suzanne's Motion for Summary Judgment, they requests an award of attorney fees and costs based on 29 U.S.C. §1132(g) and pursuant to *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010), as the prevailing party in this litigation. Todd and Suzanne request the opportunity to present in future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate.

DATED this 14th day of September 2018.


    /s/ Brian S. King
John Walker Wood
Brian S. King (admitted *pro hac vice*)
Attorney for Plaintiffs


---

[65] Rec 000404
[66] Rec 000405

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies under penalty of perjury under the laws of the State of Washington and the United States, that on the 14th day of September, 2018, the foregoing document was presented to the Clerk of the Court for filing and uploading to the Court's CM/ECF system.  In accordance with the ECF registration agreement and the Court's rules, the Clerk of the Court will send email notification of this filing to the following attorney for the defendant:

Gwendolyn C. Payton

Kilpatrick Townsend & Stockton LLP

1420 Fifth Avenue, Suite 3700

Seattle, WA 98101

gpayton@kilpatricktownsend.com

DATED: September 14, 2018.

                    <u>s/ John Walker Wood</u>

                    John Walker Wood (WSBA #39120)

                    The Wood Law Firm, PLLC

                    800 5th Ave, Suite 4100

                    Seattle, WA 98104

                    (206) 447-1342 (office)

                    (206) 577-5380 (fax)

                    Email: john@woodfirm.com

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -   25
Case No. 2:17-cv-01041-JLR

**The Wood Law Firm, PLLC**
800 5th Avenue, Suite 4100
Seattle, WA 98104
(206) 447-1342; (206) 577-5380 (fax)