**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

TODD R., SUZANNE R., and
LILLIAN R. *formerly known as J.R.*,

     Plaintiff,

v.

PREMERA BLUE CROSS BLUE
SHIELD OF ALASKA,

     Defendants.

Case No.: 2:17-cv-01041-JLR

**DEFENDANT'S OPPOSITION TO MOTION
PLAINTIFFS' FOR SUMMARY JUDGMENT**

**NOTED ON MOTION CALENDAR:
NOVEMBER 14, 2018  (AMENDED)**

**ORAL ARGUMENT REQUESTED**

## I.    INTRODUCTION

Plaintiffs challenge Premera's denial of benefits for Lillian's[1] ten-month confinement at a residential treatment center in Utah known as Elevations. Plaintiffs attack the use of the nationally-recognized Milliman Care Guidelines ("Milliman Guidelines") by the independent physicians who reviewed Plaintiffs' appeals. They argue that the court should disregard these guidelines and instead look at a fragmentary quote from the Introduction to a document issued by the American Academy of Child and Adolescent Psychiatry (AACAP) and titled "Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential

---

[1] Lillian, who identifies herself as transgender, was identified in the medical records as Jon or Jay, and was previously identified in this case as J.R.

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 1

Treatment Centers."  Plaintiffs also rely on opinions of Lillian's treating health care providers who purportedly recommended that Plaintiffs seek care from a residential treatment center.

Premera and the independent physicians who reviewed Plaintiffs' claim and subsequent appeals considered many factors, including the entire record submitted by Plaintiffs and the nationally recognized Milliman Guidelines.  Where, as here, the Milliman Guidelines are one of many factors considered by independent physicians in evaluating the Plaintiffs' claim, the Milliman Guidelines are widely-accepted by the industry as authoritative, and repeatedly cited by courts as support for their decisions.  Courts repeatedly recognize such use of the Milliman Guidelines is the standard of care.

The AACAP document upon which Plaintiffs rely does not address the question at issue here. It does not provide guidelines for determining the medical necessity of residential care; rather, its purpose is to provide guidelines for residential care following admission.  And unlike the Milliman Guidelines, no court or treatise or medical publication has ever recognized the AACP document as relevant or authoritative.  No court in the Westlaw database has ever relied on it.

Evidence from Lillian's treating health care providers do not show that at any time any treating physician evaluated whether her admission or continued confinement at Elevations was medically necessary. They provide conclusory opinions but do not address whether Lillian suffered acute symptoms widely recognized by psychiatrists as indicating that a child's or adolescent's confinement in residential treatment is medically necessary.  There is no analysis as to whether she could have been treated through less intense care.  This is because Lillian exhibited none of the acute symptoms that support confinement in residential care.

Indeed, medical records generated while Lillian was at Elevations repeatedly reveal that Lillian considered her own confinement at Elevations to be unnecessary.  She wanted to go home. The Elevations medical records and comments by Lillian's parents reveal a preoccupation with what they perceive to be challenges associated with Lillian's transgender

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1    identity.   Lillian expressed that the problem she was experiencing was her parents'
2    unwillingness to accept her for who he is.

3         Thus, evidence generated by Lillian's treating providers is does not support summary
4    judgment in favor of Plaintiffs, and nor does it create a genuine issue of material fact. There is
5    no evidence that undermines the conclusions of the independent physicians who reviewed
6    Plaintiffs' appeals and determined that Lillian's confinement at Elevations was not medically
7    necessary. Premera's denial of benefits was based on the opinion of an "Independent Physician
8    Reviewer" who was Board Certified by the American Board of Psychiatry and Neurology in
9    General Psychiatry and Child & Adolescent Psychiatry.   Subsequently, as required by
10   Washington law, an anonymous reviewing physician employed by the Independent Review
11   Organization randomly selected from a list generated by the Washington Office of Insurance
12   Commissioner agreed with Premera's denial of benefits. This physician was Board Certified in
13   Psychiatry with Subcertification in Child & Adolescent Psychiatry.

14        The Court should deny Plaintiffs' Motion for Summary Judgment and grant Premera's
15   Motion for Summary Judgment and dismiss this case.

16                    II.  FACTUAL AND PROCEDURAL BACKGROUND

17        Premera hereby incorporates by reference the factual and procedural background at
18   pages 2-10 of its pending Motion for Summary Judgment, Dkt 33.

19                         III.     ARGUMENT

20   A.   **The Milliman Guidelines are Accepted by Courts as Widely Used Tools for**
         **Determining Medical Necessity Where, as Here, they are Applied by Independent**
21       **Physicians in Combination with Other Relevant Factors.**

22        1.   **Premera Uses the Milliman Guidelines as Factors for Determining Medical**
23            **Necessity.**

24        Plaintiffs' claim is an action for breach of contract, and therefore depends on the
25   provisions of the parties' contract, the Plan. The Plan does not cover services that are not
26   medically necessary. In determining medical necessity, Premera applies guidelines developed
27

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 3

by Milliman[2] and licensed to Premera for evaluating the medical necessity of residential treatment, which Premera refers to as its "Medical Policy," "Residential Acute Behavioral Health Level of Care, Child or Adolescent" ("Medical Policy" or "Milliman Guidelines"). [JR-007137-40].

Premera uses its Medical Policy (the Milliman Guidelines) as a tool to help decide whether a claimed benefit is for residential care that is medically necessary. If Premera denies coverage and the member appeals, independent physicians evaluate the claim, using the Milliman Guidelines as one of many factors that they consider in deciding the appeal. If the appeal proceeds to a state-mandated Independent Review Organization ("IRO"), the IRO, which is randomly selected from a list of reviewers approved by the State of Washington, applies the standard of care as he or she understands it and does not necessarily use the Milliman Guidelines.

