UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TODD R., et al., | CASE NO. C17-1041JLR |
| Plaintiffs, | FINDINGS OF FACT AND |
| v. | CONCLUSIONS OF LAW AND ORDER REGARDING THE |
| PREMERA BLUE CROSS BLUE SHIELD OF ALASKA, | PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT |
| Defendant. | |

## I.  INTRODUCTION

Before the court are:  (1) Defendant Premera Blue Cross Blue Shield of Alaska's ("Premera") motion for summary judgment (Def. MSJ (Dkt. # 33)); and (2) Plaintiffs Todd R., Suzanne R., and Lillian R.'s[1] (collectively, "Plaintiffs") motion for summary judgment (Plf. MSJ (Dkt. # 37)).  Plaintiffs seek review of Premera's denial of benefits

---

[1] Lillian R. was formerly known as Jonathon R. and is referred to as "Jon" or "Jonathon" throughout the administrative record.  (*See* Compl. (Dkt. # 2) ¶ 1 n.1; *see generally* AR (Dkt. # 36) (sealed).)

under a group health benefits plan ("the Plan"), which is governed by the Employment Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. (*See* Compl. (Dkt. # 2) ¶¶ 2, 9, at 7-8.) Specifically, Premera declined to cover a portion of Lillian R.'s stay at a residential treatment center as not medically necessary. (*See* Def. MSJ at 1; Plf. MSJ at 1-2.) Plaintiffs repeatedly appealed Premera's decision, but at each level of Plaintiffs' administrative appeals Premera prevailed. (*See* Def. MSJ at 5-10; Plf. MSJ at 9-13.) After exhausting their administrative remedies, Plaintiffs sued Premera in an effort to recover the denied benefits. (*See generally* Compl.) As discussed below, the court construes the parties' motions for summary judgment as trial memoranda submitted in connection with a bench trial on the administrative record. *See* Fed. R. Civ. P. 52(a); *see also infra* § II. Based on the court's review of the record and its consideration of the parties' arguments,[2] the court concludes that Lillian R.'s residential treatment at issue here was medically necessary and therefore covered under the Plan and enters judgment on that issue in favor of Plaintiffs.

## II.    PROCEDURAL ISSUES

Before turning to the merits of the parties' arguments, the court must determine the appropriate procedural vehicle for considering the parties' cross motions. The answer depends, in part, on the applicable standard of review. *See Bunger v. Unum Life Ins. Co. of Am.*, 196 F. Supp. 3d 1175, 1177 (W.D. Wash. 2016). An ERISA plan that does not contain language conferring discretion upon the plan administrator is subject to a *de novo*

---

[2] The court heard the argument of counsel on January 23, 2019.

standard of review by the district court.  *See Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989) ("[W]e hold that a denial of benefits challenged under

§ 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives

the administrator or fiduciary discretionary authority to determine eligibility for benefits

or to construe the terms of the plan.").  Here, the parties agree that the proper standard of

review is *de novo*.  (Plf. MSJ at 14 ("Premera's decision to deny benefits to [Lillian]

should be reviewed *de novo*."); Def. MSJ at 10 ("[T]he *de novo* standard . . . applies

here."); Plf. Resp. at 2 (Dkt. # 43) ("The parties agree that this [c]ourt should apply a de

novo standard of review to assess the validity of [Lillian R.'s] need for residential

treatment and Premera's responsibility to pay for that treatment.").)  The court accepts

the parties' position and reviews the record *de novo*.  *See Rorabaugh v. Cont'l Cas. Co.*,

321 F. App'x 708, 709 (9th Cir. 2009) (stating that the court may accept the parties'

stipulation to *de novo* review).

As noted above, the parties have filed cross motions for summary judgment.  (*See*

Plf. MSJ; Def. MSJ.)  The Ninth Circuit has held that in an ERISA benefits case, where

the court's review is for abuse of discretion, summary judgment is the proper "conduit to

bring the legal question before the district court."  *Bendixen v. Standard Ins. Co.*, 185

F.3d 939, 942 (9th Cir. 1999), *overruled on other grounds by Abatie v. Alta Health &

Life Ins. Co.*,  458 F.3d 955, 965 (9th Cir. 2006) (*en banc*).  However, where, like here,

the standard of review is *de novo*, the Ninth Circuit has not definitively identified the

appropriate vehicle for resolution of an ERISA benefits claim.  *See Bunger*, 196 F. Supp.

3d at 1177.  The *de novo* standard requires the court to make findings of fact and weigh

the evidence.  *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (stating that *de novo* review applies to the plan administrator's factual findings as well as plan interpretation).  On *de novo* review, "[t]he trial court performs an 'independent and thorough inspection' of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits." *Leight v. Union Sec. Ins. Co.*, 189 F. Supp. 3d 1039, 1047 (D. Or. 2016) (quoting *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006)).  Here, the parties apparently brought their cross-motions for summary judgment simply as a vehicle for positioning the case before the court and obtaining a decision.  *See Stephanie C. v. Blue Cross Blue Shield of Mass. HMO*, 852 F.3d 105, 110 (1st Cir. 2017) ("Thus— as in the administrative law context—a motion for summary judgment is simply a mechanism for positioning an ERISA benefit-denial case for a district court's decision on the record of proceedings before the plan administrator.") (citing *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006) (explaining that "[i]n the ERISA context, summary judgment is merely a vehicle for deciding the case")).  Yet, making factual findings or weighing evidence is forbidden when considering a motion for summary judgment.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, a motion for summary judgment is ill-suited to the kind of review the court must undertake here.

When considering a party's appeal of the denial of benefits under ERISA, other courts have utilized the procedures set forth in Federal Rule of Civil Procedure 52 for conducting a trial on the administrative record.  *See, e.g., Kearney v. Standard Ins. Co.*,

175 F.3d 1084, 1095 (9th Cir. 1999) ("[T]he district court may try the case on the record that the administrator had before it."); *Bunger*, 186 F. Supp. 3d at 1177-78; *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1314 (D. Or. 2012); *Leight*, 189 F. Supp. 3d at 1047-48; *see also* Fed. R. Civ. P. 52. The court agrees that when applying a *de novo* standard in an ERISA benefits case, a trial on the administrative record under Rule 52, which permits the court to make factual findings, evaluate credibility, and weigh evidence, is a more appropriate vehicle for resolving the parties' dispute. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (ruling that on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[] . . . is a bench trial and not the disposition of a summary judgment motion"); *Rabbat*, 894 F. Supp. 2d at 1314 (concluding that the appropriate procedural vehicle for adjudicating an ERISA claim under *de novo* review is through a bench trial based on the administrative record); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52."); *Sammons v. Regence Bluecross Blueshield of Or.*, No. 3:15-CV-01703-SI, 2016 WL 1171019, at *2 (D. Or. Mar. 23, 2016), *aff'd*, 739 F. App'x 385 (9th Cir. 2018) ("The appropriate procedure to resolve this dispute is through a bench trial on an administrative record."). Although the parties have filed cross motions for summary judgment, based on the foregoing authorities, the court construes the parties' motions as trial memoranda submitted in connection with a bench trial on the administrative record. *See Leight*, 189 F. Supp. 3d at 1048 (construing cross motions for summary judgment as trial memoranda in the context of an ERISA benefits claim).

