UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TODD R., et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>PREMERA BLUE CROSS BLUE<br>SHIELD OF ALASKA,<br><br>               Defendant. | CASE NO. C17-1041JLR<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW AND<br>ORDER REGARDING THE<br>PARTIES' CROSS MOTIONS<br>FOR JUDGMENT |

## I.  INTRODUCTION

Before the court are (1) Plaintiffs Todd R., Suzanne R., and Lillian R.'s[1]

(collectively, "Plaintiffs") motion for judgment pursuant to Federal Rule of Civil

---

[1] Lillian R. was formerly known as Jonathan R. and is referred to as "Jon" or "Jonathan" throughout the administrative record. (*See* Am. Compl. (Dkt. # 100) ¶ 1 n.1; *see generally* AR (Dkt. # 36) (sealed).)  Consistent with the parties' briefing, the court refers to her as "Lillian" in this order.

Procedure 52 (Pls. Mot. (Dkt. # 105); *see also* Pls. Resp. (Dkt. # 110)[2]) and (2) Defendant Premera Blue Cross Blue Shield of Alaska's ("Premera") motion for summary judgment[3] (Def. Mot. (Dkt. # 101); *see also* Def. Resp. (Dkt. # 108)).

This case returns to the court after the Ninth Circuit vacated and remanded the court's previous findings of fact and conclusions of law. (Mem. from USCA (Dkt. # 88)); *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 825 F. App'x 440, 441 (9th Cir. 2020) (vacating 1/30/19 Order and remanding). Plaintiffs seek review of Premera's denial of benefits under a group health benefits plan ("the Plan"), which is governed by the Employment Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* (*See* Am. Compl. ¶¶ 2, 9.) The court has considered the motions, all submissions filed in support of and in opposition to the motions, the relevant portions of the record, and the applicable law. Being fully advised,[4] the court DENIES Plaintiffs' motion for judgment and GRANTS Premera's motion for judgment.

\\

\\

---

[2] The court granted the parties' stipulated motion to file briefs that combined their opposition and reply briefs into one brief. (*See* 5/5/21 Ord. (Dkt. # 107).)

[3] Inexplicably, Premera filed a motion for summary judgment despite the court's January 30, 2019 order construing the parties' prior motions for summary judgment as trial memoranda pursuant to Rule 52(a) (*see* 1/30/19 Order (Dkt. # 50) at 2-6), and despite stipulating with Plaintiffs to file Rule 52 motions for judgment (*see* 10/14/20 JSR (Dkt. # 91)). As it did in its prior order, the court construes Premera's motion for summary judgment as a trial memorandum submitted in connection with a bench trial on the administrative record. *See* Fed. R. Civ. P. 52(a); (*see also* 1/30/19 Order at 2-6).

[4] Both parties request oral argument. (*See* Pls.' Mot. at 1; Def.'s Mot. at 1.) The court, however, finds oral argument unnecessary to its disposition of the motions. *See* Local Rules W.D. Wash. LCR 7(b)(4).

## II.     STANDARD OF REVIEW

An ERISA plan that does not contain language conferring discretion upon the plan administrator is subject to a *de novo* standard of review by the district court.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[W]e hold that a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."). Here, the parties have agreed that the proper standard of review is *de novo*.  (*See* 1/30/19 Order at 3.)  Thus, the court accepts the parties' position and reviews the record *de novo*. *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) (stating that the court may accept the parties' stipulation to *de novo* review).

The *de novo* standard requires the court to make findings of fact and weigh the evidence.  *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (stating that *de novo* review applies to the plan administrator's factual findings as well as plan interpretation); (*see also* 1/30/19 Order at 2-6).  On *de novo* review, "[t]he trial court performs an 'independent and thorough inspection' of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits." *Leight v. Union Sec. Ins. Co.*, 189 F. Supp. 3d 1039, 1047 (D. Or. 2016) (quoting *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d

\\

\\

\\

727, 733 (9th Cir. 2006)).  Accordingly, the court issues the following findings of fact

and conclusions of law based on a *de novo* review of the record.[5]

### III.    FINDINGS OF FACT

**A.    The Parties**

1.  Plaintiffs reside in Matanuska-Susitna Borough, Alaska.  (Am. Compl. ¶ 1.)
Todd R. and Suzanne R. are the parents of Lillian R.  (*Id.*)

2.  Todd R. is a participant in the Plan, which is a fully-insured employee welfare
benefits plan under ERISA, and Lillian R. is a beneficiary of the Plan.  (*Id.* ¶¶ 2, 5.)  The
parties agree that the effective date of Plaintiffs' enrollment in the Plan was May 1, 2014.
(Pls. Mot. at 6; Def. Mot. at 3.)

3.  Premera is an insurance company, and Premera admits that it is the claims
administrator for the Plan.  (Def. Mot at 2.)

**B.    The Plan's Terms and Premera's Medical Policy**

4.  The Plan states:  "This plan does not cover services that are not medically
necessary, even if they are court-ordered."  (AR at 011702.)

5.  The Plan defines what is "medically necessary" or a "medical necessity" as:

> Services and supplies that a doctor, exercising prudent clinical judgment,
> would use with a patient to prevent, evaluate, diagnose or treat an illness,
> injury, disease or its symptoms.  These services must:
>
> • Agree with generally accepted standards of medical practice

---

[5] To the extent any findings of fact may be deemed conclusions of law, they shall also be
considered conclusions.  Similarly, to the extent any conclusions as stated may be deemed
findings of fact, they shall also be considered findings.  *See In re Bubble Up Delaware, Inc.*, 684
F.2d 1259, 1262 (9th Cir. 1982).

- Be clinically appropriate in type, frequency, extent, site and duration. They must also be considered effective for the patient's illness, injury or disease

- Not be mostly for the convenience of the patient, doctor, or other health care provider. They do not cost more than another service or series of services that are at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature. This published evidence is recognized by the relevant medical community, physician specialty society recommendations and the views of doctors practicing in relevant clinical areas and any other relevant factors.

(AR at 011722.)

6. The Plan states that "[b]enefits for covered services are subject to . . . [m]edical . . . policies" that "are used to administer the terms of the plan." (*Id.* at 011683.) The Plan specifies that "[m]edical policies are generally used to determine if a member has coverage for a specific procedure or service" and "are based on accepted clinical practice guidelines and industry standards accepted by organizations like the American Medical Association (AMA)." (*Id.*)

7. The Plan covers "[i]npatient (including partial hospitalization), residential treatment . . . to manage or reduce the effects of the mental condition." (*Id.* at 011688.) Premera's criteria for evaluating the medical necessity of residential treatment are set forth in its medical policy, which is entitled: "Residential Acute Behavioral Health Level of Care, Child or Adolescent" (hereinafter, "Medical Policy"). (*See id.* at 007137-40.) Premera licensed its Medical Policy from MCG Health, which develops evidence-based

clinical review guidelines, generally known as the "Milliman Care Guidelines," for use by healthcare and government organizations. (*Id.*; *see also id.* at 007151.)