The plan language states:

**EXCLUSIONS**

**Not Medically Necessary**

This plan does not cover services that are not medically necessary, even if they are court-ordered. This rule also applies to the place where you get the services.

[JR-002379]. Medically necessary is, in turn, defined as follows:

**Medically Necessary and Medical Necessity**

Services and supplies that a doctor, exercising prudent clinical judgment, would use with a patient to prevent, evaluate, diagnose or treat an illness, injury, disease or its symptoms. These services must:
- Agree with generally accepted standards of medical practice

---

[2] Milliman is a corporation founded in 1947 that is based and incorporated in the State of Washington and is among the largest providers of actuarial and related products and services. http://www.milliman.com/about/. In addition to consulting actuaries, "Milliman's body of professionals includes numerous other specialists, ranging from clinicians to economists." *Id.*

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

- Be clinically appropriate in type, frequency, extent, site and duration. They must also be considered effective for the patient's illness, injury or disease
- Not be mostly for the convenience of the patient, doctor, or other health care provider. They do not cost more than another service or series of services that are at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature. This published evidence is recognized by the relevant medical community, physician specialty society recommendations and the views of doctors practicing in relevant clinical areas and any other relevant factors.

[JR-002382].

Under the Medical Policy (the Milliman Guidelines), residential care admission is appropriate for a child or adolescent exposed to one or more of the following risks: imminent danger to self; imminent danger to others; life-threatening inability to receive adequate care from caretakers; a severe disability or disorder requiring acute residential intervention; severe substance abuse disorder; or the patient requires a structured setting with continued around-the-clock behavioral care. *Id.* at [JR-007137]. The Policy then sets forth detailed and objective criteria to establish each of the above factors. *Id.* The purpose of these criteria is to determine if the symptoms reported on the medical records are severe enough to warrant the continued use of a residential treatment center level of care, which is 24-hour confinement *See id.*

2. **Courts Have Repeatedly Recognized the Milliman Guidelines as Nationally Recognized and Widely Used by Insurers and Health Care Providers.**

The Milliman Guidelines have for decades been accepted as authoritative repeatedly in case law, treatises, and medical literature. Courts and commentators repeatedly identify them as "nationally recognized," and "widely used," and have cited the Milliman Guidelines as support for their decisions. *See e.g., Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 887 (7th Cir. 2012) ("nationally recognized"); *Mercer v. APS Healthcare, Inc.*, No. 9:13-CV-0840 DNH/RFT, 2015 WL 5692563, at *3 (N.D.N.Y. Sept. 28, 2015) ("nationally recognized"), *aff'd*, 669 F. App'x 9 (2d Cir. 2016); *Prime Healthcare Servs.-Montclair, LLC v. Hargan*, No. CV 17-659 PA (JCX), 2018 WL 333862, at *9 (C.D. Cal. Jan. 9, 2018) ("widely

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713  FAX: (206) 260-8946

used"), *appeal dismissed sub nom. Prime Healthcare Servs. - Montclair, LLC v. Hargan*, No. 18-55305, 2018 WL 4214320 (9th Cir. June 12, 2018); *see also, Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017) ("To determine whether a person needs inpatient or outpatient care, most hospitals use one of two systems: the InterQual Criteria or the Milliman Care Guidelines. Both were developed by independent companies with no financial interest in admitting more inpatients than outpatients. . . . [T]he Milliman Guidelines were written and reviewed by over 100 doctors and reference 15,000 medical sources. About 3,700 hospitals use InterQual and about 1,000 use Milliman—over 75% of hospitals nationwide."). A 2014 University of Southern California Law Review article noted that "Milliman guidelines are also used by seven of the eight largest U.S. health plans and are used to support the care management for the majority of privately insured Americans." Paul Garcia, *The Problem with Parity: An Analysis of the Confusion Surrounding the California Mental Health Parity Act*, 87 S. Cal. L. Rev. Postscript 38, 73 (2014) (citing Milliman Care Guidelines, Overview Milliman Care Guidelines 2 (2012) www.careguidelines.com/sites/default/files/MCGOverviewBrochure_8.5x11.pdf)).

**3. Premera's Use of the Milliman Guidelines in Combination with Other Relevant Factors is the Standard of Care.**

Premera's use of a medical policy developed by Milliman as its Medical Policy is standard in the industry where healthcare coverage is limited by a requirement that all "services, supplies, or items submitted as certified on claim submission, must be medically necessary for the client's diagnosis or treatment," including claims for Medicaid reimbursement. See INPATIENT AND OUTPATIENT HOSPITAL SERVICES HANDBOOK, St. Healthcare L. Libr. 3542541. Initially, "[r]eview personnel assess the medical necessity of an admission by comparing documentation present in the medical record using recognized evidence-based guidelines for inpatient screening criteria." *Id.* "The evidence-based guidelines are Milliman Care Guidelines. . . . Non-physician reviewers use the criteria as guidelines for the initial approval or for the referral of inpatient reviews for medical necessity

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

decisions. Cases that do not meet initial approval are referred to a physician consultant to determine the medical necessity of the inpatient admission. If the criteria are met but the medical necessity of the admission is still questionable, the case is referred to a physician consultant for a determination. If a physician consultant determines the admission is not medically necessary, a denial is issued." *Id.*

Where, as here, the Milliman Guidelines are used by independent physicians as one of many factors in evaluating the Plaintiffs' claim, they are repeatedly cited by courts as support for their decisions. For example, the federal district court for the Eastern District of Wisconsin, addressing arguments similar to Plaintiffs' here, noted that "Humana's care determination [denying the claimed benefit] was otherwise well supported and based on a reasonable explanation of the relevant Plan documents." *Becker v. Chrysler LLC, Health Care Benefit Plan*, No. 09-C-344, 2011 WL 2601254, at *6 (E.D. Wis. June 30, 2011), *aff'd sub nom. Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879 (7th Cir. 2012).