Accordingly, pursuant to Rule 52(a), the court issues the following findings of fact and conclusions of law based on a *de novo* review of the record.[3]

### III.     FINDINGS OF FACT

**A.     The Parties**

1.  Plaintiffs reside in Matanuska-Susitna Borough, Alaska.  (Compl. ¶ 1.)  Todd R. and Suzanne R. are the parents of Lillian R.  (*Id.*)

2.  Todd R. is a participant in the Plan, which is a fully-insured employee welfare benefits plan under ERISA, and Lillian R. is a beneficiary of the Plan.  (*Id.* ¶¶ 2, 5.) Lillian R.'s coverage under the Plan commenced on May 1, 2014.

3.  Premera is an insurance company, and Premera admits that it is the claims administrator for the Plan.  (*See* Def. MSJ at 2.)

**B.     The Plan's Terms and Premera's Medical Policy**

4.  The Plan states:  "This plan does not cover services that are not medically necessary, even if they are court-ordered."  (AR (Dkt. # 36) (sealed) at 002379, 011702.)

5.  The Plan defines what is "medically necessary" or a "medical necessity" as:

> Services and supplies that a doctor, exercising prudent clinical judgment, would use with a patient to prevent, evaluate, diagnose or treat an illness, injury, disease or its symptoms.  These services must:
>
> • Agree with generally accepted standards of medical practice

//

---

[3] To the extent any findings of fact may be deemed conclusions of law, they shall also be considered conclusions.  Similarly, to the extent any conclusions as stated may be deemed findings of fact, they shall also be considered findings.  *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

- Be clinically appropriate in type, frequency, extent, site and duration. They must also be considered effective for the patient's illness, injury or disease

- Not be mostly for the convenience of the patient, doctor, or other health care provider. They do not cost more than another service or series of services that are at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature. This published evidence is recognized by the relevant medical community, physician specialty society recommendations and the views of doctors practicing in relevant clinical areas and any other relevant factors.

(AR at 002382, 011722.)

6. The Plan states that "[b]enefits for covered services are subject to . . . [m]edical . . . policies" that "are used to administer the terms of the plan." (*Id.* at 11683.) The Plan specifies that "[m]edical policies are generally used to determine if a member has coverage for a specific procedure or service" and "are based on accepted clinical practice guidelines and industry standards accepted by organizations like the American Medical Association (AMA)." (*Id.*)

7. Premera's criteria for evaluating the medical necessity of residential treatment is set forth in its medical policy, which is entitled: "Residential Acute Behavioral Health Level of Care, Child or Adolescent" (hereinafter, "Medical Policy"). (*See id.* at 007137-40.) Premera licensed its Medical Policy from MCG Health, which develops evidence-based clinical review guidelines, generally known as the "Milliman Care

//

Guidelines," for use by healthcare and government organizations.  (*Id.*; *see also id.* at 007151.)

8.  Under the Medical Policy, admission to residential care is appropriate for a child or adolescent exposed to one or more of the following risks:  (1) "[i]mminent danger to self"; (2) "[i]mminent danger to others"; (3) "[l]ife-threatening inability to receive adequate care from caretakers"; (4) "[s]evere disability or disorder requiring acute residential intervention"; (5) "[s]evere comorbid substance abuse disorder that must be controlled . . . to achieve stabilization of primary psychiatric disorder"; or (6) "[p]atient has currently stabilized during inpatient treatment stay for severe symptoms or behavior and requires a structured setting with continued around-the-clock behavioral care."  (*Id.* at 007137.)  The Medical Policy sets forth more detailed criteria concerning the first four of these factors.  (*Id.*)

9.  In its briefing, Premera paraphrased the sixth risk for determining the medical necessity of residential treatment for adolescents as:  "the patient requires a structured setting with continued around-the-clock behavioral care."  (Def. Resp. at 5.)  Premera's paraphrase omitted the first portion of the clause referencing the requirement that the patient has "currently stabilized during inpatient treatment stay for severe symptoms or behavior."  (*See id.*)

10.  During oral argument, Premera's counsel argued that the term "inpatient treatment stay" in the sixth risk for determining the medical necessity of adolescent residential treatment refers only to an inpatient hospital stay.  Yet, nothing in the medical

policy expressly so limits the term "inpatient treatment stay" to solely hospital stays.

(*See* AR at 007137.)

11. The Plan expressly defines the term "inpatient" as:

Someone who is admitted to a healthcare facility for an overnight stay. We also use this word to describe services you get while you are an inpatient.

(*Id.* at 011722.)

12. The Plan expressly defines the term "Hospital" as:

A healthcare facility that meets all of these criteria:

- It operates legally as a hospital in the state where it is located
- It has facilities for the diagnosis, treatment and acute care of injured and ill persons as inpatients
- It has a staff of doctors that provides or supervises care
- It has 24-hour nursing services provided by or supervised by registered nurses

A facility is *not* considered a hospital if it operates mainly for any of the purposes below:

- As a rest home, nursing home, or convalescent home
- As a residential treatment center or health resort
- To provide hospice care for terminally ill patients
- To care for the elderly
- To treat chemical dependency or tuberculosis

(AR at 011722 (italics in orginal).)

## C.    Lillian R.'s Treatment

13. Dr. Shubu Ghosh is a psychiatrist who treated Lillian R. from February 8, 2011, until July 16, 2013. (*Id.* at 000403.) During this period, Dr. Ghosh saw Lillian R. on a weekly basis for therapy sessions. (*Id.*) Dr. Ghosh also prescribed medications for Lillian R. (*Id.*) After Lillian R. stopped seeing Dr. Ghosh, in July 2013, Dr. Ghosh

continued to consult with Todd R. and Suzanne R., Lillian R.'s parents, concerning Lillian R. (*Id.* at 000404.)

14. Based on his treatment of Lillian R., Dr. Ghosh concluded that inpatient residential care was the only treatment option for Lillian R. (*See id.* at 000404-05 ("It is my opinion that inpatient residential care was the only option for [Lillian R.]. [Lillian R.] needed inpatient residential level of care.").) He further stated that Lillian R.'s parents "had exhausted all outpatient avenues and [Lillian R.] required intensive treatment to cope with h[er] debilitating depression, anxiety and behavior problems." (*Id.* at 000405.) Dr. Ghosh "recommended inpatient residential care because [he] was concerned for [Lillian R.'s] safety." (*Id.* at 000405.)