8. Under the Medical Policy, admission to residential care is appropriate for a child or adolescent where "[a]round the clock behavioral care is necessary" due to the patient's exposure to one or more of the following risk factors: (1) "[i]mminent danger to self"; (2) "[i]mminent danger to others"; (3) "[l]ife-threatening inability to receive adequate care from caretakers"; (4) "[s]evere disability or disorder requiring acute residential intervention"; (5) "[s]evere comorbid substance abuse disorder that must be controlled . . . to achieve stabilization of primary psychiatric disorder"; or (6) "[p]atient has currently stabilized during inpatient treatment stay for severe symptoms or behavior and requires a structured setting with continued around-the-clock behavioral care." (*Id.* at 007137.) The Medical Policy sets forth more detailed criteria concerning the first four of these factors. (*Id.*)

9. The first factor provides:[6]

Imminent danger to self because of **1 or more** of the following:
- Imminent risk for recurrence of Suicide attempt or act of serious self Harm as indicated by **ALL** of the following:
  - Very recent Suicide attempt or deliberate act of serious self Harm
  - Absence of Sufficient relief of the action's precipitants
- Current plan for suicide or serious self Harm
- Command auditory hallucinations for suicide or serious self Harm
- Dangerous behavior risk, persistent Thoughts of suicide or serious Harm to self, or suicide trigger state without formed thoughts, that cannot be adequately monitored at lower level of care . . .

(*Id.* at 007137 (emphasis in original, references to footnotes omitted).)

---

[6] Plaintiffs rely only on the first and fourth factors in arguing that Lillian R. met the Medical Policy's residential care admission criteria. (*See* Pls. Mot. at 18-19; Pls. Resp. at 12.)

10. The fourth factor provides:

Severe disability or disorder requiring acute residential intervention as indicated by **ALL** of the following:
- Severe behavioral health disorder-related symptoms or condition are present as indicated by **1 or more** of the following:
  - Major dysfunction in daily living (eg, family, interpersonal, school functioning)
  - Severe problem with cognition, memory, or judgment
  - Severe symptoms (eg, hallucinations, delusions, other acute psychotic symptoms, mania, severe autistic behaviors)
  - Severe behavior risk (affective dysregulation) characteristics indicated by **1 or more** of the following:
    - Evidence of severely diminished ability to assess consequences of own actions (eg, acts of severe property damage)
    - Frequent extreme external (extreme angry outbursts) or internal (extreme sulking and rumination) anger manifestations
    - High levels of family conflict
- Patient management at highest nonresidential level of care has failed or is not feasible until acute intervention or modification is initiated.

(AR at 007137 (emphasis in original, references to footnotes omitted).)

11. The Medical Policy also provides the following discharge criteria:

Continued residential care is generally needed until **1 or more** of the following:
- Residential care no longer necessary due to adequate patient stabilization or improvement as indicated by **ALL** of the following:
  - Risk status acceptable as indicated by **ALL** of the following:
    - Patient has not recently made a Suicide attempt of act of serious self Harm, or has had Sufficient relief of precipitants of any such action.
    - Absence of Current plan for suicide or serious self Harm for at least 24 hours.
    - Thoughts of suicide, homicide, or serious Harm to self or to another are absent or manageable at available lower level of care.
    - Supports, and patient as appropriate, understand followup treatment and crisis plan.

- Patient and supports are sufficiently available at lower level of care.
- Patient, as appropriate, can participate as needed in monitoring at next level of care.
- Functional status acceptable as indicated by 1 or more of the following:
  - No essential function is significantly impaired
  - An essential function is impaired, but impairment is manageable at available lower level of care.
- Medical needs manageable as indicated by **ALL** of the following:
  - Adverse medication effects absent or manageable at available lower level of care
  - Medical comorbidity absent or manageable at available lower level of care
  - Substance withdrawal absent or manageable at available lower level of care
- Residential care no longer appropriate due to patient progress record or consent as indicated by **1 or more** of the following:
  - Patient deterioration requires higher level of care.
  - Guardian no longer consents to treatment.

(AR 007138 (emphasis in original, references to footnotes omitted).)

**C.     Lillian R.'s Treatment at Elevations**

12.  On December 31, 2013, or January 1, 2014, when Lillian R. was 15 years old, her parents admitted her to residential treatment at Elevations Residential Treatment Center ("Elevations").[7]  (AR 002961.)

13.  Elevations is a "medically comprehensive residential treatment center[]," which provides "a combination of intensive psychiatric treatment and personalized care." (Payton Decl. (Dkt. # 34) ¶ 2, Ex. 1 at 2.)

_____

[7] Previously, Elevations was known as Island View Residential Treatment Center (*see* AR at 000023), but the court refers to this facility as Elevations throughout this order.

1         14. Psychiatric nurse practitioner Chris Paegle, APRN, conducted an initial

2    psychiatric evaluation of Lillian R. upon her admission. (*Id.* at 002956-61 ("Psychiatric

3    Evaluation / Admission Note").[8]) Lillian R.'s initial diagnoses when admitted were

4    post-traumatic stress disorder, major depressive disorder (recurrent, moderate),

5    parent/child relational problem, and academic problem. (*Id.* at 002957.) In addition,

6    Lillian R. was diagnosed with persistent headaches "with unreliable pain control." (*Id.*)

7    The psychiatric evaluation also noted the presence of "[s]ignificant family stressors,

8    including [the] interplay of [a] sibling illness (cancer) with [Lillian R.'s] recurrent

9    headaches, which [we]re improved but not resolved, [a] decline in academic standing,

10   enmeshment with [a] girlfriend and associated gender identity diffusion." (*Id.*) Ms.

11   Paegle noted that the justifications for admission were "Severe Individual Intra-psychic

12   Disorder (mental, emotional and behavioral)" and "Significant Disturbances in

13   Environmental Relationships." (*Id.* at 002956.) The record does not include any further

14   psychiatric evaluation of Lillian R. by Ms. Paegle after this initial assessment. (*See*

15   *generally* AR.)

16        15. Lillian R.'s January 10, 2014, master treatment plan at Elevations identified

17   additional diagnoses of anxiety disorder, eating disorder, identity problem, problems with

18   the primary support group, problems related to the social environment, and educational

19   problems. (AR at 011481.)

20

21

22      [8] The Psychiatric Evaluation / Admission Note appears in the record in reverse page
order. (*See* AR 002956-61.)

16. Dr. Laura B. Brockbank, an examining psychologist, conducted a "comprehensive psychological evaluation" of Lillian R. on February 8, 2014. (*Id.* at 000410-430.) She documented the evaluation in a report dated March 20, 2014. (*See id.*)

17. Lillian R.'s therapist and parents requested the "comprehensive psychological evaluation" to obtain information concerning Lillian R's "cognitive, academic, personality and mental health functioning." (*Id.* at 000411, 000425.) They also requested "[r]ecommendations for educational and treatment planning." (*Id.* at 000411.)

18. In her evaluation, Dr. Brockbank noted that Lillian R. "is beginning to make progress while at [Elevations]." (*Id.* at 000427.) She "strongly recommended that [Lillian R.] complete the program at [Elevations]." (*Id.* at 000427.) She also recommended, given Lillian R.'s "history of running away and suicidal ideation, . . . that [she] be closely monitored." (*Id.* at 000428.) She concluded that "[u]nless some change can occur on the family-system level, it is unlikely that [Lillian R.] will be successful at home." (*Id.* at 000429.) She also opined, however, that "[g]iven continued intervention and therapeutic support, [Lillian R.'s] prognosis for continued improvement is good." (*Id.* at 000411.)

19. The record does not include any further evaluation of Lillian R. by Dr. Brockbank, nor does it include any further comprehensive psychiatric evaluation of Lillian R. conducted during her treatment at Elevations. (*See generally* AR.)