*Becker* involved a dispute over whether nursing home care received by a plan beneficiary prior to her death was the type of nursing home care covered by her health insurance. *Becker*, 2011 WL 2601254, at *6. The court upheld the denial of benefits by Humana in part because "Milliman's Care Guidelines did not control Humana's decision but rather were but one of many factors in the decision process." *Id.* The court upheld Humana's decision "[i]In light of the totality of the circumstances—[the beneficiary's] health condition, the medical records, her prognosis, her life expectancy, and review of her care by independent physicians." *Id.*; *see also, Becker*, 691 F.3d at 887 ("Drs. Wood, Menkes and Zarcone relied in part on the Milliman Care Guidelines, which the Plan asserts—and Ms. Becker does not deny—is a nationally recognized clinical decision support tool. The physicians' conclusions appear consistent with the Guidelines, which define skilled services.").

Here, Plaintiffs make bald assertions that the Milliman Guidelines are not the established standard of care, but Plaintiffs fail to acknowledge that Premera primarily relied upon the opinions of two separate independent child and adolescent psychiatrists who reviewed

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 7

Plaintiffs' claims and concluded that long-term confinement was not medically necessary to treat Lillian's condition. Plaintiffs also fail to acknowledge the anonymous IRO physician did not even consider the Milliman Guidelines; he or she relied upon his independent knowledge of the standard of care.

In its review of the Level I Appeal, Premera included the participation of an "Independent Physician Reviewer," Dr. Williams Holmes, who is Board Certified by the American Board of Psychiatry and Neurology in Child & Adolescent Psychiatry. [JR-002410-14] and [JR-011655-60]. Dr. Holmes's opinion included a "Conflict of Interest Statement" certifying his independence and an absence of any conflict of interest on his part. *See* [JR-011658-59].

Dr. Holmes reviewed Plaintiffs' Level I Appeal submission and other relevant claim information, including the Master Treatment Plan, treatment notes and shift logs from Elevations, the Plan language, and Premera's Medical Policy titled, "Residential Acute Behavioral Health Level of Care, Child or Adolescent ORG: B-902-RES (BHG)." [JR-011655].

Dr. Holmes found that although "the patient continued to display chronic difficulties with mood, anxiety, oppositional behavior, and interpersonal conflict after [May 1, 2014]," "these difficulties [...] were not of a severity to warrant 24 hour treatment." [JR-011656]. Dr. Holmes further observed that "at no time was there evidence of imminent risk of harm to self or others, as well as no episodes of self-harming behavior. There was no evidence of deterioration of functioning that would require the level of intensive treatment found in the residential treatment center setting." [JR-011656]. A Premera Medical Director who is Board Certified in Public Health and General Medicine reviewed Dr. Holmes's expert opinion. [JR-002410].

Premera denied Plaintiffs' Level I Appeal on June 16, 2015. [JR-002410-13] ("Level I Appeal Decision"). Premera affirmed its prior assessment that residential treatment was not medically necessary. [JR-002410]. Premera reasoned that "[b]y May 1, 2014, his symptoms were not of a severity that would warrant the continued use of a residential treatment center

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

level of care, though he continued to display chronic problems related to his mood and feelings of being 'overwhelmed,'" those symptoms "could have been treated in a less restrictive level of care," and residential treatment was therefore "not medically necessary" as required by the Plan language. [JR-002410].

Premera's Level II Appeal process included a panel review of Lillian's file. The panel consisted of a physician-reviewer Board-Certified in Internal Medicine, a Member Contracts Operations Manager, and a New Group and Product Implementation Manager, all three of whom had experience in health plan appeals. [JR-007151]. The panel reviewed all material submitted with Plaintiffs' Level I and Level II Appeals, Dr. Holmes's findings as the Independent Physician Reviewer, the Premera Medical Policy, Lillian's medical records, and the Plan language. [JR-007151].

On September 10, 2015, the Level II Appeal panel upheld the Level I Appeal Decision denying coverage. [JR-007151-52] ("Level II Appeal Decision"). Addressing the medical records, the Level II Denial Letter noted that "[t]he records did not include a comprehensive evaluation, but only a narrative of daily group assessments, or intermittent doctor interviews." [JR-007152]. "This information indicated the absence of a plan for self harm, or to harm others, and no evidence of severe symptoms which could not have been treated in an intensive outpatient management program." [JR-007152]. The Level II Denial reasoned that the "purpose of residential treatment admission is stabilization in the context of a short term stay" and that "the severity of illness for the [residential treatment] level of care [was] not documented in the clinical notes from the facility." [JR-007152].

The Level II Appeal Decision explained that it followed Premera's Medical Policy, which used the Milliman Care Guidelines, and constituted generally accepted standards of medical practice that are applied consistently to all plan members. [JR-007152]. Premera then reiterated that coverage for Lillian's continued stay was denied based on a standard of medical necessity, specifically noting there was "an absence of record of severe symptoms which could not have been treated in an intensive outpatient management program." [JR-007152]. This

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

decision was in accordance with the Plan which "does not cover services that are not medically necessary." [JR-007152].