15. Tad Summer is a licensed clinical social worker who worked with Lillian R. from March 20, 2013, to December 27, 2013. (*Id.* at 000407.) Mr. Summer worked with Lillian R. on her primary diagnoses of oppositional defiant disorder, depressive disorder, and anxiety disorder. (*Id.* at 000408.) During September 2013, Mr. Summer increased his sessions with Lillian R. to twice per week due to Lillian R.'s "continued oppositional behaviors, depression and trust issues." (*Id.* at 000407.) During the months that Mr. Summer was treating Lillian R., Lillian R. ran away from home twice, "became assaultive with [her] mother," and "began self injurious behaviors." (*Id.* at 000407-08.) At the beginning of December 2013, Mr. Summer did not believe that "there was any more that could be done [for Lillian R.] in an out patient basis," and he recommended that Lillian R.'s parents place Lillian R. in residential treatment. (*Id.* at 000408.)

//

16. On December 31, 2013, or January 1, 2014, when Lillian R. was 15 years old, her parents admitted her to residential treatment at Elevations Residential Treatment Center ("Elevations")[4] with initial diagnoses of post-traumatic stress disorder, major depressive disorder, and recurrent, moderate parent/child relational problem. (AR 011558; *see also* Compl. ¶¶ 28-29.) In addition, Lillian R. was diagnosed with persistent headaches "with unreliable pain control." (AR at 011558.) The psychiatric evaluation also noted the presence of "[s]ignificant family stressors, including [the] interplay of [a] sibling illness (cancer) with [Lillian R.'s] recurrent headaches, which [we]re improved but not resolved, [a] decline in academic standing, enmeshment with [a] girlfriend and associated gender identity diffusion." (*Id.*)

17. According to evidence submitted by Premera in support of its motion for summary judgment, Elevations is a "medically comprehensive residential treatment center[]," which provides "a combination of intensive psychiatric treatment and personalized care." (Payton Decl. (Dkt. # 34) ¶ 2, Ex. 1 at 2.)

18. Lillian R.'s January 10, 2014, master treatment plan at Elevations identified additional diagnoses of anxiety disorder, eating disorder, identity problem, problems with the primary support group, problems related to the social environment, and educational problems. (AR at 011481.)[5]

---

[4] Previously, Elevations was known as Island View Residential Treatment Center (AR at 000023), but the court refers to this facility as Elevations throughout this order.

[5] In their response to Premera's motion, Plaintiffs assert that Lillian R. "was receiving subacute care for chronic problems that could not be treated in an outpatient setting." (Plf. Resp. (Dkt. # 43) at 4 (citing AR at 000192-202, 000404-05).)

19. Dr. Laura B. Brockbank, an examining psychologist, conducted a "comprehensive psychological evaluation" of Lillian R. in February 2014, while Lillian R. was undergoing treatment at Elevations. (*Id.* at 000031-32, 000425.) She "strongly recommended that [Lillian R] complete the program at [Elevations]." (*Id.* at 000031, 000427.) She also concluded that "[u]nless some change can occur on the family-system level, it is unlikely that [Lillian R.] will be successful at home." (*Id.* at 000429.)

20. Lillian R. was treated at Elevations until June 21, 2015, when she was discharged. (*Id.* at 009258.)

**D.    Plaintiff's Claim for Lillian R.'s Treatment and Premera's Denial**

21. Plaintiffs seek reimbursement from the Plan for the residential treatment that Lillian R. received at Elevations after April 30, 2014. (Compl. ¶ 34; *see* AR at 00049.)

22. Plaintiffs submitted claims to Premera for Lillian R.'s residential treatment at Elevations for the period beginning on May 1, 2014, until the end of her stay. (Compl. ¶¶ 28, 30-31.) Although Lillian R. was admitted to Elevations on December 31, 2013, or January 1, 2014, Plaintiffs' claim applies only to Lillian R.'s treatment at Elevations after April 30, 2014, because May 1, 2014, is the effective date of the Plan. (AR at 000005.) Lillian R. was covered by a different health plan prior to May 1, 2014, and that plan is not a subject of this dispute. (*See id.*)

23. On November 18, 2014, Premera denied Plaintiffs' claims from May 1, 2014, through August 31, 2014, as untimely submitted and denied the claims from September 1, 2014, forward, as not medically necessary. (Compl. ¶ 31; AR at 000049-54.)

//

24. In its denial letter, Premera advised Plaintiffs that its evaluation of the medical necessity of Lillian R.'s residency at Elevations was based on the Plan, the application of Premera's criteria as set forth in the Medical Policy, and a "review of the information given to us by [Elevations]." (AR at 000050.)

25. Premera's November 18, 2014, denial letter stated:

> Continued residential care to treat a mental health condition is not medically necessary after 4/30/14. Information from your provider does not show evidence of continued high-risk behavior, immediate threat of high-risk behavior, life-threatening inability to provide self-care or to receive adequate care from caretakers, severe mental health symptoms, or need for a structured setting and continued around-the-clock care to treat a severe mental health condition that partly stabilized during inpatient care. The information from your provider also does not indicate that the most intensive non-residential level of care will still be unable to control your mental health difficulties, or that you need continued treatment for a severe Substance Use Disorder in order to [sic] your mental health disorder. The information from your provider indicates that you can be treated at a lower level of care. The difficulties that you are still experiencing are usually safely treated at a lower level of care, such as partial hospitalization or outpatient treatment. Your health plan covers only medically necessary services.

(*Id.*)

**E.    Plaintiffs' Level I Appeal of Premera's Denial**

26. On May 13, 2015, Plaintiffs appealed Premera's denial of coverage through Premera's internal appeal process ("Level I Appeal"). (Compl. ¶ 32; AR at 000016-47.)

27. Plaintiffs made three arguments in their Level I Appeal letter. (AR at 000016-47.) First, Plaintiffs argued that Premera's Medical Policy did not comport with generally accepted standards of care and was too restrictive. (*Id*. at 000020-22.) Plaintiffs cited to the American Academy of Child and Adolescent Psychiatry ("AACAP") Practice Parameters and other medical literature on the standard of care.

(*Id.*)  Second, Plaintiffs argued that Lillian R.'s treatment was medically necessary, and they included a detailed chronology of Lillian R.'s behavior, past treatments and medications, as well as Lillian R.'s medical records and Elevations treatment records. (*Id.* at 000022-46.)  Third, Plaintiffs asserted that by denying coverage for Lillian R.'s residential treatment, Premera violated the Parity Act[6] by providing a lower level of care for mental health services than for medical services.  (*Id.* at 000045-46.)

28.  Plaintiffs' Level I Appeal included a letter from a psychiatrist and a letter from a licensed clinical social worker—both of whom treated Lillian R. prior to her admission at Elevations.  (*Id.* at 000403-05; 000407-08; *see also id.* at 000027-31.)

29.  The first letter was from Dr. Ghosh.  (*Id.* at 000403-05.)  As noted above, Dr. Ghosh treated Lillian R. weekly from February 8, 2011, to July 16, 2013.  (*Id.* at 000403.)  Dr. Ghosh stated that it was his "opinion that inpatient residential care was the only option for [Lillian R.]."  (*Id.* at 000404-05.)

30.  The second letter was from Mr. Summer, the licensed clinical social worker who treated Lillian R. from March 20, 2013, through December 27, 2013.  (*Id.* at 000407-08.)  At the beginning of December 2013, Mr. Sumner recommended residential treatment for Lillian R, and Todd R. and Suzanne R. placed Lillian R. in residential treatment shortly thereafter.  (*Id.* at 000408.)