20. During her stay at Elevations, Lillian R. received individual therapy and met regularly with a psychiatrist. (*See id.* at 002961 (Psychiatric Evaluation / Admission

Note, stating that Lillian R. was assigned to Phyllis Tronrud, CMHC, for therapy and to Dr. Kirk Simon for psychiatric care).)

21. Lillian R.'s records from Elevations document a period during which she experienced thoughts or urges of suicide or self-harm. On June 12, 2014, the notes indicate that staff checked on Lillian R. to see if she still had thoughts of self-harm. (*See id.* at 011750.) Lillian R. stated that she was unsure and promised to tell staff if she did have such thoughts. (*Id.*) On June 13, 2014, Lillian R. stated that she could manage herself. (*Id.*) On June 15, 2014, Lillian R. stated that she had an urge to self-harm. (*Id.*) Notes on June 16, 2014, state that Lillian R. "was placed on self harm [sic] precautions for self harm [sic] ideation," that she "felt a strong desire to cut" like she used to, and that she "could not make a commitment for safety and did not feel confident that [she] could go to staff before harming [her]self." (*Id.* at 000036.) In addition, her "suicidal thoughts continued." (*Id.*) On June 17, 2014, Elevations took Lillian R. off self-harm precautions. (*See id.* at 011750.) On June 19 and 20, 2014, Lillian R. stated that she still had thoughts of self-harm. (*Id.*) On June 23, 2014, Lillian R. said that she had thoughts of self-harm but would not act on them. (*Id.*)

22. Lillian R. was treated at Elevations until June 21, 2015, when she was discharged. (*Id.* at 009258.)

**D.    Plaintiff's Claim for Lillian R.'s Treatment and Premera's Denial**

23. Plaintiffs seek reimbursement from the Plan for the residential treatment that Lillian R. received at Elevations after April 30, 2014. (Am. Compl. ¶ 31; *see* AR at 000049 (November 18, 2014 denial letter).)

24. Plaintiffs submitted claims to Premera for Lillian R.'s residential treatment at Elevations for the period beginning on May 1, 2014, until the end of her stay. (*See* Am. Compl. ¶ 31.) Although Lillian R. was admitted to Elevations on December 31, 2013, or January 1, 2014, Plaintiffs' claim applies only to Lillian R.'s treatment at Elevations after April 30, 2014, because May 1, 2014, is the effective date of the Plan. (AR at 000005.) Lillian R. was covered by a different health plan prior to May 1, 2014, and that plan is not a subject of this dispute. (*See id.*)

25. On November 18, 2014, Premera denied Plaintiffs' claims from May 1, 2014, through August 31, 2014, as untimely submitted and denied the claims from September 1, 2014, forward, as not medically necessary. (AR at 000049-54.)

26. The denial letter was signed by Premera Medical Director Robert H. Small, M.D. Dr. Small advised Plaintiffs that Premera's evaluation of the medical necessity of Lillian R.'s residency at Elevations was based on the Plan, the application of the Millman Care Guidelines for residential care for children or adolescents as set forth in the Medical Policy, and a "review of the information given to us by [Elevations]." (*Id.* at 000050.)

27. The denial letter stated:

> Continued residential care to treat a mental health condition is not medically necessary after 4/30/14. Information from your provider does not show evidence of continued high-risk behavior, immediate threat of high-risk behavior, life-threatening inability to provide self-care or to receive adequate care from caretakers, severe mental health symptoms, or need for a structured setting and continued around-the-clock care to treat a severe mental health condition that partly stabilized during inpatient care. The information from your provider also does not indicate that the most intensive non-residential level of care will still be unable to control your mental health difficulties, or that you need continued treatment for a severe Substance Use Disorder in order to [sic] your mental health disorder. The information from your

provider indicates that you can be treated at a lower level of care. The difficulties that you are still experiencing are usually safely treated at a lower level of care, such as partial hospitalization or outpatient treatment. Your health plan covers only medically necessary services.

(*Id.*)

**E.      Plaintiffs' Level I Appeal of Premera's Denial**

28.  On May 13, 2015, Plaintiffs appealed Premera's denial of coverage through Premera's internal appeal process ("Level I Appeal"). (AR at 000016-47 ("Level I Appeal letter").)

29.  Plaintiffs made three arguments in their Level I Appeal letter. (*See id.*) First, Plaintiffs argued that Premera's Medical Policy did not comport with generally accepted standards of care and was too restrictive. (*Id.* at 000020-22.) Plaintiffs cited to the American Academy of Child and Adolescent Psychiatry ("AACAP") Practice Parameters and other medical literature on the standard of care. (*Id.*) Second, Plaintiffs argued that Lillian R.'s treatment was medically necessary, and they included a detailed chronology of Lillian R.'s behavior, past treatments and medications, as well as Lillian R.'s medical records and Elevations treatment records. (*Id.* at 000022-46.) Third, Plaintiffs asserted that by denying coverage for Lillian R.'s residential treatment, Premera violated the Parity Act[9] by providing a lower level of care for mental health services than for medical services. (*Id.* at 000045-46.)

\\

\\

---

[9] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii). This claim is not at issue in the current motions for judgment. (*See generally* Pls. Mot.; Defs. Mot.)

30.  Plaintiffs' Level I Appeal included a letter from a psychiatrist and a letter from a licensed clinical social worker—both of whom treated Lillian R. prior to her admission at Elevations.  (*Id.* at 000403-05; 000407-08; *see also id.* at 000027-31.)

31.  The first letter was from Dr. Shubu Ghosh, a psychiatrist who treated Lillian R. from February 8, 2011, until July 16, 2013.  (*Id.* at 000403-05.)  During this period, Dr. Ghosh saw Lillian R. on a weekly basis for therapy sessions.  (*Id.*)  Dr. Ghosh also prescribed medications for Lillian R.  (*Id.*)  After Lillian R. stopped seeing Dr. Ghosh, in July 2013, Dr. Ghosh continued to consult with Todd R. and Suzanne R. concerning Lillian R.  (*Id.* at 000404.)  In addition, Dr. Ghosh notes that at some point in 2013, Lillian R.'s parents sought help from Dr. Charles Lester,[10] a "parent coach and psychologist," and saw Dr. Lester weekly.  (*Id.*)

32.  Based on his treatment of Lillian R., Dr. Ghosh concluded that inpatient residential care was the only treatment option for Lillian R.  (*See id.* at 000404-05 (letter in support of Plaintiffs' appeal, stating "[i]t is my opinion that inpatient residential care was the only option for [Lillian R.].  [Lillian R.] needed inpatient residential level of care.").)  He further stated that "[l]evels of care have been tried and failed" and that Lillian R.'s parents "had exhausted all outpatient avenues and [Lillian R.] required intensive treatment to cope with h[er] debilitating depression, anxiety and behavior problems."  (*Id.* at 000404-05.)  Dr. Ghosh noted that, despite treatment, Lillian R.'s "behaviors became more of a concern with cutting behavior, aggression toward parents,

---

[10] The record does not include a letter or psychiatric evaluation of Lillian R. performed by Dr. Lester.  (*See generally* AR.)

withdrawal and isolation from family and peers, failure at school, threats of self-harm[,] and three incidents of running away." (*Id.* at 000404.) Dr. Ghosh "recommended inpatient residential care because [he] was concerned for [Lillian R.'s] safety." (*Id.* at 000405.)