On December 18, 2015, Plaintiffs requested an independent review of Premera's decision. [JR-007170-72] ("IRO Request"). The independent review was randomly assigned to MCMC, one of the three IROs Premera used for fully insured claims out of Alaska. [JR-0011743]. The physician reviewer, who remained anonymous, is board certified in Psychiatry with subcertification in Child & Adolescent Psychiatry. [JR-011747]. The IRO reviewer is an attending staff psychiatrist at several northeast hospitals as well as a clinical instructor. [JR-011747]. The IRO reviewer specializes in psychiatric disorders, forensic psychiatry, and child & adolescent psychiatry. [JR-011747]. The IRO reviewer is also an author of peer-reviewed medical literature, a member of the American Academy of Child and Adolescent Psychiatry, American Psychoanalytic Association, and Academy of Occupational and Organizational Psychiatrists. [JR-011747].

On January 14, 2016, MCMC upheld Premera's denial of coverage for inpatient residential treatment. [JR-001745-52] ("Decision Letter"). The IRO Decision Letter concluded that the Plan should not cover the residential treatment because it was not medically necessary. [JR-011746]. The Decision Letter noted that during the time period in question, Lillian "had periods of time at home during which he was not receiving residential treatment and his clinical course continued." [JR-001751]. This demonstrates that "alternative therapies and approaches that would have been as likely to be effective during the period of time." [JR-001751]. The IRO did not rely on or use the Milliman Guidelines. *See id.*

Plaintiffs' claim was reviewed repeatedly through a multi-step process prescribed by law. Every step, a new specialist reviewed the claim. These physicians who applied Premera's medical policy did so as they considered the entire record, including Lillian's medical records and their own understanding from experience of the standard of care from. Ultimately, the IRO did not rely on Premera's medical policy.

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 10

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

**4. The Milliman Guidelines Protect the Public by Helping to Ensure that Health Care is Medically Necessary.**

As shown above, the norm across the healthcare industry is to use medical policies such as the Milliman Guidelines to help determine medical necessity. This protects the public. *Norfolk Cty. Ret. Sys.*, 877 F.3d 687, reveals the mischief that can occur where there is no independently developed medical policy to help determine medical necessity. Community Health Systems, Inc. was the largest for-profit hospital system in the country. 877 F.3d at 690. Its revenue depended heavily on Medicare, which prohibits hospitals from classifying patients as inpatients when less extensive, outpatient services would suffice; otherwise, hospitals can be held liable for fraud. *Id.* Instead of using the Milliman Care Guidelines or the competing system, InterQual Criteria, which were "developed by independent companies with no financial interest in admitting more inpatients than outpatients" with input from hundreds of doctors and reference thousands of medical sources, and are used by "over 75% of hospitals nationwide" ("About 3,700 hospitals use InterQual and about 1,000 use Milliman"), Community's hospitals used a system called the "Blue Book," written by Community itself. *Id.* Blue Book required some patients to be admitted first—thus potentially increasing Community's revenue tenfold— and then treated as outpatients only after tests showed they were not at risk. Community never publicly disclosed its use of the Blue Book instead of an independently developed medical policy. *Id.* at 690-91. Rather, Community's CEO, Wayne T. Smith, said the "strong revenue" was thanks to "the strength of our operating model." *Id.*

Community continued to use the Blue Book into 2011, when it set out to acquire another hospital company, Tenet Healthcare Corporation. *Id.* at 691. On April 11, 2011, Tenet sued Community, alleging that Community omitted the real source of Community's profit: namely the Blue Book, which Tenet said directed Community's hospitals to defraud Medicare. *Id.* at 691-92. Community later paid the federal government $98 million to settle multiple suits for Medicare fraud. *Id.*

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

Accordingly, Courts have repeatedly approved use of the Milliman Guidelines as a medical policy for determining medical necessity of proposed treatments, consistent with Premera's practice.

**B.    The AACAP "Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers" Are Irrelevant to this Dispute.**

Plaintiffs' attack on the Milliman Guidelines fails also because Plaintiffs do not establish the standard of care for determining medical necessity of residential care that Premera allegedly failed to apply.  *See Weiss v. CIGNA Healthcare, Inc.*, 972 F. Supp. 748, 755 (S.D.N.Y. 1997) ("Weiss has not alleged that CIGNA relies on [the Milliman & Robertson Guidelines] to the exclusion of other factors, nor has she alleged that any of CIGNA's determinations of 'Medical Necessity' have actually departed from 'generally accepted medical standards,' either in her own case or in the case of any other putative class member. Instead, her claim challenges the appropriateness of any or all such determinations, a speculative allegation untethered to the terms of the Plan.").

Plaintiffs identify a fragmentary quote from the Introduction to a document issued by the American Academy of Child and Adolescent Psychiatry ("AACAP") and titled "Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers."  From this 11-page, single-spaced document, Plaintiffs only quote the following: "When the treating clinician has considered less restrictive resources and determined that they are either unavailable or not appropriate for the patient's needs, it might be necessary for a child or adolescent to receive treatment in a psychiatric residential treatment center (RTC). In other cases the patient may have already received services in a less restrictive setting and they have not been successful."  [Plaintiffs' Motion at 23 (citing Rec 00064)].

No physician or other expert who reviewed Plaintiffs' claim relied on this document. Indeed, a Westlaw search reveals that this document, dated 2010, has not been cited by a single treatise or court or expert report.  Regardless, the statement is so vague as to be of no use as a standard of care for determining whether residential care is medically necessary.  The reason

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

for this is not only that the statement comes from the Introduction. Examination of this entire document reveals that its purpose is not to establish a policy or standards for determining when residential treatment is medically necessary.