//

//

//

---

[6] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

31.  Neither Dr. Ghosh nor Mr. Sumner treated Lillian R. during the period of her inpatient residential treatment at Elevations.  (*See id.* at 000403-08.)  Neither Dr. Ghosh nor Mr. Sumner made any assessment of Lillian R. while she was at Elevations.  (*See id.*)

32.  In their Level I Appeal letter, Plaintiffs also highlighted the evaluation of Dr. Brockbank, an examining psychologist, who evaluated Lillian R. in February 2014, during the course of Lillian R.'s treatment at Elevations.  (AR at 000031-32.)  Lillian R.'s therapist and parents requested the "comprehensive psychological evaluation" to obtain information concerning Lillian R's "cognitive, academic, personality and mental health functioning."  (*Id.* at 000411, 000425.)  They also requested "[r]ecommendations for educational and treatment planning."  (*Id.* at 000411)

33.  In her evaluation, Dr. Brockbank noted that Lillian R. "is beginning to make progress while at [Elevations]."  (*Id.* at 000427.)  She also opined that "[g]iven continued intervention and therapeutic support, [Lillian R.'s] prognosis for continued improvement is good."  (*Id.*)  As a result of her evaluation, Dr. Brockbank "strongly recommended that [Lillian R] complete the program at [Elevations]."  (*Id.* at 000031, 000427.)  She stated that "[g]iven [Lillian R.'s] history of running away and suicidal ideation, it is recommended that [s]he is closely monitored."  (*Id.* at 000032.)  She also stated that if Lillian R. "becomes upset or angry, [s]he may attempt to run from the program . . . ." (*Id.*)  In addition, Dr. Brockbank noted that "[u]nless some change can occur on the family-system level, it is unlikely that [Lillian R.] will be successful at home."  (*Id.* at 000429.)

//

34. In their Level I Appeal letter, Plaintiffs also provided several progress and therapy notes from Lillian R.'s time at Elevations. (*Id.* at 000033-34.) These notes describe Lillian R.'s temperament on various occasions as "upset," "discouraged at how far away [she] is from [her] ideal self," "anxious," "irritable," "isolating," and "depressed." (*Id.* at 000033-35.)

35. The notes also document a period of time in which Lillian R. experienced thoughts or urges of suicide or self-harm. On June 12, 2014, the notes indicate that staff checked on Lillian R. to see if she still had thoughts of self-harm. (*See id.* at 011750.) Lillian R. stated that she was unsure and promised to tell staff if she does have these thoughts. (*Id.*) On June 13, 2014, Lillian R. stated that she could manage herself. (*Id.*) On June 15, 2014, Lillian R. stated that she had an urge to self-harm. (*Id.*) On June 16, 2014, "[Lillian R.] was placed on self harm [sic] precautions for self harm [sic] ideation," she "felt a strong desire to cut" like she used to, she "could not make a commitment for safety and did not feel confident that [she] could go to staff before harming [her]self." (*Id.* at 000036.) In addition, her "suicidal thoughts continued." (*Id.*) On June 17, 2014, Elevations took Lillian R. off of self-harm precautions. (*Id.* at 011750.) On June 19 and 20, 2014, Lillian R. stated that she still had thoughts of self-harm. (*Id.*) On June 23, 2014, Lillian R. said that she had thoughts of self-harm but would not act on them. (*Id.*)

36. Based on the letters and various progress and therapy notes, Plaintiffs argued that Lillian R. "continue[d] to need [a residential] level of care in order to complete [her] master treatment plan goals so that [she could] be successfully treated at a lower level of

//

care." (*Id.* at 000045.) Plaintiffs maintained that if Lillian R. had been "discharged on May 1, 2014, [she] would have quickly regressed into [her] prior behaviors." (*Id.*)

37. As a part of Plaintiffs' Level I Appeal, Premera asked an "Independent Physician Reviewer" to review its decision to deny coverage. (*See* AR 011655-60.) Dr. William Holmes, MD, who is board certified by the American Board of Psychiatry and Neurology in Child and Adolescent Psychiatry (*id.* at 011658), reviewed Plaintiffs' Level I Appeal submissions and other relevant claim information, including the Master Treatment Plan, treatment notes and shift logs from Elevations, the Plan language, and Premera's Medical Policy (*id.* at 011655).

38. Dr. Holmes concluded that "the service provided, mental health residential treatment center stay from 5/1/14 to 4/30/15, was not medically necessary based on the provided medical policy and plan language." (*Id.* at 011656.) Specifically, he stated:

> The service provided was not medically necessary based on the provided medical [sic]. There was no medical necessity for residential treatment center level of care for dated [sic] of service 5/1/14 forward. By 5/1/14, there was no evidence of symptom severity that would require the ongoing intensity of the residential treatment center level of care. It was noted that the patient continued to display chronic difficulties with mood, anxiety, oppositional behavior, and interpersonal conflict after 5/1/14. However, these difficulties are of a chronic nature for the patient and were not of a severity to warrant 24 hour [sic] treatment. It was noted that on occasion the patient voiced thoughts of self-harm. However, at no time was there evidence of imminent risk of harm to self or others, as well as no episodes of self-harming behavior. There was also no evidence of deterioration of functioning that would require the level of intensive treatment found in the residential center setting.

(*Id.*)

//

39. Premera denied Plaintiffs' Level I Appeal on June 16, 2015. (*Id.* at 002410-13 (Level I Appeal decision).) Premera affirmed its prior decision that residential treatment was not medically necessary after April 30, 2014. (*Id.* at 002410.) Specifically, Premera stated:

> By May 1, 2014, [Lillian R.'s] symptoms were not of a severity that would warrant the continued use of a residential treatment center level of care, though [s]he continued to display chronic problems related to h[er] mood and feelings of being "overwhelmed." However, these symptoms could have been treated in a less restrictive level of care. Therefore, your appeal is being upheld in accordance to the terms of the health plan, as the mental health residential treatment center stay from May 1, 2014, through April 30, 2015, was not medically necessary.

(*Id.*)

40. In its June 16, 2015, denial letter, Premera also responded to Plaintiffs' assertion that Premera's use of the Milliman Care Guidelines was improper. (*See id.*) Premera stated it was not aware of credible scientific evidence that the AACAP Practice Parameters—preferred by Plaintiffs—would be more appropriate than the Milliman Care Guidelines, and Premera asserted that it had "acted in accordance with [P]lan requirements and used evidence-based standards for evaluating the medical necessity of [Plaintiffs'] claims." (*Id.* at 002410-11.)