33. The second letter was from Tad Sumner, a licensed clinical social worker who treated Lillian R. from March 20, 2013, through December 27, 2013. (*Id.* at 000407-08; *see also id.* at 000029-31.) Mr. Sumner worked with Lillian R. on her primary diagnoses of oppositional defiant disorder, depressive disorder, and anxiety disorder. (*Id.* at 000408.) During September 2013, Mr. Sumner increased his sessions with Lillian R. to twice per week due to Lillian R.'s "continued oppositional behaviors, depression and trust issues." (*Id.* at 000407.) During the months that Mr. Sumner was treating Lillian R., Lillian R. ran away from home twice, "became assaultive with [her] mother," and "began self injurious behaviors." (*Id.* at 000407-08.) At the beginning of December 2013, Mr. Sumner did not believe that "there was any more that could be done [for Lillian R.] in an out patient basis." (*Id.* at 000408.) In a meeting with Lillian R.'s parents, Mr. Sumner and Dr. Lester recommended that Lillian R.'s parents place Lillian R. in residential treatment. (*Id.*)

34. Neither Dr. Ghosh nor Mr. Sumner treated Lillian R. during her inpatient residential treatment at Elevations. (*See id.* at 000403-08.) Neither Dr. Ghosh nor Mr. Sumner made any assessment of Lillian R. while she was at Elevations. (*See id.*) Neither Dr. Ghosh nor Mr. Sumner state that they reviewed any records of Lillian R.'s treatment at Elevations. (*See id.*)

35. Plaintiffs also highlighted Dr. Brockbank's February 8, 2014 evaluation in their Level I Appeal letter. (*Id.* at 000031-32.) As noted above, Dr. Brockbank "strongly recommended that [Lillian R.] complete the program at [Elevations]" and stated that "[g]iven [Lillian R.'s] history of running away and suicidal ideation, it is recommended that [s]he is closely monitored." (*Id.*; *see also id.* at 000427.)

36. Plaintiffs also included excerpts of progress and therapy notes from Lillian R.'s time at Elevations in their Level I Appeal letter. (*Id.* at 000033-45.) These notes describe Lillian R.'s temperament on various occasions as "upset," "discouraged at how far away [she] is from [her] ideal self," "anxious," "irritable," "isolating," and "depressed." (*See id.*) Plaintiffs included excerpts of notes from the June 2014 incident during which Elevations briefly placed Lillian R. on self-harm precautions after she reported an urge to self-harm. (*Id.* at 000035-36.)

37. Based on the letters and progress and therapy notes, Plaintiffs argued that Lillian R. "continue[d] to need [a residential] level of care in order to complete [her] master treatment plan goals so that [she could] be successfully treated at a lower level of care." (*Id.* at 000045.) Although Plaintiffs maintained that if Lillian R. had been discharged on May 1, 2014, when the Plan became effective, she "would have quickly regressed into [her] prior behaviors," they did not cite any medical record or opinion in support of that assertion. (*Id.*)

38. As a part of Plaintiffs' Level I Appeal, Premera asked an "Independent Physician Reviewer" to review its decision to deny coverage. (*See id.* at 000204-09.) Dr. William Holmes, MD, who is board certified by the American Board of Psychiatry and

Neurology in Child and Adolescent Psychiatry (*id.* at 000207), reviewed Plaintiffs' Level I Appeal submissions and other relevant claim information, including the Master Treatment Plan, treatment notes and shift logs from Elevations, the Plan language, and Premera's Medical Policy (*id.* at 000204). Dr. Holmes referred to the Millman Care Guidelines, the AACAP Practice Parameter for the Assessment and Treatment of Children and Adolescents with Postraumatic Stress Disorder, and the AACAP Principles of Care for the Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Center as support for his decision. (*Id.* at 000207.)

39. Dr. Holmes concluded that "the service provided, mental health residential treatment center stay from 5/1/14 to 4/30/15, was not medically necessary based on the provided medical policy and plan language." (*Id.* at 000205.) Specifically, he stated:

> The service provided was not medically necessary based on the provided medical [sic]. There was no medical necessity for residential treatment center level of care for dated [sic] of service 5/1/14 forward. By 5/1/14, there was no evidence of symptom severity that would require the ongoing intensity of the residential treatment center level of care. It was noted that the patient continued to display chronic difficulties with mood, anxiety, oppositional behavior, and interpersonal conflict after 5/1/14. However, these difficulties are of a chronic nature for the patient and were not of a severity to warrant 24 hour [sic] treatment. It was noted that on occasion the patient voiced thoughts of self-harm. However, at no time was there evidence of imminent risk of harm to self or others, as well as no episodes of self-harming behavior. There was also no evidence of deterioration of functioning that would require the level of intensive treatment found in the residential center setting.

(*Id.*)

40. Premera denied Plaintiffs' Level I Appeal on June 16, 2015. (*Id.* at 002410-13 (Level I Appeal decision).) Premera affirmed its prior decision that

residential treatment for Lillian R. was not medically necessary after April 30, 2014. (*Id.* at 002410.) Specifically, Premera stated:

> By May 1, 2014, [Lillian R.'s] symptoms were not of a severity that would warrant the continued use of a residential treatment center level of care, though [s]he continued to display chronic problems related to h[er] mood and feelings of being "overwhelmed." However, these symptoms could have been treated in a less restrictive level of care. Therefore, your appeal is being upheld in accordance to the terms of the health plan, as the mental health residential treatment center stay from May 1, 2014, through April 30, 2015, was not medically necessary.

(*Id.*)

41. In its June 16, 2015 denial letter, Premera also responded to Plaintiffs' assertion that Premera's use of the Milliman Care Guidelines in its Medical Policy was improper. (*See id.*) Premera stated it was not aware of "credible scientific evidence" that the AACAP Practice Parameters—preferred by Plaintiffs—would be more appropriate than the Milliman Care Guidelines, and Premera asserted that it had "acted in accordance with [P]lan requirements and used evidence-based standards for evaluating the medical necessity of [Plaintiffs'] claims." (*Id.* at 002410-11.)

42. Finally, Premera denied that it had violated the Parity Act. (*Id.* at 002411.)

**F.     Plaintiffs' Level II Appeal**

43. On August 10, 2015, Plaintiffs requested a Level II Appeal of Premera's denial of coverage. (*See id.* at 002428-33 ("Level II Appeal letter").) In addition to the medical records provided in their Level I Appeal, Plaintiffs provided the remainder of Lillian R.'s medical records from Elevations. (*See id.* at 002431.)

44. In their Level II Appeal letter, Plaintiffs argued that Premera failed to advise them of the weight given to the letters of medical necessity from Lillian R.'s prior treating providers and requested references to the medical records that led to Premera's conclusion that Lillian R.'s treatment was not medically necessary. (*Id.* at 002430.) They questioned whether Premera's Level I Appeal decision was based on a "continued stay criteria" or a "discharge criteria." (*Id.* at 002431.) They criticized the alleged burden imposed by the Medical Policy, which they again asserted violated the federal Parity Act, and provided additional records from Lillian R.'s stay at Elevations to support their contention that residential treatment for Lillian R. was medically necessary. (*Id.* at 002431-33.) They asked Premera to cite specific examples in the medical records that supported Premera's denial of Lillian R.'s claim, which they asserted was required under ERISA. (*Id.* at 002433.) Finally, they challenged Premera's determination that certain portions of Lillian R.'s claims were not timely submitted. (*Id.* at 2429-30.)