Rather, as the title itself states, the document's purpose is to establish a standard of care for treatment of children and adolescents with mental illness once the decision has been made to admit them to residential treatment centers. *See* [JR-000065] ("This document provides stake holders the best principles for treating children and adolescents in RTCs [residential treatment centers]. There are some residential treatment centers that provide excellent care; however, the U.S. Government Accountability Office (GAO) has reported others have caused harm or death to a child. (GAO report 10/07, www.gao.gov/cgi-bin/getrpt?GAO-08-146T)"). For example: "Most of the 'boot camps' and 'wilderness programs' do not utilize a multidisciplinary team that includes psychologists, psychiatrists, pediatricians, and licensed therapists who are consistently involved in the child's care. Also, the Joint Commission nearly universally denies certification for these types of programs that fail to meet the quality of care guidelines for medically supervised care from licensed mental health professionals." *Id.*

The fragmentary quotation from the AACAP document is neither relevant nor probative with respect to what is at issue in this dispute—whether Lillian's residential treatment at Elevations was medically necessary.

## C. The Opinions of Lillian's Alleged "Treating Physicians" Do Not Create an Issue of Fact.

Plaintiffs offer two letters prepared by two health care providers who treated Lillian prior to his time at Elevations and progress and therapy notes developed by Elevations as alleged evidence from "treating" health care providers that Lillian required residential care. None of this evidence supports that Lillian's residential treatment at Elevations was medically necessary.

ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians," nor does it place "a heightened burden of explanation on administrators

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823, 123 S. Ct. 1965, 155 L.Ed.2d 1034 (2003). Rather, as courts have now repeatedly recognized, it makes more sense to "consider 'the length and nature of [the treating physician and plaintiff's] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence.'" *Barbu v. Life Ins. Co. of North America*, 35 F.Supp.3d 274, 289 (E.D.N.Y. 2014) (quoting *Connors v. Conn. Gen. Life. Ins. Co*., 272 F.3d 127, 135 (2d Cir. 2001) (brackets added by *Barbu* & citing *Black & Decker*, 538 U.S. at 832 (noting the importance of considering duration of provider-patient relationship and the comparative expertise between treating and non-treating providers)).

The Court's task is to "'evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative.'" *Reetz v. Hartford Life & Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1083 (W.D. Wash. 2018) (quoting *Paese v. Hartford Life & Accident Ins. Co*., 449 F.3d 435, 442 (2d Cir. 2006)).

Plaintiffs have not offered any evidence from a health care provider who treated Lillian at the time she was admitted to Elevations and at that time evaluated whether residential treatment was medically necessary for Lillian  Nor have they offered any evidence that any treating provider evaluated whether her continued stay at Elevations was medically necessary. Plaintiffs' treating provider evidence does not even create a genuine issue of material fact, much less support summary judgment in favor of Plaintiffs. *See, e.g., Bolden v. Unum Life Ins. Co. of America*, No. 02 C 6701, 2003 WL 921764 at *3 (N.D. Ill., March 6, 2003) (granting defendant's motion for summary judgment under a de novo review, on the basis that the plaintiff failed to provide medical evidence of her restrictions due to her rheumatologic condition, even though plaintiff's treating physician, Dr. Gordon, generally endorsed plaintiff's disability claim. "Dr. Gordon failed to document this condition or to describe any specific physical impairment or loss of functional capacity that she [plaintiff] might have."); *Garrett v. Prudential Ins. Co. of Am*., 107 F. Supp. 3d 1255, 1265–66 (M.D. Fla. 2015) ("Nor was it wrong to give little or no weight to the treating physicians' letters, since they were conclusory

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

and do not take into consideration the Plan's definition of disability as it relates to Plaintiff's ability to perform the material and substantial duties of her regular occupation. Rather, the letters merely identify her medical conditions and conclude that she is not able to entertain full-time employment.") (citing *Harvey v. Standard Ins. Co.*, 503 Fed. Appx. 845, 849 (11th Cir. 2013) ("Each of Standard's record reviewers acknowledged that Harvey had degenerative disc disease, but concluded that Harvey could perform sedentary work level activities with a sit/stand work accommodation. On the other hand, Harvey's physician diagnosed her with lumbar disc degeneration and scoliosis, but never provided information regarding her level of functional impairment or the amount of work activity in which she could engage.")).

Plaintiffs have offered two letters that were prepared in May 2014 specifically for the Plaintiffs' appeals of Premera's denial, from health care providers who had treated Lillian— one of them several months prior to his admission to Elevations on December 31, 2013, and both of them well before the period of service at issue in this action.[3] [JR-000027-31; JR-000403-05; JR-000407-08]. Both providers recommended that Lillian receive residential treatment, but there is no evidence in the record that either evaluated her at the time she was admitted to Elevations. *Id.* Neither applied an objective medical policy, and neither provided any medical opinion or diagnosis as to Lillian's condition during the time in question to support their claims. *Id.*

Plaintiffs also rely upon progress and therapy notes from Lillian's time at Elevations, which typically described Lillian's temperament on individual occasions as "upset," "discouraged at how far away he is from his ideal self," "anxious," "irritable," and "isolating." [JR-000033-34]. The therapy notes do not address whether Lillian's residential treatment at Elevations is medically necessary, nor whether she should have been admitted to Elevations in

---

[3] Apparently Plaintiffs only claim benefits for Lillian's residency at Elevations from May 1, 2014, even though he was admitted on December 31, 2013, because their coverage with Premera began on May 1.

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 15

the first place. They are mainly preoccupied with what the Elevations staff and Lillian's parents perceive as challenges associated with Lillian's transgender identity.