41. Finally, Premera denied that it had violated the Parity Act.[7] (*Id.* at 002411.) Premera stated that "[t]he evidentiary standards, processes, and strategies used to develop Premera's mental health medical policies are no more restrictive than the standards, processes, and strategies used to develop Premera's medical and surgical medical

---

[7] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

policies." (*Id.*)  Premera confirmed that "[a]t the time of service, Premera used the Milliman Care Guidelines for all inpatient services, including mental health, medical, and surgical services," and thus was "in compliance with federal mental health parity law." (*Id.*)

**F.      Plaintiffs' Level II Appeal**

42.  On August 10, 2015, Plaintiffs requested a Level II Appeal of Premera's denial of coverage.  (*See id.* at 002428-33.)  In addition to the medical records provided in their Level I Appeal, Plaintiffs also provided the remainder of Lillian R.'s medical records from Elevations.  (*See id.* at 002431.)

43.  In their Level II Appeal, Plaintiffs argued that Premera failed to advise them of the weight given to Lillian R.'s medical records.  (*Id.* at 002430.)  They questioned whether Premera's Level I Appeal decision was based on a "continued stay criteria" or a "discharge criteria."  (*Id.* at 002431.)  They criticized the alleged burden imposed by the Medical Policy, which they again asserted violated the federal Parity Act,[8] and provided additional medical records to support their contention that residential treatment for Lillian R. was medically necessary.  (*Id.* at 002431-33.)  They asked Premera to cite specific examples in the medical records that supported Premera's denial of Lillian R.'s claim, which they asserted was required under ERISA.  (*Id.* at 002433.)  Finally, they challenged Premera's determination that certain portions of Lillian R.'s claims were not timely submitted.  (*Id.* at 2429-30.)

---

[8] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

44. To review Plaintiffs' Level II Appeal and Lillian R.'s file, Premera assigned a panel consisting of (1) a physician, who is a medical director and board certified in internal medicine, (2) a Member Contracts Operations Manager, and (3) a New Group and Product Implementation Manager. (*See id.* at 007151.) The panel reviewed all of the materials that Plaintiffs submitted with both their Level I and Level II Appeals, Dr. Holmes's findings as the Independent Physician Reviewer, Premera's Medical Policy, Lillian R.'s medical records, and the Plan language. (*Id.*)

45. On September 10, 2015, the Level II Appeal panel upheld Premera's Level I Appeal determination denying coverage. (*Id.*) However, the Level II Appeal panel acknowledged that all of Plaintiffs' claims were timely submitted and agreed to review the claims Premera had previously determined to be untimely. (*Id.* at 007152.)

46. Addressing the medical records, the Level II Appeal panel stated that the records "did not include a comprehensive evaluation, but only a narrative of daily group assessments, or intermittent doctor interviews." (*Id.*) Further, the records "indicated the absence of a plan for self harm [sic], or to harm others, and no evidence of the severe symptoms which could not have been treated in an intensive outpatient management program." (*Id.*) The panel explained that the "purpose of residential treatment admission is stabilization in the context of a short term stay" and that "the severity of illness for [residential treatment] level of care [is] not documented in the clinical notes from the facility." (*Id.*)

47. The panel noted Plaintiffs' request for specific references in the medical records that support Premera's belief that Lillian R.'s treatment was not medically

1 necessary, but explained that Premera's determination was "based on an absence of

2 record of severe symptoms which could not have been treated in an intensive outpatient

3 program." (*Id.*)

4    48.  The panel noted Plaintiffs' request that Premera apply or consider the AACAP

5 Practice Parameters, but explained that Milliman Care Guidelines "are generally accepted

6 standards of medical practice" and "Premera's medical policies are applied consistently

7 for all plan members." (*Id.*)  Accordingly, Premera explained that it could not

8 "accommodate a member request to apply a different medical policy for a specific

9 claim." (*Id.*)

10    49.  With respect to Plaintiffs' claim that Premera's denial violated the Parity Act,[9]

11 the panel stated that the Milliman Care Guidelines do not require "proof of acute

12 deterioration in capacity" in order to be covered for continuing residential treatment.

13 (*Id.*)  Further, the panel stated that, like residential care for mental health issues, "Premera

14 does not cover continued inpatient or residential care for medical or surgical services

15 after such care is no longer medically necessary." (*Id.*)

16 **G.    Plaintiffs' Request for an Independent Review**

17    50.  After a member exhausts Premera's internal appeals, the Plan offers members

18 an external review option.  (*Id.* at 002385-86.)

19    51.  On December 18, 2015, Plaintiffs requested an independent review of

20 Premera's decision.  (*Id.* at 007170-72.)  MCMC, LLC ("MCMC") conducted the

21

22      [9] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

independent review.  (*See id.* at 011740-52.)  The physician reviewer from MCMC, who is anonymous, is board-certified in psychiatry with a sub-certification in child and adolescent psychiatry.  (*Id.* at 011747.)  The physician reviewer is also an attending staff physician at several northwest hospitals, as well as a clinical instructor.  (*Id.*)  The physician reviewer is also an author of peer-reviewed medical literature, a member of the American Academy of Child and Adolescent Psychiatry, the American Psychoanalytic Association, and the Academy of Occupational and Organizational Psychiatrists.  (*Id.*)

52.  On January 14, 2016, MCMC upheld Premera's denial of coverage for Lillian R.'s residential treatment.  (*Id.* at 011745-52.)  MCMC's independent physician reviewer concluded that a residential treatment center was not medically necessary from May 1, 2014, through June 21, 2015.  (*Id.* at 011746, 011751.)  The physician reviewer noted that during the time period in question, Lillian R. "had periods of time at home during which [she] was not receiving residential treatment and [her] clinical course continued." (*Id.*)  The physician reviewer concluded that this demonstrated that "alternative therapies and approaches . . . would have been as likely to be effective during the period of time." (*Id.*)  Further, the physician reviewer stated, "since there are less intensive alternative approaches that would have as much of a chance of improving h[er] condition as the treatment that [s]he was receiving at Elevations, withholding treatment would not have reasonably been expected to affect the patient's health adversely."  (*Id.* at 011751.)

53.  In the clinical summary portion of MCMC's report, the independent physician reviewer stated that, in the months following May 2014, with certain stated exceptions, "in general, [Lillian R.] ha[d] no significant behavioral difficulty and denie[d] self harm

[sic] urges." (*Id.* at 011750.) The independent physician reviewer then specifically noted the particular instances in June 2014, during which Lillian R. expressed thoughts of or urges to self-harm. (*Id.*)

## IV. CONCLUSIONS OF LAW

**A. Jurisdiction**

1. The court has jurisdiction over this case under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

**B. Standards under ERISA**

2. ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."). The court finds that Todd R. is a qualified participant and Lillian R. is a beneficiary of the Plan.

3. As discussed above, ERISA does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations. *Firestone*, 489 U.S. at 109. The parties, however, have agreed that *de novo* review is appropriate here. (*See* Plf. MSJ at 14; Def. MSJ at 10; Plf. Resp. at 2.) The court accepts the parties' stipulation and reviews the record *de novo*. *See Rorabaugh*, 321 F. App'x. at 709.