45. To review Plaintiffs' Level II Appeal and Lillian R.'s file, Premera assigned a panel consisting of (1) a physician, who is a medical director and board certified in internal medicine; (2) a Member Contracts Operations Manager; and (3) a New Group and Product Implementation Manager. (*See id.* at 007151.) The panel reviewed all of the materials that Plaintiffs submitted with both their Level I and Level II Appeals, Dr. Holmes's findings as the Independent Physician Reviewer, Premera's Medical Policy, Lillian R.'s medical records, and the Plan language. (*Id.*)

46. On September 10, 2015, the Level II Appeal panel upheld Premera's Level I Appeal determination denying coverage. (*See id.* at 007151-54 ("Level II Denial

letter").) The Level II Appeal panel, however, acknowledged that all of Plaintiffs' claims were timely submitted and agreed to review the claims Premera had previously determined to be untimely. (*Id.* at 007152.)

47. Addressing the medical records, the Level II Appeal panel stated that the records "did not include a comprehensive evaluation, but only a narrative of daily group assessments, or intermittent doctor interviews." (*Id.*) According to the panel, the records "indicated the absence of a plan for self harm [sic], or to harm others, and no evidence of severe symptoms which could not have been treated in an intensive outpatient management program." (*Id.*) The panel explained that "[i]n general, the purpose of residential treatment admission is stabilization in the context of a short term stay, followed by transfer to a less restrictive level of care or to appropriate placement, if sufficient stabilization is not achieved during a short term stay." It concluded, "based on a review of all the records, that "the severity of illness for the [residential treatment] level of care [is] not documented in the clinical notes from the facility." (*Id.*)

48. In response to Plaintiffs' request for specific references in the medical records that supported Premera's belief that Lillian R.'s treatment was not medically necessary, the panel explained that Premera's determination was "based on an absence of record of severe symptoms which could not have been treated in an intensive outpatient management program." (*Id.*)

49. The panel noted Plaintiffs' request that Premera apply or consider the AACAP Practice Parameters, but explained that the Milliman Care Guidelines "are generally accepted standards of medical practice" that comply with the plan's language requiring

that medical necessity determinations be made based on "generally accepted standards of medical practice. (*Id.*) It further stated that "Premera's medical policies are applied consistently for all plan members" and that it that it could not "accommodate a member request to apply a different medical policy for a specific claim." (*Id.*)

50. Finally, The Level II Appeal panel again rejected Plaintiffs' argument that its denial of benefits violated the Parity Act. (*Id.*)

**G.   Plaintiffs' Request for an Independent Review**

51. After a member exhausts Premera's internal appeals, the Plan offers an option to submit the case to an Independent Review Organization ("IRO") for a binding coverage decision. (*Id.* at 007153.)

52. On December 18, 2015, Plaintiffs requested an independent review of Premera's decision. (*Id.* at 007170-71.) MCMC, LLC ("MCMC") conducted the independent review. (*See id.* at 011745-52 ("IRO Response").) The physician reviewer from MCMC, who is anonymous, is board-certified in psychiatry with a sub-certification in child and adolescent psychiatry. (*Id.* at 011747.) The physician reviewer is also an attending staff physician at several Northwest hospitals, as well as a clinical instructor. (*Id.*) The physician reviewer is an author of peer-reviewed medical literature, a member of the AACAP, the American Psychoanalytic Association, and the Academy of Occupational and Organizational Psychiatrists. (*Id.*)

53. On January 14, 2016, MCMC upheld Premera's denial of coverage for Lillian R.'s residential treatment. (*See* IRO Response; *see also* AR at 011756.) MCMC's independent physician reviewer concluded that a residential treatment center was not

medically necessary from May 1, 2014, through June 21, 2015. (AR at 011746

(summary of determination), 011748-52 (physician review letter).)

54. In the clinical summary portion of MCMC's report, the independent physician

reviewer stated that, in the months following May 2014, with certain stated exceptions,

"in general, [Lillian R.] ha[d] no significant behavioral difficulty and denie[d] self harm

[sic] urges." (*Id.* at 011750; *see also id.* at 011748-50.) The independent physician

reviewer then specifically noted the particular instances in June 2014 during which

Lillian R. expressed thoughts of or urges to self-harm. (*Id.* at 011750.)

55. In concluding that residential treatment was not medically necessary between

May 1, 2014, and June 21, 2015, the physician reviewer wrote,

> The patient during the time period in question was treated in the residential program but also had periods of time of going on pass at home, during which times [she] was not receiving residential treatment and [her] clinical course continued. There are alternative therapies and approaches that would have been as likely to be effective during the period of time, including comprehensive outpatient treatment with a therapeutic school placement, mental health individual treatment and group treatment, medication management and probate court involvement to strengthen parental authority. As the patient was not receiving residential treatment during the entirety of [her] time period [sic] during the dates in question, and since there are less intensive alternative approaches that would have as much of a chance of improving [her] condition as the treatment that [she] was receiving at Elevations, withholding treatment would not have reasonably been expected to affect the patient's health adversely.

(*Id.* at 011751.)

## H. Procedural Background

56. Plaintiffs filed this action on April 28, 2017. (*See* Compl. (Dkt. # 2).)

\\

57.   The parties filed cross-motions for summary judgment in September 2018. (*See* Pls. MSJ (Dkt. # 37); Def. MSJ (Dkt. # 33).)  On January 30, 2019, the court construed the cross-motions as motions for judgment pursuant to Federal Rule of Civil Procedure 52 (*see* 1/30/19 Order at 3-6) and ruled in favor of Plaintiffs based on the sixth medical necessity factor in Premera's Medical Policy, which covers care when a "[p]atient has currently stabilized during inpatient treatment stay for severe symptoms or behavior and requires a structured setting with continued around-the-clock behavioral care" (*id.* at COL ¶¶ 11-12).

58.   On February 12, 2019, Premera moved for reconsideration.  (MFR (Dkt. # 52).)  On April 30, 2019, the court denied Premera's motion.  (4/30/19 Order (Dkt. # 77).)

59.   Premera appealed (Not. of Appeal (Dkt. # 81)), and the Ninth Circuit vacated the court's ruling and remanded, *see Todd R.*, 825 F. App'x at 441.  The Ninth Circuit found that the court's conclusion that the sixth factor was met was clearly erroneous.  *Id.* The Ninth Circuit stated that "there was no evidence to suggest" that Dr. Brockbank's recommendation that Lillian R. complete the program at Elevations "was aligned with any medical necessity standard" and that the recommendation "significantly departs from the Medical Policy."  *Id.*  The Ninth Circuit concluded that Dr. Brockbank's recommendation, Lillian R.'s prior history of running away from home and suicidal ideation, and Lillian R.'s June 2014 report of an urge to self-harm and placement for one day on self-harm precautions did not, when "viewed in light of the full record, . . . meet

1  Plaintiffs' burden to show Lillian's medical need for around-the-clock monitoring and

2  confinement from May 2014 to June 2015." *Id.*

3      60.  The Ninth Circuit further found that this court had *sua sponte* developed the

4  theory regarding the Medical Policy's sixth factor.  *Id.* ("At no point below had Plaintiffs

5  argued, or even so much as hinted, . . . that any Medical Policy factors had been

6  satisfied.") (internal quotation marks omitted).  The Ninth Circuit cited the principle of

7  party presentation and, "[o]ut of a concern for fairness," remanded for this court to

8  resolve "the party-presented controversy."  *Id.* at 442 (citing *United States v.*

9  *Sineneng-Smith*, --- U.S. ---, 140 S. Ct. 1575, 1581-82 (2020)).