The two letters contained in the record from providers who treated Lillian prior to his admission to Elevations fail to support that residential treatment services were necessary at the time of review. [JR-000403-05; JR-000407-08]. One letter is from Dr. Shubu Ghosh, a psychiatrist who treated Lillian from February 8, 2011 through July 16, 2013. [JR-000403-05]. During that period, Dr. Ghosh observed that Lillian suffered from depression and anxiety, and on two occasions Dr. Ghosh suggested residential care. [JR-000403-05; JR-000407-08]. However, Dr. Ghosh's undated letter is largely a summary of events outside of Dr. Ghosh's treatment of Lillian. Based on this information, Dr. Ghosh concludes that "[Lillian] needed inpatient residential level of care" and that "[her] parents exhausted all outpatient avenues and he required intensive treatment to cope with his debilitating depression, anxiety and behavioral problems. I recommended that [Lillian] be put in inpatient treatment because I was concerned for his safety." [JR-000405]. Dr. Ghosh was not treating Lillian at the time of his admission or at the time he wrote this letter. [JR-000403-05]. His conclusion is based on a second-hand accounting of events by Lillian's parents, who, he states, continued to consult with him. [JR-000404-05].

Dr. Ghosh was in no position to address and apply Premera's Medical Policy criteria for residential treatment. At the time of Lillian's admission to Elevations, Dr. Ghosh had not treated Lillian for six months prior. His reliance on prior treatment and second-hand accounting of events that occurred after he stopped treating Lillian and his recommendations based on that information are not reliable medical conclusions. Further, Dr. Ghosh had no contact with Elevations, did not review Lillian's medical records from Elevations, and did not treat Lillian at any point during his stay at Elevations. Accordingly, Dr. Ghosh had no information on which to assess whether residential treatment was medically necessary after May 1, 2014.

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 16

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

Said otherwise, Dr. Ghosh could not assess whether as of May 1, 2014, Lillian could have been "treated through less intense care, such as through partial hospitalization or outpatient counseling." [JR-007138]. Dr. Ghosh also did not apply any neutral criteria such as the Milliman Guidelines. His letter therefore lacks foundation and relevance to the question in this case, which is whether a continued stay at Elevations after May 1, 2014 was medically necessary.

The other letter is from Ted Sumner, a licensed clinical social worker, who treated Lillian for a period of nine months from March 2013 through December 2013. [JR-000407-08]. This letter suffers from similar deficiencies as Dr. Gosh's. Mr. Sumner started treating Lillian based on Lillian's parents' stated concerns about her oppositional behavior, depression, relationship issues, and school performance. [JR-000407]. Mr. Sumner's letter, much like Dr. Ghosh's, summarizes a series of oppositional behavior events. [JR-000407]. Mr. Sumner concludes that he "recommended" residential treatment because "[Lillian] continued to decline." [JR-000408]. Mr. Sumner's letter, however, fails to offer evidence to satisfy the medical necessity requirement. Mr. Sumner had no contact with Elevations, did not review Lillian's medical records from Elevations, did not treat Lillian at any point during his stay at Elevations, and did not apply criteria such as the Milliman Guidelines. His opinion is not relevant as to whether it was medically necessary for Lillian to continue to stay at Elevations after May 1, 2014.

The progress and therapy notes do not show that Lillian's treatment at Elevations was medically necessary for the time period beginning on May 1, 2014. On January 2, 2014, three days after Lillian was admitted to Elevations, Elevations conducted a "Suicide/Self-harm" assessment of Lillian. [JR-000457-458]. Elevations reported that Lillian had never attempted suicide and had no plan to do so; she related having cut herself in the past, but he could not say when she had done so, and she had no present plan to hurt himself. *Id.* "His [i.e., her][4] form of

---

[4] This memorandum retains Elevations' usage of the pronoun "he" when quoting from the Elevations records, even though Lillian preferred to be identified as female.

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

thought is linear and goal directed in answering questions. His content of thought: He denies

thoughts of hurting himself or hurting others." *Id.*

Also on January 2, 2014, Elevations reported, "Patient is currently on no psychotropic

medications and is recently admitted. He states his goals of treatment include 'acceptance from

parents and to work on school and work'." [JR-000458].

The only symptoms of concern that are reported are that he had recurring headaches,

was anxious, depressed, lacking energy, and angry. [JR-000458]. Elevations described its

interview of the parents on January 13, 2014 as follows: "He refers to us as Todd and Suzanne.

He is disruptive because he will not listen. While he is respectful of those outside our home, he

is not with our family members. He is failing in school, is enmeshed with a girlfriend, wants to

dress like a girl and not willing to take his prescribed medication so he might better cope. He is

in a relationship with a girl that is all consuming and isolating. He no longer has friends

outside this relationship and is no longer interested in the things he used to enjoy." [JR-

000458].

These symptoms do not satisfy the standard of care for medically necessary residential

care. There is no evidence that he suffered the kind of acute symptoms that would justify

Lillian's confinement in residential treatment. Nor is there any evidence that, once she was

admitted to Elevations, he was ever evaluated for a determination that his residential stay

should continue. There is no evaluation as to whether he had stabilized and could have been

treated through less intense care, such as through partial hospitalization or outpatient

counseling. [JR-007138]. Lillian exhibited none of the acute symptoms that support

confinement in residential care.

Recently, this Court recognized that where the treating physician has been able to

personally observe the patient, the treating physician's testimony may be more credible than a

physician who has only reviewed the paper record, if "the in-person medical examination

credibly contradicts a paper-only review." *Reetz*, 294 F.Supp.3d at 1083 (citing *Oldoerp v.*

*Wells Fargo & Co. Long Term Disability Plan*, 12 F.Supp.3d 1237, 1250 (N.D. Cal. 2014)

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

("[W]hen an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions."); see also, *Alfano v. CIGNA Life Ins. Co. of New York*, No. 07 Civ. 9661, 2009 WL 222351, 15 (S.D.N.Y. Jan. 30, 2009) ("However, where, as here, a court reviews an administrator's decision de novo, it 'is free to evaluate [a treating physician's] opinion in the context of any factors it consider[s] relevant, such as the length and nature of the [doctor-patient] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." (quoting *Connors*, 272 F.3d at 135) (brackets added by *Alfano*) & citing *Paese*, 449 F.3d at 442 ("noting that the lack of a treating physician rule 'does not mean that a district court, engaging in a de novo review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative'").