4. "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance

if the claimant has adequately established" his or her claim "under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010); *see also Perryman v. Provident Life & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 942 (D. Ariz. 2010) (stating that the administrator's "evaluation of the evidence is not accorded any deference or presumption of correctness"). In reviewing the administrative record and other admissible evidence, the court "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014) (quoting *Schramm v. CNA Fin. Corp. Insured Grp. Benefits Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)).

5. When a district court "reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294; *see also Schramm*, 718 F. Supp. 2d at 1162 ("In an ERISA case involving *de novo* review, the plaintiff has the burden of showing entitlement to benefits."); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (the claimant "bears the burden of proving his entitlement to contractual benefits").

6. "Under de novo review, the rules ordinarily associated with the interpretation of insurance policies apply." *Leight*, 189 F. Supp. 3d at 1047 (citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997)). Accordingly, the court construes any ambiguities in the Plan against Premera and is required "to adopt [a] reasonable interpretation advanced by [the insured]." *See Lang*, 125 F.3d at 799.

## C. Plaintiffs' Entitlement to Benefits

7.  In deciding whether the Plan provides coverage for Lillian R.'s inpatient residential treatment at Elevations, the court begins with the Plan's language. The Plan states that it covers "inpatient [and] residential treatment . . . to manage or reduce the effects of a mental condition." (AR at 002374.) However, the parties agree that the Plan excludes services that are not "medically necessary." (*Id.* at 002379; *see* Def. Mot. at 4; Plf. Mot. at 2-3.) Thus, the crux of the issue that the court must decide is whether Plaintiffs have met their burden of proving that Lillian R.'s treatment at Elevations from May 1, 2014, through June 21, 2015, was "medically necessary" and therefore not excluded from coverage under the Plan.

8.  Premera's criteria for evaluating the "medical necessity" of residential treatment is set forth in its Medical Policy, which in turn is based on the Milliman Care Guidelines. (Def. Mot. at 5 (acknowledging this fact); *see also supra* § III.B ¶ 7.) Premera's evaluation of the medical necessity of Lillian R.'s treatment at Elevations and Premera's ultimate denial of coverage for that treatment "was based on Premera's criteria set forth in the Medical Policy and a 'review of the information given to [Premera] by [Elevations].'" (AR at 000050.)

9.  Plaintiffs argue that Premera's reliance on the Medical Policy was in error and that Premera should have instead applied the principles they argued could be found in the AACAP. (Plf. Mot. at 10 (citing AR at 000019-22).) However, the court need not decide which standard to apply in evaluating "medical necessity," because it concludes that

Lillian R.'s treatment qualifies as medically necessary even when applying Premera's Medical Policy.

10. Premera argues that the weight of the evidence falls in its favor because in denying coverage it relied on an independent physician reviewer, allowed Plaintiffs two levels of internal appeals, and then submitted to an external independent review of its decision by MCMC—all of which affirmed its original decision to deny coverage. (*See* Def. Mot. at 12-17.) For the reasons stated below, the court disagrees and concludes on *de novo* review that Plaintiffs have met their burden of demonstrating that Lillian R.'s treatment at Elevations was medically necessary and therefore covered under the Plan.

11. As described herein, the court concludes that Lillian R.'s treatment qualifies as "medically necessary" because it falls within the sixth risk listed in Premera's Medical Policy. (*See* AR at 007137; *see supra* § III.B. ¶ 8.)

12. The sixth risk listed in Premera's Medical Policy provides that residential care is appropriate for an adolescent where the "[p]atient has currently stabilized during [an] inpatient treatment stay for severe symptoms or behavior and requires a structured setting with continued around-the-clock behavioral care." (*See* AR at 007137; *see supra* § III.B. ¶ 8.) As discussed below, the court concludes, based on its *de novo* review of the record, that Lillian R. was initially admitted for "inpatient treatment" at Elevations "for severe symptoms or behavior," subsequently stabilized as a result of her treatment at Elevations, but, based on Dr. Brockbank's evaluation, continued to require the "structured setting" and "continued around-the-clock behavioral care" available at Elevations. (*See* AR at 007137; *see supra* § III.B. ¶ 8.)

13. Premera responds in two ways. First, in its November 18, 2014, denial letter, Premera stated that Lillian R.'s care did not fall with the sixth risk listed in Premera's Medical Policy and therefore was not medically necessary because "[i]nformation from [Elevations] d[id] not show evidence of . . . [the] need for a structured setting and continued around-the-clock care to treat [a] severe mental health condition that partly stabilized during inpatient care." (AR at 000050.) However, as discussed below, Premera did not adequately take into account certain medical evidence submitted by Plaintiffs that supports coverage.

14. Second, at oral argument, Premera's counsel argued that the sixth risk listed in the Medical Policy does not apply because it requires the adolescent patient to have "stabilized during [an] inpatient treatment stay for severe symptoms," and Lillian R.'s residential treatment stay at Elevations did not qualify as an "inpatient treatment stay." (*See id.* at 007137.) Premera's counsel argued that the term "inpatient" refers solely to inpatient hospital stays and not to residential treatment center stays, and thus, the sixth risk does not apply because Lillian R. "was never in inpatient hospitalization." In other words, Premera argues that the Medical Policy's sixth risk only applies where an adolescent is first admitted to inpatient hospitalization for severe symptoms, stabilizes at that level of care, and then is downgraded to a residential level of care. Premera's counsel also argued that Lillian R.'s initial admission at Elevations was not for "severe symptoms" as is also required under the Medical Policy's sixth risk.

15. The court will address both of Premera's arguments, but in reverse order.

//

1    1.  The Plan's Language and the Medical Policy's Sixth Risk

2        16.  As noted above, "the rules ordinarily associated with the interpretation of

3    insurance policies apply" in this case.  *See Leight*, 189 F. Supp. 3d at 1047 (citing *Lang*,

4    125 F.3d at 799).  Thus, the court construes any ambiguities in the Plan against Premera.

5    *See Lang*, 125 F.3d at 799.  In addition, Premera's Medical Policy is specifically

6    referenced and therefore incorporated into the Plan.  (*See* AR at 011683; *see supra* § III.B

7    ¶ 6.)  Further, Premera's counsel admitted during oral argument that Premera's Medical

8    Policy "is part of the contract" or Plan.  Thus, the court extends the application of the

9    foregoing rules to its interpretation of Premera's Medical Policy and construes any

10   ambiguities in the Medical Policy against Premera.

11           *a.  Inpatient*

12       17.  Applying the foregoing rules and for the reasons stated below, the court

13   concludes that the term "inpatient," as it is used in the sixth risk listed in Premera's

14   Medical Policy, is not limited solely to hospital admissions but applies to admissions at

15   other healthcare facilities, including residential treatment centers such as Elevations.

16       18.  First, despite Premera's argument that its Medical Policy limits the term

17   "inpatient" to circumstances involving a hospital admission, the court finds no such

18   limitation in the language of the Medical Policy.  The admission guidelines for

19   adolescents to residential care contained in Premera's Medical Policy do not (1)

20   specifically define the term "inpatient" as that term is used in the sixth risk, or (2)

21   expressly limit the term "inpatient" to mean only hospital admissions.  (*See* AR at

22   007137-38.)