10      61.  After remand, the parties expressed their intent to file cross-motions for

11  judgment under Federal Rule of Civil Procedure 52.  (10/14/20 JSR at 1.)  The court

12  granted the parties' request to set the deadline for their cross-motions on April 21, 2021.

13  (10/16/20 Order (Dkt. # 92).)

14      62.  On February 1, 2021, the court granted in part and denied in part Plaintiffs'

15  motion to amend their complaint.  (2/1/21 Order (Dkt. # 99).)  The court granted

16  Plaintiffs leave to amend their complaint to clarify Lillian R.'s name and pronouns, but

17  denied Plaintiffs' request to amend their complaint to include the theory undergirding the

18  court's vacated order.  (*See id.*)

19  ## IV.  CONCLUSIONS OF LAW

20      Consistent with the Ninth Circuit's remand for the court to resolve the

21  party-presented controversy, Plaintiffs renew the arguments they raised in their motion

22  for summary judgment that the court did not address in its prior order.  They argue that

(1) Lillian R.'s treating providers' recommendations that she receive residential treatment met "generally accepted standards of medical practice" and thus met the Plan's definition of medical necessity (*see* Pls. Mot. at 10-17; Pls. MSJ at 15-16; 22-24); (2) Premera's reviewers failed to properly apply and analyze the fourth prong of the medical necessity criteria set forth in Premera's Medical Policy (*see* Pls. Mot. at 17-19; Pls. MSJ at 16); and (3) Lillian R. had not met the criteria for discharge from residential treatment when Premera denied her benefits (*see* Pls. Mot. at 19-22; Pls. MSJ at 4-5). Premera contends that (1) the Ninth Circuit's order is dispositive of the case (Def. Mot. at 14-16); and (2) its decision to deny benefits was correct because the record establishes that Lillian R.'s stay at Elevations was not medically necessary under the terms of the Plan and Medical Policy (Def. Mot. at 16-24*; see also* Def. MSJ at 12-17). Below, the court addresses (1) its jurisdiction and the standard of review, (2) Premera's argument regarding the Ninth Circuit's order, (3) Plaintiffs' argument regarding the applicable medical necessity criteria, and (4) whether Plaintiffs have met their burden to prove that Lillian R.'s residential treatment met the medical necessity criteria set forth in the Medical Policy.

**A.      Jurisdiction**

        1. The court has jurisdiction over this case under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

**B.      Standards under ERISA**

        2. ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits

under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.").  The court finds that Todd R. is a qualified participant and Lillian R. is a beneficiary of the Plan.

3.  As discussed above, ERISA does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations.  *Firestone*, 489 U.S. at 109.  The parties, however, have agreed that *de novo* review is appropriate here.  (*See* 1/30/19 Order at 3.)  The court accepts the parties' stipulation and reviews the record *de novo*.  *See Rorabaugh*, 321 F. App'x. at 709.

4.  "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established" his or her claim "under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010); *see also Perryman v. Provident Life & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 942 (D. Ariz. 2010) (stating that the administrator's "evaluation of the evidence is not accorded any deference or presumption of correctness").  In reviewing the administrative record and other admissible evidence, the court "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014) (quoting *Schramm v. CNA Fin. Corp. Insured Grp. Benefits Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)).

5.  When a district court "reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294; *see also Schramm*, 718 F. Supp. 2d at 1162 ("In an ERISA case involving *de novo* review, the plaintiff has the burden of showing entitlement to benefits."); *Horton v. Reliance Standard Life Ins. Co*., 141 F.3d 1038, 1040 (11th Cir. 1998) (the claimant "bears the burden of proving his entitlement to contractual benefits").

6.  "Under de novo review, the rules ordinarily associated with the interpretation of insurance policies apply." *Leight*, 189 F. Supp. 3d at 1047 (citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997)).  Accordingly, the court construes any ambiguities in the Plan against Premera and is required "to adopt [a] reasonable interpretation advanced by [the insured]." *See Lang*, 125 F.3d at 799.

## C.    The Impact of the Ninth Circuit's Decision

7.  Premera contends that the Ninth Circuit's decision vacating the court's prior order and remanding for consideration of the party-presented controversy is dispositive of this action. (Def. Mot. at 14-16.)  It argues that the Ninth Circuit has already determined that the record in this case does not support a finding that Lillian R.'s stay at Elevations was medically necessary. (*Id.* at 14 (citing *Todd R.*, 825 F. App'x at 442).)  Plaintiffs counter that the Ninth Circuit's decision is much more narrow, and that it forecloses only a finding of medical necessity based solely on Dr. Brockbank's evaluation and Lillian R.'s history of suicidal ideation and running away. (*See* Pls. Resp. at 7-10.)

8. The court agrees with Plaintiffs that Premera reads *Todd R.* too broadly. The Ninth Circuit stated that Premera had challenged the court's finding "that the sixth [medical necessity] provision applied to Lillian R.'s circumstances," and held:

> The district court found support for Dr. Brockbank's recommendation [that Lillian R. complete the program at Elevations] because of Lillian's prior "history of running away and suicidal ideation" and because in June 2014, Lillian reported an urge to self-harm and Elevations staff briefly (for one day) placed her on self-harm precautions. Viewed in light of the full record, however, *that evidence* did not meet Plaintiffs' burden to show Lillian's need for around-the-clock monitoring and confinement from May 2014 to June 2015.

*Todd R.*, 825 F. App'x at 442 (emphasis added). The court understands the Ninth Circuit's order to state only that the listed evidence—Dr. Brockbank's letter, Lillian R.'s prior history of running away and suicidal ideation, and Lillian R.'s June 2014 urge to self-harm and brief placement on self-harm precautions—was insufficient to satisfy Plaintiffs' burden to prove that they met the Policy's sixth medical necessity factor: that the patient "has currently stabilized during inpatient treatment stay for severe symptoms or behavior and requires a structured setting with around-the-clock behavioral care." *See id.*

9. The court concludes that the Ninth Circuit's order is not dispositive of this case because it does not foreclose Plaintiffs from attempting to show that Lillian R.'s residential treatment was medically necessary under any of the other medical necessity factors. Therefore, the court proceeds to consider the party-presented controversy.

\\

\\

**D.    The Plan's Medical Necessity Criteria**

10.    Plaintiffs urge the court to find that Premera's Medical Policy "did not comport with generally accepted standards of care and was too restrictive in comparison to medical literature on the standard of care," and that Premera's denial of benefits violated the "standards that reflect generally accepted practices for mental health treatment of adolescents in a residential setting" set forth in *Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2020 WL 6479273, at *48-*49 (N.D. Cal. Nov. 3, 2020). (*See* Pls. Mot. at 11, 12-15.)  They contend that Lillian R.'s treating providers' opinions met these standards when they recommended that Lillian R. receive and continue residential treatment.  (Pls. Mot. at 12.)  Premera counters that its Medical Policy, which incorporates the Milliman Care Guidelines for evaluating the medical necessity of residential treatment for children and adolescents, meets generally accepted standards of care.  (Def. Resp. at 18-20.)