But here, Elevations' records corroborate—rather than contradict—the opinions of the physicians upon which Premera relied.  Lillian repeatedly told the Elevations personnel that she did not believe it was necessary for her to be confined at Elevations and he did not want to be there:  "He currently states, 'I don't feel like I should be required to be here'." [JR-000458]. "[Lillian] blames his parents for why he is in treatment.  He believes his parents are the problem and reports 'Todd and Suzanne do not accept me for me.'" [JR-000483].  January 2, 2014: "Jay[5] seemed to be much more social tonight and seemed to hang around staff and join in on their conversations, he said that he is mad at his parents for sending him here because he does not need to be here and they are the only people who have a problem with him being transgender, he did refuse to move rooms because he says he feels extremely uncomfortable with having to share a bathroom or bedroom with other male residents and doesn't think he

---

[5] The "treatment team" at Elevations agreed to call Lillian "Jay" "as a middle ground between his given name and his desire [at that time] to be addressed as 'Holly'" because he identified himself as transgender.  [JR-000445].

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

should have to since we would not make a female resident share with a male, staff did not push the issue tonight and notified the therapist." [JR-000459].

Indeed, the overriding preoccupation of his parents and the Elevations personnel appears to have been Lillian's self-identification as transgender: "[Lillian] is a 15 year old male who presents himself as transgender, wears female clothes, and speaks in a soft somewhat feminine manner." [JR-000483]. January 2, 2014: "Patient identifies himself as transgender stating, 'I feel like a woman'." "When asked to name some of his feminine traits he is unable to do so." "He is requesting that peers refer to him as a female 'Holly' and that he wishes to be on a girls team." *Id.* "CLINICAL IMPRESSION Patient comes in today presenting himself with a very feminine manner with feminine body language. His communication style is very passive-aggressive. . . . His speech is soft spoken and he comes across rather gamey trying to engage by speaking softly and giving leading answers to questions." [JR-000458]. "Suzanne and Todd expressed a desire to have their 'son' back and they don't care if he is gay or what his sexual orientation is." [JR-000476]. "[Suzanne and Todd] shared how they would like him to not 'flaunt' himself, but explore what his identity is without drawing so much attention from everyone. Todd and Suzanne also expressed they feel [Lillian] may be using this as a distraction to address his mental health issues and previous trauma." *Id.*

On May 14, 2018, two weeks after the start of the period for which Plaintiffs seek coverage from Premera, Elevations conducted a "Mental Status Exam." The examiners concluded: "[Lillia]n presented in a cooperative and relatively pleasant fashion. He minimized acute minimized acute mood issues and appeared euthymic. He denies safety concerns and contracted for safety. No obvious manic or psychotic findings either observed or reported." [JR-000127].

Here, the evidence from the two providers who treated Lillian in the years prior to his admission to Elevations is not reliable or probative insofar as the issue in this case—whether Lillian's residential treatment at Elevations was medically necessary. It suffers from the very

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

deficiencies that led the Supreme Court in *Black & Decker* to eliminate automatic deference to the treating physician.

**D.** **The Record Establishes that the Court Should Affirm Premera's Denial of Benefits for Lillian's Treatment Because it Was Not Medically Necessary.**

Premera's conclusion that the treatment was not "medically necessary" is supported by the undisputed record, and in any event the Court cannot grant Plaintiffs' motion in the face of this evidence. Premera's denial of benefits was based on the opinion of an "Independent Physician Reviewer," William Holmes, MD, a physician Board Certified by the American Board of Psychiatry and Neurology in General Psychiatry and Child & Adolescent Psychiatry. [JR-000009-14]. Subsequently, a reviewing physician Board Certified in Psychiatry with Subcertification in Child & Adolescent Psychiatry reviewed the record on behalf of an IRO and agreed. [JR-011745-52].

Courts recognize that independent physicians with the requisite expertise who review the plaintiffs' claim may be the most probative evidence available and may in fact constitute probative and persuasive evidence supporting denial of the claimed benefit. The Seventh Circuit has held that in reviewing medical files, "doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006)). It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations. *Id.*

The independent reviewers involved in Lillian's appeal accepted Lillian's diagnoses and they both concluded that in-patient treatment was not "medically necessary." Their decisions were based on their professional experience and judgment upon review of the record provided to them.

Dr. Holmes acknowledged that Lillian suffered from "chronic difficulties with mood, anxiety, oppositional behavior, and interpersonal conflicts" subsequent to his admission. [JR-

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

000010]. However, he concluded, her symptoms "were not of a severity to warrant 24 hour treatment," noting there was no "evidence of imminent risk of harm to self or others" "no episodes of self-harming behavior," and "no evidence of deterioration of functioning" to require inpatient treatment. [JR-000010].

The IRO physician, after carefully reviewing and summarizing the record, similarly concluded that "withholding treatment would not have reasonably been expected to affect the patient's health adversely." [JR-011751]. The reviewer reasoned that "less intensive alternative approaches would have as much of a chance of improving his condition." [JR-011751].