19. Further, the terms "inpatient" and "residential care" are used interchangeably throughout the medical records. For example, Dr. Ghosh specifically describes "residential care" as "inpatient." (*See id.* at 000404-05 ("It is my opinion that inpatient residential care was the only option for [Lillian R.] [Lillian R.] needed inpatient residential level of care.").) Moreover, Premera repeatedly describes Lillian R.'s "residential care" at Elevations as "inpatient" throughout its own briefing. (*See* Def. MSJ at 10 ("On January 14, 2016, MCMC upheld Premera's denial of coverage for inpatient residential treatment."), *id.* at 13 ("The medical evidence offered by Plaintiffs fails to raise an issue of fact as to whether [Lillian R.'s] condition was at such an acute level as to require inpatient care."), *id.* at 15; Def. Resp. (Dkt. # 44) at 10, 22.) Indeed, at oral argument, Premera's counsel agreed that the terms "residential" and "inpatient" are used interchangeably throughout the medical records.

20. The language of the Plan itself supports the conclusion that the term "inpatient" refers to a broader category of overnight stays than just hospitalizations. The Plan expressly defines the term "inpatient" as "[s]omeone who is admitted to a healthcare facility for an overnight stay." (AR at 011722; *see supra* § III.B ¶ 11.) Thus, the definition of "inpatient" is not expressly limited solely to an individual who is admitted to a hospital.

21. Further, the Plan specifically defines the term "hospital" as only one type of healthcare facility that meets a series of specific criteria. (AR at 011722; *see supra* § III.B ¶ 12.) The Plan goes on to provide that a facility "is *not* considered a hospital if it operates mainly . . . [a]s a residential treatment center." (AR at 011722 (italics in

original).)  Thus, contrary to Premera's counsel's assertion, the term "inpatient" necessarily includes more than just a person who is admitted to a hospital; the term also applies to a person who is admitted overnight to other types of healthcare facilities.

22.  The Plan does not expressly define "healthcare facility" (*see generally* AR at 011719-24), but the court concludes that Elevations falls within the meaning of this term. As noted above, evidence submitted by Premera describes Elevations as a "medically comprehensive residential treatment center[]," which provides "a combination of intensive psychiatric treatment and personalized care."  (Payton Decl. ¶ 2, Ex. 1 at 2.) Thus, the court concludes that Lillian R.'s treatment at Elevations falls within the Plan's definition of "inpatient" as "[s]omeone who is admitted to a healthcare facility for an overnight stay."  (*See* AR at 011722.)

23.  Based on the foregoing analysis, the court concludes that Lillian R.'s initial admission to Elevations qualifies as an "inpatient treatment stay" under the sixth risk listed in Premera's Medical Policy.

    *b.  Severe Symptoms*

24.  The court also concludes—contrary to Premera's counsel's assertion at oral argument—that Lillian R.'s initial admission to Elevations was "for severe symptoms" as is also required under the sixth provision of Premera's Medical Policy.  (*See id.* at 011722.)  As noted above, during the months immediately preceding Lillian R.'s admission to Elevations, Lillian R. ran away from home twice, "became assaultive with [her] mother," and "began self injurious behaviors."  (*Id.* at 000407-08.)  Mr. Summer, the licensed clinical social worker who was treating Lillian R. at the time, concluded in

December 2013 that there was nothing more that could be done for her in an outpatient

setting and residential treatment was recommended. (*Id.* at 000408.) Further, Dr. Ghosh,

the psychiatrist who treated Lillian R. immediately prior to Mr. Summer, also concluded

that inpatient residential care was the only treatment option for Lillian R. because her

parents had exhausted all outpatient treatment options and Dr. Ghosh was concerned for

Lillian R.'s safety. (*Id.* at 000404-05.)

25. Thus, the court rejects Premera's position at oral argument that the sixth risk

contained in its Medical Policy is inapplicable because Lillian R.'s initial admission at

Elevations was not "for an inpatient treatment stay for severe symptoms." To the

contrary, the court concludes that Lillian R.'s initial admission at Elevations was "an

inpatient treatment stay for severe symptoms."

2. Evidence of Medical Necessity

26. As noted above, in its denial letter to Plaintiffs, Premera stated that Lillian

R.'s stay at Elevations after April 30, 2014, did not fall with the sixth risk delineated in

Premera's Medical Policy and therefore was not medically necessary because

"[i]nformation from [Elevations] d[id] not show evidence of . . . [the] need for a

structured setting and continued around-the-clock care to treat [a] severe mental health

condition that partly stabilized during inpatient care." (AR at 000050.) In so concluding,

Premera failed to adequately consider and/or evaluate certain portions of the medical

record.

27. Specifically, Premera does not adequately account for Dr. Brockbank's

February 2014 psychological evaluation of Lillian R. In her evaluation, Dr. Brockbank

noted that Lillian R. was "beginning to make progress while at [Elevations]," and "[g]iven continued intervention and therapeutic support, [Lillian R.'s] prognosis for continued improvement is good." (*Id.* at 000427.) However, she "strongly recommended that [Lillian R.] complete the program at Elevations." (*Id.* at 000031, 000427.) She supported her recommendation by noting Lillian R.'s history of running away and suicidal ideation. (*Id.* at 000032.) She also assessed that Lillian R. might attempt to run from the program (*id.*) and, without some changes, was unlikely to be successful at home (*id.* at 000429). Dr. Brockbank's assessment, performed approximately two months prior to the period for which Plaintiffs are seeking coverage, supports the court's conclusion that Lillian R.'s continued treatment was medically necessary under the terms of the Plan because her treatment fell within the confines of the sixth risk listed in Premera's Medical Policy. In other words, Lillian R. had "currently stabilized during [an] inpatient treatment stay" at Elevations "for severe symptoms or behavior" but still "require[d] a structured setting with continued around-the-clock behavioral care" at Elevations. (*See id.* at 007137.)

28. Further, Dr. Brockbank's assessment and her recommendation that Lillian R. remain in the treatment program at Elevations is supported by additional evidence in Elevation's clinical notes. In June 2014, just four months after Dr. Brockbank's assessment, Lillian R. began once again to experience suicidal ideation and self-harm urges. *See supra* § III.E ¶ 35. Further, Lillian R. could not always make a commitment to her own safety or that feel confident that she would notify staff before harming herself. *Id.*

29. Despite this critical evidence in support of the medical necessity of Lillian R's continued participation in the Elevations residential treatment program, Premera never even discusses Dr. Brockbank's evaluation in any of its briefing. (*See generally* Def. Mot., Def. Resp., Def. Reply (Dkt. # 46).)