11.    The court agrees with Premera that its use of the Milliman Care Guidelines to evaluate medical necessity comports with generally accepted standards of care.  As Premera points out, numerous courts and commentators have identified the Milliman Care Guidelines as "nationally recognized" and "widely used."  *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017) (noting that the Milliman Care Guidelines "were written and reviewed by over 100 doctors and reference 15,000 medical sources" and are used by about 1,000 hospitals nationwide); (*see also* Def. Resp. at 19 (citing cases).)  Plaintiffs, meanwhile, make no argument that the Milliman Care Guidelines fail to meet generally accepted standards of care, nor do they

1  point to any evidence, case law, or medical literature that places the Millman Care

2  Guidelines into question.  (*See generally* Pls. Mot., Pls. Resp.)

3  　　12.  Therefore, the court declines Plaintiffs' invitation to substitute the standards

4  set forth in *Wit* for the Millman Care Guidelines incorporated into Premera's Medical

5  Policy.

6  **E.  Plaintiffs' Entitlement to Benefits**

7  　　13.  In deciding whether the Plan provides coverage for Lillian R.'s inpatient

8  residential treatment at Elevations, the court begins with the Plan's language.  The Plan

9  states that it covers "inpatient [and] residential treatment . . . to manage or reduce the

10  effects of a mental condition."  (*See supra* § III ("FOF") ¶ 7.)  However, the Plan

11  excludes services that are not "medically necessary."  (*See* FOF ¶¶ 4-5.)  Thus, the issue

12  that the court must decide is whether Plaintiffs have met their burden of proving that

13  Lillian R.'s treatment at Elevations from May 1, 2014, through June 21, 2015, was

14  "medically necessary" and therefore not excluded from coverage under the Plan.

15  　　14.  Premera's criteria for evaluating the "medical necessity" of residential

16  treatment are set forth in its Medical Policy, which in turn is based on the Milliman Care

17  Guidelines.  (*See* FOF ¶¶ 5, 7.)

18  　　15.  Plaintiffs argue that Lillian R.'s residential treatment was medically necessary

19  under the fourth and first medical necessity factors listed in the Medical Policy.  (*See* Pls.

20  Mot. at 18-19; Pls. Resp. at 12-13.)  They further argue that Lillian R. was entitled to

21  continued care under the Medical Policy's criteria for discharging a child or adolescent

22

from residential care.  (*See* Pls. Mot. at 19-22.)  The court considers each argument in turn.

The Fourth Medical Necessity Factor

16.  Plaintiffs argue that the record establishes medical necessity under the fourth Medical Policy factor, which requires a finding that Lillian R. suffered from a "[s]evere disability or disorder requiring acute residential intervention" based on a list of required conditions and that "[p]atient management at highest nonresidential level of care has failed or is not feasible until acute intervention or modification is initiated.  (*See* Pls. Mot. at 18-19; *see also* FOF ¶ 10.)

17.    Indications of a "severe disability or disorder" include the existence of "severe behavioral health disorder-related symptoms or condition" as indicated by one or more of:  (1) "major dysfunction in daily living;" (2) "severe problem with cognition, memory, or judgment;" (3) "severe symptoms" including "hallucinations, delusions, other acute psychotic symptoms, mania, [or] severe autistic behaviors;" or (4) "severe behavior risk"  as indicated by "evidence of severely diminished consequences of own actions," "frequent extreme external  . . . or internal . . . anger manifestations," or "high levels of family conflict."  (*See id.*)

18.  Plaintiffs contend that the following evidence, when considered in the context of the record as a whole, establishes that Lillian R. had a "major dysfunction in daily living" or "severe behavior risk" as required to demonstrate the medical necessity of Lillian R's residential treatment between May 2014 and June 2015:

a.     Five treating providers (Dr. Ghosh, Mr. Sumner, Dr. Lester, Dr. Brockbank, and Ms. Paegle) recommended residential treatment for Lillian R. (*See* Pls. Mot. at 11; *see also* FOF ¶¶ 14, 16-18, 31-33.)  Dr. Ghosh and Mr. Sumner believed that lower levels of care had failed and would continue to fail. (*See* Pls. Mot. at 18; *see also* FOF ¶¶ 32-33.)

b.     By December 2013, Lillian R.'s behavior became "out of control" – she ran away several times, refused to take medications, was unable to return to school because of poor academic performance, and ran from Suzanne R.'s car at an intersection and spent four days at a covenant house.  (Pls. Mot. at 18; *see also* FOF ¶ 32.)

c.     Elevations assigned Lillian R. to treatment by a therapist and psychiatrist.  (Pls. Mot. at 11; *see also* FOF ¶ 20.)

d.     In her February 8, 2014 psychiatric evaluation of Lillian R., Dr. Brockbank identified the existence of family conflict as a "major factor" in Lillian R.'s potential success.  (Pls. Mot. at 18; *see also* FOF ¶ 18.)

e.     Lillian R.'s Elevations records document multiple times when Lillian R. experienced elevated depression, anxiety, self-harming thoughts; as well as difficulties with the parent-child relationship and meeting treatment goals.  (Pls. Mot. at 15 (citing AR 000096, 000102, 010673, 010596, 010590, 009902); *see also* FOF ¶¶ 21, 36-37.)

f.     Lillian R. experienced urges of self-harm and suicidal ideation in June 2014.  (*See* Pls. Mot. at 11; *see also* FOF ¶ 21.)

19. The court concludes that Plaintiffs have not met their burden to show that Lillian R.'s treatment at Elevations from May 1, 2014, through June 21, 2015, was "medically necessary" under the fourth medical necessity prong.

20. First, although it is true that Dr. Ghosh and Mr. Sumner recommended residential treatment for Lillian R. in 2013, neither evaluated whether Lillian R. continued to require residential care during her stay at Elevations. (*See* FOF ¶¶ 31-34.) Dr. Ghosh last saw Lillian R. in July 2013, and Mr. Sumner last saw her in December 2013. (*See* FOF ¶¶ 31, 33.) Neither appear to have reviewed any records of Lillian R.'s treatment at Elevations. (*See* FOF ¶ 34.) Because Dr. Ghosh's and Mr. Sumner's opinions are based solely on their treatment of Lillian R. in 2013, the court does not place high weight on their opinions regarding Lillian R's need for residential care between May 1, 2014 and June 21, 2015.

21. Second, while Plaintiffs assert that Dr. Lester also recommended residential care for Lillian R. in late 2013, the record does not contain any opinion or evaluation drafted by Dr. Lester himself. (*See* FOF ¶ 31 n.10.) The court therefore does not place high weight on Dr. Lester's 2013 recommendation.

22. Third, the opinions of Ms. Paegle and Dr. Brockbank, although closer in temporal proximity to May 2014, also do not reflect Lillian R.'s need for residential treatment between May 2014 and June 2015. (*See* FOF ¶¶ 14, 16-19.) Although it is true that Dr. Brockbank stated that Lillian R. was "unlikely" to be successful at home absent "change . . . on the family-system level" (*see* FOF ¶ 18), her February 2014 evaluation

does not shed light on whether Lillian R. demonstrated a "severe behavior risk" as indicated by "high levels of family conflict" after May 2014.