Plaintiffs offer no qualified and well-founded opinion in response to the two independent medical experts upon which Premera relied. This is fatal to their claims as a matter of law. *See Krysten v. Blue Shield of California,* No. 15-CV-02421-RS, 2016 WL 5934709, at *5 (N.D. Cal. Oct. 11, 2016), *aff'd sub nom. Krysten C. v. Blue Shield of California,* 721 F. App'x 645 (9th Cir. 2018) ("Blue Cross . . . rel[ied] on the opinions of the three physicians that Krysten had progressed to a point that residential treatment for her condition was no longer medically necessary. Krysten has shown she was still in need of treatment, but has pointed to nothing in the record sufficient to establish that only residential treatment would have been adequate for her medical needs."); *Briesch v. Auto. Club of S. California,* No. 298CV405C, 2000 WL 33710862, *6 (D. Utah Dec. 20, 2000) ("Plaintiffs have not cited to any statement by a doctor, nurse, or legal expert that supports the conclusion that Briesch's continued confinement at an acute treatment center such as Charter Hospital after November 17 was medically necessary.").

Moreover, when a claim is reviewed by an independent review organization and deemed not medically necessary, that finding supports a conclusion that the denial was justified. *See Peter B. v. Premera Blue Cross,* No. C16-1904-JCC, 2017 WL 4843550 (W.D. Wash. Oct. 26, 2017) No. C16-1904-JCC, 2017 WL 4843550, at *5 (W.D. Wash. Oct. 26, 2017) ("The Court finds as follows: Premera's coverage determinations were consistent with

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

Plan requirements, Premera relied on the advice of an independent physician in making its final coverage decision, there is no evidence of shifting rationales, and the IRO review validated Premera's final benefit determination."); *Tracy O.*, 2017 WL 3437672, at *9 (noting, in granting summary judgment in favor of the defendants, that the insurer's "conclusions are further supported by the independent review" of the claims); *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 Fed. Appx. 568, 576 (10th Cir. 2017) (noting in a disability benefit case that a decision to terminate long-term disability benefits was supported by two independent reviewers concluded that the claimant was able to work); *see also Basquez v. East Cent. OK Elec. Co-op., Inc.*, No. 06-cv-487 (SPS), 2008 WL 906166, at *11 (E.D. Okla. March 31, 2008) (citing *Davis v. UNUM Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006)) ("[A]n administrator's decision to seek [] independent expert advice is evidence of a thorough investigation. When an administrator ... opts to investigate a claim by obtaining an expert medical opinion—independent of its own lay opinion and that of the claimant's doctors—the administrator is going to pay a doctor one way or another. Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict." (internal citations and quotations omitted))[6]; *see also* John Bronsteen, Brendan S. Maher & Peter K. Stris, *ERISA, Agency Costs, and the Future of Health Care in the United States*, 76 FORDHAM L. REV. 2324-26 (2008) (explaining that external review significantly diminishes agency risk because the agent's discretion for opportunistic behavior is circumscribed by the determinations of an impartial reviewer).

The Affordable Care Act ("ACA") recognizes the probative value of an IRO decision.

---

[6] *Briesch, Tracy O., Blair,* and *Basquez* were decided on a de novo standard of review. *See Briesch* 2000 WL 33710862 at fn. 7 ("The court reaches this decision under a de novo standard of review."); *Tracy O.*, 2017 WL 3437672, at *10 ("Under even a de novo standard of review, Plaintiffs have failed to show by a preponderance of the evidence that Defendants disregarded or improperly minimized information from S.O.'s treatment providers."); *Blair*, 688 F. App'x at 573 ("our review is de novo"); *Basquez*, 2008 WL 906166, at *12 ("both parties agree that the de novo standard of review is inapplicable"). *Krysten* and *Peter B.* applied the abuse of discretion standard. But all these cases are instructive here, where the evidence is undisputed.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 23

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

The ACA mandates an IRO review process for all health plans offered in the United States, with the exception of plans grandfathered under pre-ACA rules. *See* 42 U.S.C. § 300gg-19(b);29 C.F.R. § 2590.715-2719(c)(2)(vii)-(ix). *Group Health Plans and Health Insurance Issuers: Rules Relating to Internal Claims and Appeals and External Review Processes*, 76 Fed. Reg. 37,208, 37,210-11 (June 24, 2011) (codified at 45 C.F.R. pt. 147) (explaining the IRO process for self-insured plans).

The Court should deny Plaintiffs' summary judgment motion and grant summary judgment in favor of Premera because the only competent, admissible medical evidence before this Court confirms that Lillian's residential treatment at Elevations was not medically necessary. The same is true here. Accordingly, for the foregoing reasons, there is no issue of fact to preclude summary judgment in favor of Premera and the Plan.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Premera and dismiss this case.

DATED this 1st day of November, 2018.

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP
Attorneys for Defendant
Premera Blue Cross Blue Shield of Alaska

By  */s/ Gwendolyn C. Payton*
     Gwendolyn C. Payton
     WSBA # 26752
     gpayton@kilpatrick.com
     1420 Fifth Avenue, Suite 3700
     Seattle, WA 98101
     Telephone: (206) 467-9600
     Facsimile: (206) 623-6793

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 24

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

## CERTIFICATE OF SERVICE

I, Gwendolyn C. Payton, hereby certify under penalty of perjury of the laws of the State of Washington that on November 1, 2018, I caused to be served a copy of the attached document to the following person(s) in the manner indicated below at the following address(es):

Brian S. King
336 S 300 E STE 200
Salt Lake City, UT 84111
brian@briansking.com

John Walker Wood
The Wood Law Firm
800 5th Avenue, STE 4100
Seattle, WA 98104
john@woodfirm.com

☑ **by CM/ECF**

☐ **by Electronic Mail**

☐ **by Facsimile Transmission**

☐ **by First Class Mail**

☐ **by Hand Delivery**

☐ **by Overnight Delivery**

/s/ *Gwendolyn C. Payton*
Gwendolyn C. Payton

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT - 25

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713  FAX: (206) 260-8946