30. Further, the medical evaluations upon which Premera relies do not sufficiently account for Dr. Brockbank's opinion or the medical records concerning Lillian R.'s propensity to self-harm. For example, during Plaintiffs' Level I Appeal, to support his conclusion that Lillian's treatment after May 1, 2014, was not medically necessary, Dr. Holmes states "there was no evidence of symptom severity that would require the ongoing intensity of the residential treatment center level of care," although he acknowledges "that on occasion the patient voiced thoughts of self-harm." (AR at 011656.) Nevertheless, he discounts this fact by stating that "at no time was there evidence of imminent risk of harm to self or others, as well as no episodes of self-harming behavior," and "no evidence of deterioration of functioning that would require the level of intensive treatment found in the residential center setting." (*Id.*) He concludes that Lillian R.'s "symptoms could have been treated in a less restrictive level of care." (*Id.* at 011657.) Yet, Dr. Holmes never references Dr. Brockbank's evaluation or provides any explanation as to why he is discounting Dr. Brockbank's strong recommendation that Lillian R. complete the program at Elevations. Further, Dr. Holmes fails to note that Lillian R. was placed on self-harm precautions at least once in June 2014 because she could not make a commitment for her own safety or assure the staff at Elevations that she would alert them before harming herself. (*Id.* at 000036; *see supra*

§ III.E ¶ 35. Finally, contrary to Dr. Holmes' assertion, the sixth risk listed in the Medical Policy does not require a "deterioration of functioning," but actually applies to a patient who "has currently stabilized," but continues to "require[] a structured setting with continued around-the-clock behavioral care." (*See* AR at 007137.) As the court indicated above, this fits the description provided by Dr. Brockbank in her assessment of Lillian R.

31. When assessing Dr. Holmes's and Dr. Brockbank's opinions, the court places greater weight on Dr. Brockbank's assessment that Lillian R. needed to remain at Elevations than on Dr. Holmes's assessment that she did not. Significantly, Dr. Brockbank's "comprehensive psychological evaluation" included a direct examination of Lillian R. (*see generally id.* at 000410-30), while Dr. Holmes' assessment did not (*see generally id.* at 011655-60). Instead, Dr. Holmes's assessment was based solely on his review of Lillian R.'s medical and other records. (*See id.*)

32. Unlike in a social security administration case, there is no rule requiring ERISA plan administrators to afford greater weight to examining and treating doctors. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, this does not mean that a district court, engaging in *de novo* review, cannot evaluate and give appropriate weight to an examining doctor's conclusions, if it finds those opinions reliable and probative. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) (affirming the greater weight the district court placed on a treating physician's conclusions); *Gallegos v. Prudential Ins. Co. of Am.*, No. 16-CV-01268-BLF, 2017 WL 2418008, at *9 (N.D. Cal. June 5, 2017) (placing greater weight on treating

physician's opinion).  Here, the court so finds, and accordingly places greater weight on Dr. Brockbank's assessment than that of Dr. Holmes.

33.  In Plaintiffs' Level II Appeal, the reviewing panel stated that the records "did not include a comprehensive evaluation, but only a narrative of daily group assessments, or intermittent doctor interviews."  (AR at 007152.)  This statement ignores Dr. Brockbank's comprehensive assessment entirely.  Further, the panel states that the records indicate "the absence of a plan for self harm [sic] . . . and no evidence of the severe symptoms which could not have been treated in an intensive outpatient management program."  (*Id.*)  This statement ignores the clinical notes indicating that Elevation's staff had placed Lillian R. on self-harm precautions because she could not commit to informing staff prior to acting on her suicidal or other self-harming thoughts or urges.  *See supra* § III.E ¶ 35.  It also ignores Dr. Brockbank's assessment that Lillian R. may attempt to run from the program and that, without changes on the family-system level, Lillian R. would likely be unsuccessful at home.  *See supra* § III.E ¶ 33.  Because the panel either ignored or failed to account for significant evidence in the record before it, the court places little or no weight on the Level II Appeal panel's conclusions concerning the medical necessity of Lillian's residential treatment.

34.  Further, for the same reasons that the court placed greater weight on Dr. Brockbank's evaluation of Lillian R. than Dr. Holmes's evaluation, the court also places greater weight on Dr. Brockbank's evaluation, which included an examination of Lillian R., than the opinion or evaluation of the Level II Appeal reviewing panel, which did not.  *See supra* § IV.C ¶¶ 31-32.

35.  As noted above, MCMC's independent physician reviewer also affirmed Premera's denial of coverage.  *See supra* § III.G. ¶ 52.  Nevertheless, the court places little weight on this evidence.  First, the physician reviewer concluded that because Lillian R. "had periods of time at home during which [she] was not receiving residential treatment and [her] clinical course continued," "alternative therapies and approaches . . . would have been effective during the time period."  (AR at 011746, 011751.)  Yet, this conclusion contradicts Dr. Brockbank's strong recommendation that Lillian R. complete the Elevations program and her conclusion that, absent changes on the family-system level, "it is unlikely that [Lillian R.] will be successful at home."  (*Id.* at 000427, 000429.)  Although the independent physician reviewer notes Dr. Brockbank's evaluation, he does not explain the inconsistencies between his recommendations and hers.  (*See id.* at 011749.)

36.  Further, providing Lillian R. with periods of time at home as she progressed through the program at Elevations is consistent with Dr. Brockbank's treatment recommendations.  (*See id.* at 000430.)  Dr. Brockbank recommended that, once Lillian R. "had achieved [her] current treatment goals," she should be allowed to apply her "new coping and self-management skills to a less structured environment," "while gradually exposing [her] to real life situations and stressors."  (*Id.* at 000430.)  In other words, although Lillian R. ultimately reached points in her treatment when she was ready to try out her new skills in a "less structured" and "real life" environment, which included short stints at home, these experiences were not inconsistent with her need to return to

Elevations' "structured setting" and "continued around-the-clock behavioral care" until she was medically ready for a complete discharge from the program. (*See id.* at 007137.)

37. In addition, for the same reasons that the court places greater weight on Dr. Brockbank's evaluation of Lillian R. than Dr. Holmes's evaluation or the Level II Appeal panel's evaluation, the court also places greater weight on Dr. Brockbank's evaluation, which included an examination of Lillian R., than the independent physician reviewer, which did not. *See supra* § IV.C ¶¶ 31-32, 34.

38. The court concludes that, based on the records submitted, including Dr. Brockbank's evaluation and recommendation that Lillian R. complete the Elevations program, along with other records that support Dr. Brockbank's conclusion, including clinical notes showing that Lillian R. continued to experience suicidal and self-harm ideation and urges while at Elevations, Plaintiffs have met their burden of proving that Lillian R.'s treatment at Elevations from May 1, 2014, to June 21, 2015, was medically necessary and therefore covered under the Plan.

39. The court will determine the amount of damages for which Premera is liable to Plaintiffs, as well as Plaintiffs' entitlement to prejudgment interest, attorney's fees, and costs following additional briefing by the parties.

## V.    CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court GRANTS Plaintiffs' motion (Dkt. # 37) and DENIES Premera's motion (Dkt. # 33). The court further concludes that Lillian R.'s residential treatment at Elevations from May 1,

2014, to June 21, 2015, was medically necessary and therefore covered under the Plan and enters judgment on that issue in favor of Plaintiffs.

Dated this 30th day of January, 2019.

JAMES L. ROBART
United States District Judge