23.  Plaintiffs cite *Gallegos v. Prudential Ins. Co. of Am.*, No. 16-cv-01268-BLF, 2017 WL 2418008, at * 9 (N.D. Cal. June 5, 2017), for the proposition that the court must give greater weight to Lillian R.'s treating physicians' opinions.  In that case, however, the treating physicians continued to treat Ms. Gallegos during the period at issue and submitted updated medical records, a functional capacity evaluation, and a vocational report to demonstrate her continued disability after the denial of benefits.  *See id.* at *5-*6, *9-*10.  In contrast, the record before this court does not contain any records indicating that Dr. Ghosh, Mr. Sumner, Dr. Lester, Dr. Brockbank, or Ms. Paegle evaluated Lillian R.'s medical need for residential treatment between May 2014 and June 2015.  (*See* FOF ¶¶ 14, 19, 31-34.)

24.  Fourth, records of Lillian R.'s December 2013 conduct—such as running away, refusing to take medications, and performing poorly in in school—are too far attenuated from Lillian R.'s conduct after her admission to Elevations to be indicative of whether Lillian R. continued to demonstrate a "major dysfunction in daily living" or "severe behavior risk" that would require residential treatment between May 2014 and June 2015.

25.  Fifth, Plaintiffs' cited records do not support a finding of "[s]evere disability or disorder requiring acute residential intervention" under the fourth medical necessity factor.  (*See* Pls. Mot. at 15 (citing AR 000096, 000102, 010673, 010596, 010590, 009902).)  None appear to indicate "major dysfunction in daily living," "severe

problem[s] with cognition, memory, or judgment," "severe symptoms" including "hallucinations, delusions, other acute psychotic symptoms, mania, [or] severe autistic behaviors," or "severe behavior risk." Indeed, a number of the cited records contradict such a finding. (*See, e.g.*, AR 010596 (9/15/14 psychiatric progress note, indicating that although Lillian R. reported "frustration," she took feedback well and was cooperative; her "form of thought was linear and goal directed;" and she "denies thoughts of hurting [herself] or hurting others); AR 010590 (9/17/14 psychiatric progress note, indicating that although Lillian R.'s stated mood was "anxious," she showed continued "improvement with [her] ability to handle the situational and development stressors that [she] faces"); AR 010001 (2/24/15 therapy note, discussing Lillian R.'s upcoming leave of absence for a home visit); AR 009902 (3/24/15 psychiatric progress note, stating that Lillian R. "generally reported doing well and minimized any acute concerns" and noting "no issues to report" aside from "difficulty with managing insight, splitting, and manipulative behavior").

26. Finally, although the court finds the June 2014 incident in which Lillian R. reported urges to self-harm and was placed on one day of self-harm precautions troubling (*see* FOF ¶ 21), it cannot find that this incident, considered in the context of the entire record, supports a finding that Lillian R.'s residential treatment was medically necessary for the sixteen-month period between May 1, 2014, and June 21, 2015.

27. For the foregoing reasons, the court concludes that Plaintiffs have not met their burden to prove that Lillian R. was entitled to coverage for residential treatment

between May 1, 2014, and June 21, 2015 under the Medical Policy's fourth medical necessity factor.

The First Medical Necessity Factor

28. Plaintiffs address the first medical necessity factor—which requires a showing of "imminent danger to self"—only in passing. (*See* Pls. Resp. at 12.) They assert that Lillian R. "met the first prong of imminent danger to self" "because of her family and social dysfunction." (*Id.*)

29. The first prong of "imminent danger to self" requires a finding of

[i]mminent risk for recurrence of Suicide attempt to act of serious self Harm as indicated by **ALL** of the following:
- Very recent Suicide attempt or deliberate act of serious self Harm
- Absence of Sufficient relief of the action's precipitants

(*See* FOF ¶ 9.) Plaintiffs, however, identify nothing in the record that indicates that Lillian R. attempted suicide or engaged in serious self-harm during her stay at Elevations (*see* Pls. Resp. at 12) and the court found no such evidence in its own review of the record. The court concludes that Plaintiffs have not met their burden to prove their entitlement to benefits under the first medical necessity factor between May 2014 and June 2014.

Discharge Criteria

30. Finally, Plaintiffs argue that Premera erred by evaluating their claim for benefits based on the Medical Policy's clinical indications for admission to residential care rather than by evaluating whether Lillian R. met the Medical Policy's criteria for discharge from residential treatment. (*See* Pls. Mot. at 19-22; *see also* FOF ¶ 11.)

31. The court need not decide whether Premera erred in failing to evaluate the discharge criteria. Even if the discharge criteria were applied, Plaintiffs fail to meet their burden to prove that Lillian did not meet those criteria.[11]

32. The Medical Policy's discharge criteria indicate that "continued residential care is generally needed until . . . [r]esidential care [is] no longer necessary due to adequate patient stabilization or improvement as indicated by" six required criteria. (*See* FOF ¶ 11.) Plaintiffs contend that Lillian R. failed to meet two of the required criteria between May 2014 and June 2015. (Pls. Mot. at 20-21.)

33. First, Plaintiffs argue that Lillian R. did not meet the discharge criteria requiring that "thoughts of suicide, homicide, or serious Harm to self or to another are absent or manageable at available lower level of care." (*Id.*; *see* FOF ¶ 11) In support of their contention that any thoughts of suicide or self-harm could not be managed at a lower level of care, they point to the letters and evaluations written by Dr. Ghosh, Mr. Sumner, Ms. Paegle, and Dr. Brockbank. (*See* Pls. Mot. at 21.) As the court explained above, however, the providers' opinions were based on evaluations of Lillian R. that took place no later than February 2014. Thus, the letters, without more, do not meet Plaintiffs' burden to prove that Lillian R.'s symptoms could not have been managed at a less-intensive level of care between May 2014 and June 2015.

\\

---

[11] Plaintiffs appear to misunderstand their burden in their discussion of the discharge criteria. (*See* Pls. Mot. at 19-22.) In this ERISA appeal, it is not Premera's burden to prove that all of discharge criteria were met. Rather, it is Plaintiffs' burden to prove that one or more of the discharge criteria were not satisfied. *Muniz*, 623 F.3d at 1294.

34. Second, Plaintiffs contend that Lillian R. did not meet the requirement that she and her "parents understand follow up treatment and crisis plan." (*Id.*; *see* FOF ¶ 11.) Plaintiffs point to evidence that the family "required therapeutic intervention just to make it through an hour long session" in September 2014 and "still needed assistance working on appropriate family roles." (Pls. Mot. at 21 (citing Level II Appeal letter).) They assert that "Lillian's home visits and escalations during family therapy sessions demonstrate that neither Lillian nor her parents were ready for follow-up treatment or [a] crisis plan" and that "[u]ntil Lillian recognized the nature of the risk of suicide, she could not have been able to participate in appropriate monitoring at a lower level of care." (*Id.*) They do not, however, cite any medical opinion or other source to support their assertions about the family's ability to understand Lillian R.'s follow-up treatment and crisis plan. (*See id.*) The court concludes, therefore, that Plaintiffs have not met their burden to prove that Lillian R. was entitled to continued care under the Medical Policy's discharge criteria.

35. In sum, the court concludes that Plaintiffs have not met their burden to show that Lillian R.'s residential treatment at Elevations between May 1, 2014 and June 21, 2015 was medically necessary within the meaning of the Medical Policy. Therefore, the court GRANTS Premera's motion for judgment and DENIES Plaintiffs' motion for judgment.

\\

\\

\\

\\

\\

# IV.   CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court

GRANTS Premera's motion for judgment (Dkt. # 101) and DENIES Plaintiffs' motion

for judgment (Dkt. # 105).

Dated this 12th day of July, 2021.

JAMES L. ROBART
United States District Judge